# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JAMES FRANKLIN RODGERS, | : | |
| | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | No. __3:23-cv-196_____ |
| v. | : | |
| | : | |
| LAUREL R. HARRY, Secretary, | : | |
| Pennsylvania Department of Corrections; | : | |
| KEN HOLLIBAUGH, Superintendent of the | : | |
| State Correctional Institution at Somerset; | : | |
| PETER WEEKS, District Attorney of Blair | : | |
| County, | : | |
| | : | |
| Respondents. | : | |

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. §2254

Respectfully submitted,

KIRK J. HENDERSON
Assistant Federal Public Defender

CELESTE BACCHI
Assistant Federal Public Defender

LISA B. FREELAND
Federal Public Defender

Federal Public Defender Office for the
    Western District of Pennsylvania
1001 Liberty Avenue
Suite 1500
Pittsburgh, Pennsylvania 15222
412-644-6565

Dated:  August 28, 2023

**TABLE OF CONTENTS**

THE PARTIES...........................................................................................................................2

JURISDICTION AND VENUE..............................................................................................2

PROCEDURAL HISTORY......................................................................................................2

FACTUAL HISTORY ..............................................................................................................5

    A   The Evidence Collection and DNA Testing in this Case was Fraught with Issues. ............7

        1   Evidence From Mr. Lascoli's Home ...........................................................................7

        2   Prospect Park – Inept Investigation or Planted Evidence?........................................8

    B   The Remainder of the Commonwealth's Case. .................................................................14

    C   The Defense. .....................................................................................................................15

    D   Jury Verdicts. ...................................................................................................................18

    E   Frankie's Life Before June 1988.......................................................................................18

    F   Mr. Rodgers' Life While in Prison. ..................................................................................23

APPLICABLE LEGAL STANDARDS...................................................................................24

    A.   Review Under 28 U.S.C. §2254........................................................................................24

    B.   Due Process Standards and Trial Rights............................................................................25

    C.   Prosecutorial Misconduct..................................................................................................26

    D.   Brady/Napue Due Process Standards.................................................................................27

    E.   Ineffective Assistance of Counsel......................................................................................29

    F.   Cumulative Constitutional Error........................................................................................31

    G.   Entitlement to an Evidentiary Hearing ..............................................................................32

CONSTITUTIONAL CLAIMS ..............................................................................................35

I     TRIAL COUNSEL'S REPRESENTATION WAS CONSTITUTIONALLY DEFICIENT AND MR. RODGERS WAS PREJUDICED. .............................................35

    A   Introduction.......................................................................................................................35

    B   Relevant Constitutional Law..............................................................................................35

    C   Trial Counsel's Performance was Prejudicially Deficient..................................................37

        1   Counsel's alcohol abuse and marital problems created a conflict that interfered with his duty to zealously represent Mr. Rodgers...................................................................37

        2   Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witnesses.................................................41

(1)    David Houtz. ................................................................................. 41

(2)    Timothy Bowling. .......................................................................... 45

(3)    David Riley. ................................................................................... 48

(4)    Detective Cooper. .......................................................................... 52

3    Trial counsel failed to object to hearsay presented by the Commonwealth. .................. 53

4    Trial counsel failed to object to the admission of irrelevant evidence. ......................... 54

5    Trial counsel failed to object to the prosecutor's misstatement of evidence. ............... 57

6    Trial counsel failed to investigate and defend against the charges. ............................. 58

(1)    Trial counsel was ineffective for stipulating to the chain of custody concerning the blood evidence; a vial of blood had gone missing. ........................................................... 58

(2)    Trial counsel was ineffective for undertaking a truncated investigation that failed to find a crucial witness who would have not invoked her Fifth Amendment right not to incriminate herself. ................................................................................................ 64

7    Trial counsel failed to object to improper prosecutorial closing argument. ................... 67

(1)    Trial counsel did not object when the prosecutor improperly diminished the beyond-a-reasonable-doubt standard. ........................................................................................ 67

(2)    Trial counsel failed to object when the prosecutor urged the jury to make an assessment that required expert testimony. ........................................................................ 68

8.    In the first DNA case in Pennsylvania, trial counsel failed to present an expert at the Frye hearing to show the unreliability of the lab's results. ..................................... 70

9.    Trial counsel was ineffective for failing to secure an expert on shoeprint evidence. .... 75

10.    Trial counsel failed to review the trial exhibits before they went to the jury for deliberations. ................................................................................................................ 79

D    Conclusion. .................................................................................................................. 81

II    THE PROSECUTOR ENGAGED IN MISCONDUCT DURING THE TRIAL. .............. 84

A    Introduction. ................................................................................................................. 84

B    The Constitutional Standard. ....................................................................................... 84

C    Claims of Misconduct. ................................................................................................. 85

1    The Prosecutor Presented Known False Evidence. ...................................................... 85

(1)    David Houtz Committed Perjury. .................................................................. 87

(2)    The Commonwealth Knew or Should Have Known that David Riley's Testimony Was Inaccurate. ............................................................................................................. 91

(3)    Conclusion. ................................................................................................... 92

2    The Commonwealth Misrepresented Evidence to Secure Admission of Exhibit 28. .... 93

3    Closing Argument. ................................................................................................. 95

    (1)    The Prosecution Misrepresented Blood Evidence. .................................................. 95

    (2)    The Prosecution Misrepresented the Evidence Related to Exhibit 28. .................... 96

    (3)    The Prosecutor Improperly Diminished the Beyond-a-Reasonable Doubt Standard. ............................................................................................................96

    (4)    The Prosecutor Urged the Jury to Make an Assessment that Required Expert Testimony. ............................................................................................................ 97

4    The Prosecutor Failed to Review the Trial Exhibits Before They Went to the Jury for Deliberations. ...................................................................................................... 99

D    Cumulative Prejudice. ................................................................................................. 102

E    Conclusion. .................................................................................................................. 103

III    THE SUPERIOR COURT OF PENNSYLVANIA UNREASONABLY DENIED RELIEF ON MR. RODGERS' CLAIM THAT HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED WHEN THE TRIAL COURT ERRONEOUSLY REFUSED TO SUPPRESS STATEMENTS HE MADE WHILE IN CUSTODY, UNCOUNSELED, AND THE FOCUS OF POLICE INVESTIGATION INTO MR. LASCOLI'S HOMICIDE. ............................................ 104

A    Legal Standard ............................................................................................................. 104

B    State Court Proceedings. .............................................................................................. 105

C    The Superior Court's denial of this claim was unreasonable under §2254(d). ................. 109

D    To the extent that this Court finds the record undeveloped or the issue procedurally barred, trial and appellate counsel Randy Miller was ineffective in litigating this issue. ............................................................................................................................. 110

E    Mr. Rodgers was prejudiced by the admission of his June 10, 1988 statements. ............. 111

PRAYER FOR RELIEF ....................................................................................................... 113

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JAMES FRANKLIN RODGERS, | : | |
| | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. _____ |
| LAUREL R. HARRY, Secretary, | : | |
| Pennsylvania Department of Corrections; | : | |
| KEN HOLLIBAUGH, Superintendent of the | : | |
| State Correctional Institution at Somerset; | : | |
| PETER WEEKS, District Attorney of | : | |
| Blair County, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. §2254**

Petitioner, James Franklin Rodgers, by and through undersigned counsel, submits this Petition for a Writ of Habeas Corpus Under 28 U.S.C. §2254 and Combined Memorandum of Law.[1]

---

[1]    Proceedings in Mr. Rodgers' habeas case docketed at No. 3:06-cv-00046-KRG-LPL have been stayed and administratively closed since March 2010 to permit Mr. Rodgers to reconstruct a complete state court record. During that process, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012), which entitled juveniles like Mr. Rodgers who received an automatic life sentence to be resentenced under a discretionary standard. Accordingly, this Court indicated that the stay would remain in place until Mr. Rodgers was resentenced under *Miller*. Text Order (7/11/2012). Mr. Rodgers has been resentenced and the state court proceedings are now complete. Therefore, on August 28, 2023, Mr. Rodgers filed a Motion to Reopen Habeas Proceedings in Case No. 3:06-cv-00046-KRG-LPL to allow for the filing of a timely, post-resentencing habeas petition under 28 U.S.C. §2254. Doc. 43. As of the time of the filing of the instant §2254 petition, the Motion to Reopen remains pending.

In an abundance of caution and in the absence of clear direction from the courts, Mr. Rodgers files this petition as a new case as well as under his prior case number.

1

## THE PARTIES

James Franklin Rodgers (who goes by Frankie) is incarcerated by the Pennsylvania Department of Corrections, currently housed at the State Correctional Institution at Somerset, under a sentence of forty years to life.

Respondent Laurel R. Harry is the Secretary of the Department of Corrections.

Respondent Ken Hollibaugh is the Superintendent of the State Correctional Institution at Somerset.

Respondent Peter Weeks is the District Attorney of Blair County.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §2254(a). Venue is proper under 28 U.S.C. §2241(d) because Mr. Rodgers is in custody in this district and his conviction and sentence arise out of Blair County, which is within this district.

## PROCEDURAL HISTORY

The procedural history in this case is long and winding, covering over 35 years. This case initially started as a capital prosecution. On May 23, 1990, after four days of deliberation, James Franklin Rodgers was convicted in the Blair County Court of Common Pleas of first-degree murder, robbery, and aggravated assault. After just two hours of deliberation the next day, the jury returned with a life sentence and said that one of the reasons the jury gave for rejecting a death sentence was the "possibility of someone else being involved because of circumstantial evidence, i.e., excess clothing, period of time required to find clothing in the park." N.T. 5/24/1990 at 153. On April 3, 1991, the trial court formally sentenced Mr. Rodgers to a mandatory sentence of life imprisonment without possibility of parole on the homicide count and an aggregate concurrent

2

sentence of between five and ten years on the remaining counts. On February 26, 1992, Superior Court affirmed Mr. Rodgers' conviction and sentence. *Commonwealth v. Rodgers*, 605 A.2d 1228 (Pa.Super. 1992). The Supreme Court of Pennsylvania denied Mr. Rodgers' Petition for Allowance of Appeal on October 20, 1992. *See Commonwealth v. Rodgers*, 615 A.2d 1311 (Pa. 1992).

On May 13, 1994, Mr. Rodgers filed a pro se petition for collateral review under the Pennsylvania Post-Conviction Collateral Relief Act (PCRA). Initial PCRA counsel, Terry W. Despoy, filed an amended PCRA petition on January 26, 1995, and another petition on March 15, 1995, that had several differences. Over the next few years, there were a number of oral arguments and status conferences regarding the post-conviction proceedings. On October 2, 1998, the PCRA court appointed a different attorney, Thomas Hooper, to take over representation. Several more years passed before the PCRA court scheduled an evidentiary hearing for March 21, 2003. By this time, yet another attorney, John Siford, had been appointed to represent Mr. Rodgers. The PCRA court limited the evidentiary hearing to just one claim, which concerned an exhibit that went out with the jury that informed them that Mr. Rodgers had been convicted of robbery. *See infra* Claim I.C.10; Claim II.C.4. The court ultimately dismissed the PCRA petition on May 13, 2003. *Commonwealth v. Rodgers*, 859 A.2d 835 (Pa.Super. 2004).

On appeal to Pennsylvania Superior Court, Attorney Siford filed a Brief for Appellant on January 29, 2004. Just two weeks later, he withdrew because he had been hired by the Blair County Public Defender's Office. Mary Ann Probst was then appointed to represent Mr. Rodgers. The Superior Court denied Ms. Probst's request for a remand and then, on July 13, 2004, affirmed the PCRA court's holding. A timely Application for Reargument was denied on September 22, 2004. A timely Petition for Allowance of Appeal was filed in the Supreme Court and denied on February 24, 2005.

Mr. Rodgers prepared a pro se federal Petition for Writ of Habeas Corpus and presented it to prison officials on February 22, 2006.[2] It was docketed at 3:06-cv-00046-KRG-LPL. On May 31, 2006, Mr. Rodgers followed with a pro se Memorandum of Law in Support of Petition for Writ of Habeas Corpus. Doc. 10. Mr. Rodgers and the Commonwealth then exchanged pleadings. Docs. 8, 10. The Court directed the Respondent to file a "comprehensive [answer], responding to each of Petitioner's claims." Doc. 11 at 2. The Respondent filed an answer that argued against the merits of each of Mr. Rodgers' claims, Doc. 12, and Mr. Rodgers filed a response. Doc. 13.

At this point, the Court on January 20, 2009, appointed the Federal Public Defender for the Western District of Pennsylvania to represent Mr. Rodgers because "the appointment of counsel is warranted given the facts of this case." Doc. 14.

Parts of the state court record were not transmitted to this Court. After several status conferences, this Court, on March 31, 2010, stayed the proceedings and administratively closed the case until the record could be reconstructed. Doc. 29.

Meanwhile, on June 25, 2012, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). *Miller* held that mandatory life sentences for juveniles are unconstitutional. On August 23, 2012, Mr. Rodgers filed a PCRA petition in state court seeking resentencing pursuant to *Miller*. Eventually, the Supreme Court held in *Montgomery v. Louisiana*, 577 U.S. 190 (2016), that the rule in *Miller* is retroactive, which meant that Mr. Rodgers' mandatory life sentence was unconstitutional. Mr. Rodgers also requested a stay on this basis, but the Court, on July 11, 2012, held that this request was denied as moot because the case was already stayed. *See* 7/11/2012 Text Only Entry.

---

[2] A *pro se* petitioner's habeas petition is deemed filed at the moment it is delivered to prison officials for mailing to the district court. *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

As a result of *Miller* and *Montgomery*, Mr. Rodgers' unconstitutional life sentence was vacated on July 21, 2017. A flurry of motions practice and hearings followed as the parties and court prepared for Mr. Rodgers resentencing hearing, which was conducted on June 26-28, 2019. Taking the matter under advisement, the court pronounced sentence on January 17, 2020, finding that a life sentence for Mr. Rodgers would be unconstitutional given his progress in prison and the possibility of rehabilitation. N.T. 1/17/2020 at 15. The court then issued a new judgment of sentence and imposed a sentence of 40 years to life. *Id.* at 20.

Mr. Rodgers appealed the sentence. The Superior Court affirmed the lower court on August 30, 2021. *Commonwealth v. Rodgers*, No. 389 WDA 2020 (Pa.Super. 2021). The Pennsylvania Supreme Court denied allowance of appeal on May 31, 2022. *Commonwealth v. Rodgers*, No. 280 WAL 2021 (Pa. 2022). During the state-court process, Mr. Rodgers sought and obtained DNA testing of two pieces of evidence. Mr. Rodgers also sought discovery, which was denied.

This Petition for a Writ of Habeas Corpus follows.

## FACTUAL HISTORY

Seventy-two-year-old Pasquale "Patsy" Lascoli was found dead at home in Altoona, Pennsylvania on June 7, 1988. *See Commonwealth v. Rodgers*, 605 A.2d 1228, 1230 (Pa.Super. 1992). He was stabbed at least 70 times. *Id.* Most of the wounds were superficial; a single wound to Mr. Lascoli's heart was the fatal injury. *Id.*

No witness placed Mr. Rodgers in or near Mr. Lascoli's home at the time of the homicide. Moreover, with the exception of DNA evidence – evidence of dubious provenance – no fingerprints or other physical evidence placed Mr. Rodgers at the crime scene. Nor did Mr. Rodgers

confess to the crime. Instead, for more than thirty-five years, Mr. Rodgers has denied killing Mr. Lascoli, even though such denial inures to his detriment.[3,4] *See, e.g.*, N.T. 5/16/1990 at 126, 129.

As the Commonwealth conceded, the case against Mr. Rodgers "[was] based on circumstantial evidence." N.T. 5/18/1990 at 75. Trial evidence showed Mr. Rodgers knew Mr. Lascoli, who was his mother's friend and drinking companion. *See Rodgers*, 605 A.2d at 1231. Witnesses testified that they observed a cut to Mr. Rodgers' hand on June 8, 1988. *Id.* Finally, DNA testing found Mr. Lascoli's blood on clothing reportedly worn by Mr. Rodgers on June 8 and Mr. Rodgers' blood was detected on the inside of Mr. Lascoli's pocket. *Id.*

However, as discussed in detail below, evidence existed that cast doubt on the credibility of the Commonwealth's case against Mr. Rodgers. Mr. Lascoli, a widower and retired railroad worker, lived alone in an apartment adjacent to some of his relatives. He was well known in the neighborhood and a frequent patron of Russo's Bar, where he first met Mr. Rodgers' mother, Christine "Chris" Houtz. *Id.* Mr. Rodgers associated with a group of neighborhood teens and young adults who lived near and were familiar with Mr. Pascoli. This group included key Commonwealth witnesses Thomas Bowling, Maria Pierce, Kristen O'Schea, and Mr. Rodgers' older half-brother, David Houtz – all of whom had criminal histories, and all of whom had inconsistencies in their stories about what happened the night of Mr. Pascoli's murder. There was conflicting evidence about how and when Mr. Rodgers suffered the cuts on his hand, and the Commonwealth was

---

[3]   *See, e.g.*, Commonwealth's Re-sentencing Memorandum at 38 (filed 10/2/2019) ("In addition to all the negative factors set forth above, the defendant has shown absolutely no remorse for this vicious murder. He has tried to justify his lack of remorse by claiming innocence. That is just another example of his manipulation.").

[4]   Expert testimony during the penalty phase indicated that testing data revealed Mr. Rodgers was not the "type of person who would knowingly go out and participate in something along this line." N.T. 5/24/1990 at 35.

improperly permitted to use Mr. Rodgers' uncounseled and un-*Mirandized* custodial statement against him. And the DNA evidence was highly suspect, as the State Crime Lab initially tested the clothing items and did not locate Mr. Rodgers' blood type on either item. It was only after Mr. Lascoli's pants were kept overnight in an officer's home on the way to the DNA lab and handled without the use of gloves that Mr. Rodgers' DNA was found. *See* Pictures of Pocket circa 1988, attached as Appendix 1.

### A    The Evidence Collection and DNA Testing in this Case was Fraught with Issues.

#### 1    Evidence From Mr. Lascoli's Home

The police gathered evidence from Mr. Lascoli's home, including blood samples and fingerprints, which were sent for testing. Mr. Rodgers was *excluded* as the source for virtually every type of forensic evidence collected, including:

- Blood samples taken from the walls, floor, and furniture[5]

- Fingerprints found in the home[6]

- A fingerprint on Mr. Lascoli's wallet[7]

- Bloody shoe prints near Mr. Lascoli's body, in the kitchen, and in an upstairs bedroom[8]

- Chewing gum found at the scene, some of which had been chewed[9]

---

[5]    N.T. 5/1/1990 at 105-24.

[6]    *See* N.T. 5/1/1990 at 133; N.T. 5/4/1990 at 101-02.

[7]    *See* N.T. 5/4/1990 at 147; N.T. 5/10/1990 at 5-7; FBI Report (8/22/1988), attached as Appendix 2.

[8]    *See* N.T. 5/1/1990 at 122-23; N.T. 5/2/1990 at 66; Det. M.F. Cooper Report (4/26/1989), attached as Appendix 3.

[9]    *See* N.T. 5/5/1990 at 23. However, the Chewels brand bubble gum was the type of gum alternative suspect Tommy Bowling would chew. N.T. 5/10/1990 at 51-53.

● Knives collected by the police were not incriminating.[10]

The only physical evidence inside of Mr. Lascoli's home that linked Mr. Rodgers to the offense was blood found on Mr. Lascoli's outturned pocket.[11] The Commonwealth theorized Mr. Rodgers stole Mr. Lascoli's wallet from his front left pocket during the attack. N.T. 5/18/1990 at 100. Mr. Lascoli's wallet was not found in the home, but $9.05 remained in the front right pocket of his pants. N.T. 4/30/1990 at 137. Nothing else in the house appeared to have been taken or disturbed. *See* N.T. 5/1/1990 at 71, 74 ("Well, everything appeared to be undisturbed. If there was someone up there that had perpetrated this act, they didn't go through the drawers as would appear in a normal burglary or anything like that. Everything appeared to be in place, and the same with the attic area.").

The Pennsylvania State Police Crime Lab (State Crime Lab) initially tested this pocket, finding the blood group and enzyme makers were consistent with Mr. Lascoli, but not with Mr. Rodgers. *See* N.T. 5/5/1990 at 9, 22, 71-72. It was not until much later that Mr. Rodgers' blood was "found" on the outturned pocket. *See* discussion *infra*.

### 2   *Prospect Park – Inept Investigation or Planted Evidence?*

In the four weeks following the homicide, law enforcement searched Prospect Park four times. Each search, conducted weeks apart in areas previously searched by police, yielded new evidence.

---

[10]   Pennsylvania State Police Crime Lab Report (7/8/1988), attached as Appendix 4.

[11]   The outturned pocket was not empty. It still contained nail clippers. N.T. 4/30/1990 at 137.

On June 15, 1988, a week after Mr. Lascoli's death, a child found the picture holder from Mr. Lascoli's wallet in Prospect Park. N.T. 5/3/1990 at 221-22. A photo technician bumped into a bush while processing the area and Mr. Lascoli's wallet fell on his head. N.T. 5/4/1990 at 13. The police searched the surrounding area for more evidence but found only a green blanket.[12] N.T. 5/4/1990 at 20.

The following day, the police searched Prospect Park again. One hundred feet from where the wallet was found the day before, the police found shorts (jams) spread on top of a cardboard box. *Id*. at 50-53, 109. Also, the police said that they did not photograph this seemingly-key piece of evidence in the park even though they photographed everything else that was seized. *Compare* N.T. 5/4/1990 at 50-52 (no photograph of the jams); *with id.* at 58-59, 59, 61, 61-62, 62-63, 63-64, 64, 72-73, 73-74, 77, 79, 89 (photos of everything else found in Prospect Park). At trial, however, a defense investigator testified that he recalled seeing a picture of "Frankie's jams [that] were laying across the [beer] case." N.T. 5/10/1990 at 136-37. He saw the picture when looking through evidence at City Hall in the spring of 1989. *Id.* At 136. There is no record of this picture having been turned over in discovery. When the jams were later photographed in the police station, the tag had "F.R." and "Frank" written on the it. Picture of Jams Showing Tag, attached as Appendix 6. Interestingly, Melissa O'Schea, an ex-girlfriend of Mr. Rodgers who let him stay at her apartment and occasionally washed Mr. Rodgers' clothes, testified that she had never seen the initials on the tag before. N.T. 5/3/1990 at 201-02.

---

[12]    *Every* other item seized in Prospect Park was submitted for some kind of forensic testing except this green blanket. *See* Pennsylvania State Crime Lab Report (8/24/1988), attached as Appendix 5 (Items 50, 52-59, 86-89, 94-95 were recovered from Prospect Park and sent to the State Lab; the green blanket is not listed). In total, the police submitted 95 items to the State Lab for testing, but not the blanket. *Id.* If testing was done, the results were not provided to the defense.

Six days later, the police searched Prospect Park for a third time. This time, they found a pair of men's size 46 blue jeans, a yellow jacket, a smock, and a doily – all sitting in the open roughly twenty feet from where the jams were found. N.T. 5/4/1990 at 59-64, 115-16. These items belonged to Mr. Lascoli. *Id*. at 66.

On their fourth trip to Prospect Park, a month after the homicide, on July 7, 1988, the police found a gray Penn State sweatshirt and a gray button-down sweater. Yet again, these items were located in an area previously searched by police. *Id.* at 120 ("we would have went past the sweat shirt and sweater"). The sweatshirt belonged to Mr. Rodgers' half-brother, David Houtz. N.T. 5/3/1990 at 129-31. Witnesses testified that Mr. Rodgers had worn the sweatshirt, but also that Mr. Rodgers' friend, Tsani Johnson, was last seen wearing it. *Id*. at 129, 154; N.T. 5/2/1990 at 160.

David Houtz, Mr. Rodgers' half-brother who was long mentioned by the defense as being involved with disposing of evidence after the murder, was found with two others in Prospect Park on July 7. N.T. 5/4/1990 at 112-13; N.T. 5/3/1990 at 145-46; *see also* N.T. 5/3/1990 at 178-80 (Kim Hileman testified Tommy Bowling told her David Houtz took clothes from her car and threw them out at Prospect Park). Perhaps the police missed bloody clothes in an area they had already searched, or perhaps those items were placed in the park after the initial three searches.

After another month had passed, an anonymous caller contacted the Altoona Police and directed the attention of the police to a storm drain near Prospect Park because the anonymous caller said that there was a knife there. This anonymous caller claimed to somehow know that this knife in a storm drain "was possibly used in the Lascoli homicide." Continuation Report of Sgt. Harold E. Snyder (8/9/1988), attached as Appendix 7. On August 8, 1988, the police recovered a

10

knife from the drain.[13]  N.T. 5/1/1990 at 76-79, 151. Ultimately, nothing connected that knife to

Mr. Rodgers or to the homicide.

The serial location of evidence in Prospect Park is concerning. The day after Mr. Lascoli

was killed, Tommy Bowling and another male were observed by his landlord walking towards

Prospect Park carrying "a big bundle of something under their arms." N.T. 5/15/1990 at 60. At the

time, Mr. Rodgers lived with Mr. Bowling and Maria Pierce (two people identified by trial counsel

as alternative suspects), so both had access to Mr. Rodgers' clothing. *See* N.T. 5/2/1990 at 137.

When Mr. Rodgers stopped at Mr. Bowling's apartment on June 13 to retrieve his clothes, they

were scattered all over the apartment. Mr. Bowling said he would wash them and return them to

Mr. Rodgers. N.T. 5/16/1990 at 107-08; N.T. 5/15/1990 at 137-39; *see also* N.T. 5/2/1990 at 171-

72. When Mr. Rodgers picked his clothes up a few days later, the jams were not among them. N.T.

5/16/1990 at 107-08. Additionally, Melissa O'Schea, Mr. Rodgers' former girlfriend, testified she

did his laundry for him during this time. N.T. 5/3/1990 at 196.

The State Lab tested numerous items collected by the police. None of the testing linked

Mr. Rodgers to the offense. Then, on three separate occasions, the police took fourteen items to a

---

[13]    The Commonwealth's theory all along has been that Mr. Rodgers committed this murder by himself. *See*, *e.g.*, N.T. 5/18/1990 at 78-79 (Commonwealth's closing that ridiculed the defense theory that more than one person was involved), 94-95 (same), 96-98 (same), 96-97 ("There is absolutely no evidence, ladies and gentlemen, that there was more than one individual"), 116 ("And I submit to you, ladies and gentlemen, that it shows beyond a reasonable doubt that Frankie Rodgers, this Defendant and no one else, went out to Mr. Lascoli's house, had a deadly weapon, a knife, placed it in a vital part of the body . . . and killed Patsy Lascoli"); Commonwealth's Re-Sentencing Memorandum (10/2/2019) at 10 ("He, and he alone, murdered Mr. Lascoli in the most animalistic way. The crime scene itself evidenced the fact that only one attacker, the defendant, entered the victim's home and murdered him in his own living room. The evidence supports the fact that the defendant was the sole perpetrator"); *id.* at 11 ("Collectively, the totality of the evidence leads to the clear conclusion that a single perpetrator robbed Mr. Lascoli"). That certainly begs the question of how someone else would know anything about this knife sitting at the bottom of a storm sewer. Unless, of course, someone else put the knife there.

private lab, Lifecodes, for testing. Lifecodes Chain of Custody (7/29/1988), attached as Appendix 8; Lifecodes Chain of Custody (10/20/1988), attached as Appendix 9; Lifecodes Report (3/3/1989), attached as Appendix 10. Altoona Police Detective Sassano took the first two batches of evidence home with him – overnight – before delivering them to Lifecodes the next day. N.T. 5/4/1990 at 139-40; *id.* at 143-44.

Detective Sassano told Lifecodes exactly where to test Mr. Lascoli's pants, directing them to the front left pocket because "[i]t is felt the suspect's blood may be in, on or around the left front pocket as it was turned inside out and this is where his stolen wallet and/or money was carried by him."[14] Sassano/Lutz Letter to Lifecodes (10/21/1988), attached as Appendix 11. This "critical" piece of evidence was not submitted by the police to Lifecodes until twelve weeks after the first batch of evidence was DNA tested.

Detective Sassano also predicted the gray sweater might have blood from two people because of "our observations at the scene, that there was blood throughout the house." N.T. 5/4/1990 at 136. While a bloody scene would result in bloody clothes, nothing in the evidence suggests there would be a *mixture* of two people's blood on the sweater. Moreover, Detective Sassano did not predict any other bloody item of clothing might contain a mixture. *Id.* at 136-37.

Ultimately, Lifecodes found two items matching Mr. Rodgers: the front left pocket of Mr. Lascoli's pants and the sweater found four weeks after the homicide in Prospect Park. Again, this

---

[14]    The issue of providing "case-specific" information to forensic scientists "raises an alarming concern regarding cognitive bias among professionals." Kaur, Sukhmanpreet (2022) *Cognitive and Other Types of Biases Affecting Forensic Evidence: Research Analysis and Expert Conclusions*, Themis: Research Journal of Justice Studies and Forensic Science: Vol. 10, Article 8 at 165 (available at https://scholarworks.sjsu.edu/themis/vol10/iss1/8). "As demonstrated in the research, when information is provided to create context, that context can become influential to the decisions and conclusions made by those who are counted on to be unbiased." *Id.*

was *after* the State Lab had tested both items first and identified only the presence of Group B blood, Mr. Lascoli's blood type. Mr. Rodgers has blood type O. N.T. 5/5/1990 at 45-47, 52-53, 71-72.

In addition to this anomaly, there were other issues with Lifecodes' results. The blood on the pants pocket, despite the passage of three months, had no bacteria. Lifecodes Final Report (3/14/1989) at 3, attached as Appendix 12 Coincidentally, Mr. Rodgers' blood sample, which disappeared after the clothing was turned over to Lifecodes for testing,[15] also lacked bacteria. *Id.*; *see also* Affidavit of the Commonwealth's Representative: Inventory on November 25, 1992, of the Physical Evidence in *Commonwealth v. James Franklin Rodgers*, attached as Appendix 13. Every other item tested that had sufficient DNA for testing contained bacterial DNA. *See* Appendix 8; Appendix 10.

Other Lifecodes results were similarly improbable. For example, Lifecodes found that the sample of Mr. Rodgers' blood was not human DNA.[16] Appendix 12 at 3. This was inconsistent with the State Lab, which verified Mr. Rodgers' blood was procured from a human. N.T. 5/5/1990 at 38. Furthermore, Lifecodes did not detect Mr. Lascoli's blood to have a Y-chromosome. Mr. Rodgers' blood, however, did have a Y-chromosome. *See* Appendix 12. Apart from the oddity of finding a man's DNA that lacked a Y-chromosome, the supposed sample mixture on the sweater was *negative* for a Y-chromosome. *Id.*

---

[15] The record does not reflect what happened to that tube of Mr. Rodgers' blood sample. Lifecodes returned it to the custody of the Altoona Police Department on October 20, 1988. *See* Appendix 8.

[16] The jury did not hear that Lifecodes found Mr. Rodgers' blood not to be human. *See generally* N.T. 5/7/1990; N.T. 5/8/1990; N.T. 5/9/1990; *see also* discussion at Claim I, *infra*.

Incredibly, despite the Commonwealth's theory that the perpetrator stole Mr. Lascoli's wallet from his front pants pocket – and presumably bled on it as he allegedly bled on the pocket – the police did not submit the wallet for DNA testing. *See generally* Pennsylvania State Crime Lab Preliminary Report (8/1/1988), attached as Appendix 14; Appendix 5. Despite the Commonwealth's theory that Mr. Rodgers grabbed the wallet with his bloody hand, there is no indication of blood on the wallet or its card case. How Mr. Rodgers could have left his blood in Mr. Lascoli's pocket while extracting the wallet without also leaving blood on the wallet or card case remains unanswered. The most obvious answer is that Mr. Rodgers did not reach into Mr. Lascoli's pocket and remove the wallet. The State Lab's testing supports this position, as does the FBI's fingerprint analysis, which found the usable fingerprint on the wallet did not match Mr. Rodgers or Mr. Lascoli. Appendix 2; N.T. 5/4/1990 at 147; N.T. 5/10/1990 at 5-7.

### B    *The Remainder of the Commonwealth's Case.*

In addition to the physical evidence discussed above, the Commonwealth offered circumstantial evidence to support its case against Mr. Rodgers. Testimony from some of Mr. Rodgers' friends indicated that he had suggested burglarizing Mr. Lascoli's home a few days before the murder. *See*, *e.g.*, N.T. 5/03/1990 at 107-08. Mr. Rodgers' brother, David Houtz,[17]

---

[17]    Mr. Houtz testified he had not been offered any plea deal in exchange for his testimony. N.T. 5/3/1990 at 142-43. At a sidebar, the Commonwealth made the same representation, but qualified it by saying "[t]he only one who may know it would be [District Attorney Richard] Consiglio [who] signed the information, but I have no knowledge. I doubt that any agreement would be made without my knowledge." *Id.* at 137-38.

However, records reveal that Mr. Houtz did receive consideration for his "cooperation." *See* David Houtz Guilty Plea Colloquy Form (10/5/30 [sic]) at 8-9, attached as Appendix 15; David Houtz Plea Agreement/Waiver Request (10/5/1990), attached as Appendix 16. The plea occurred just over four months after he testified against Mr. Rodgers. Moreover, while the record does not indicate when the agreement was reached, a letter from Houtz's then-attorney states "the Plea

claimed that Melissa O'Schea, Mr. Rodgers' former girlfriend, told him that Mr. Rodgers had requested that she bring him a change of clothes on June 7. *Id.* at 136-37. There was also testimony that Mr. Rodgers did not have money on June 7, but he had $40 dollars the next day. Trial Court Opinion (5/10/1991) at 3, attached as Appendix 19. Finally, there was testimony Mr. Rodgers arrived at Tommy Bowling's apartment in the early morning hours of June 8 with cuts to his fingers. *Id.*

C   *The Defense.*

Mr. Rodgers testified in his defense. He described smoking pot and drinking on June 7. N.T. 5/16/1990 at 53-54. He also took Xanax or Soma to calm himself down before going to his mom's house. *Id.* at 176, 179. The combination of marijuana and pills messed Mr. Rodgers up. *Id.* at 176. He went to his mom's and to his grandfather's. *Id.* at 58-60. He saw Mr. Lascoli at his grandfather's and tried to get in contact with his mother per Mr. Lascoli's request. *Id.* at 70-72. When he returned to Tommy Bowling's apartment, the basketball game was on. *Id.* at 81. Mr. Rodgers went to sleep shortly after and did not wake up until the next day. *Id.* at 82-83. When he awoke the next morning, his hand was cut. *Id.* at 83.

At trial, the defense presented William Harshberger, who testified that, on the night of the murder, while walking near Mr. Lascoli's house, he heard at least three distinct voices in the house. N.T. 5/14/1990 at 33. After walking a few blocks, Harshberger saw two young people "walking

---

Agreement was offered by Assistant District Attorney Richard Consiglio earlier at the Preliminary Hearing." Letter from Attorney Timothy Sullivan (11/9/1990), attached as Appendix 17. The preliminary hearing was on February 7, 1990, about three months *before* Mr. Houtz testified falsely that he did not have a plea deal with the Commonwealth. David Houtz Docket Transcript (2/7/1990), attached as Appendix 18. *See* further discussion at Claim I, *infra.*

sort of fast" from Mr. Lascoli's home. *Id*. at 34-35. He gave a detailed description of them; neither was Mr. Rodgers. *Id*. at 35-37, 58-59.

However, the trial court precluded much of the evidence Mr. Rodgers would have offered to support his defense that he was innocent of the murder. Mr. Rodgers attempted to present the testimony of witnesses with knowledge of who murdered Patsy Lascoli (and who made statements to that effect to law enforcement and others), as well as evidence pointing to the culpability of others. This evidence, along with efforts to attack the credibility of the Commonwealth's witnesses, were precluded by the trial court. *See*, *e.g.*, Appendix 19 at 9-10; *see also* N.T. 5/14/1990 at 13-14, 17-18, 76-79, 84-86; N.T. 5/11/1990 at 11-12 (Mike Anthony's inculpatory statements); Statement of Roy H. Spiers (3/2/1990), attached as Appendix 20 (recounting Shawn Thomas's statement to him that others were at Mr. Lascoli's place and they "set [Rodgers] up" by "smear[ing] blood on him" while Mr. Rodgers "was out of his mind and had no idea what was going on, or something of that nature"); N.T. 5/16/1990 at 195-213 (Constable's statements from Mr. Thomas that Mr. Rodgers did not commit the homicide); N.T 5/3/1990 at 143-149; *see also* N.T. 5/10/1990 at 158-67. These rulings severely hampered the defense.

Melissa O'Schea exercised her Fifth Amendment right not to incriminate herself in this crime. Through her attorney, she informed the court that she did not want to implicate herself in the following ways: "whether or not she was one of several people at the Lascoli house and the various things she allegedly witnessed there," "whether or not prior to the murder, these [alternative suspects] were at her residence," "whether or not Mike Anthony and Shawn Thomas were at her house washing clothes during the early hours of June 8th," "[t]he area of inquiry regarding the brown-handled knife," "whether or not she spoke with Linda Tabor or this Rich … Johnson about the killing," "conversations with Kim Hileman … in which she implicated herself

16

or described what events took place at the time Lascoli was killed," "whether or not she had a conversation with Rodgers … at his mother's house … indicating that he should leave," whether she took "that brown-handled knife and drop[ped] it down between the wall where it may have fallen into the area above the first floor apartment bathroom ceiling," and the "area of inquiry dealing with the assault charges that were allegedly attempted to be brought against Mike Anthony early in 1990 and whether or not Mr. Anthony made a threat to [O'Schea] regarding whether or not he would tell the story about Mr. L." N.T. 5/14/1990 at 12-19.

Meanwhile, Mr. Rodgers' attorney, Randall Miller, was struggling because of the toll this case was taking on his personal life. He had turned to alcohol. His wife told him that she did not want him working on Mr. Rodgers' case. She went so far as to deliberately disrupt his ability to work on Mr. Rodgers' defense. Ultimately, Mr. Miller filed for divorce during the course of his representation of Mr. Rodgers. Meanwhile, the Blair County Commissioners were trying to fire Mr. Miller, which obviously took a personal toll. *See* Letter from Randy Miller (12/21/1992), attached as Appendix 21; Letter from Randy Miller (1/24/1992), attached as Appendix 22; Application for Leave to Withdraw as Counsel (9/23/1991), attached as Appendix 23.

Part of the story that also must be recognized is that this was a high-profile case with pressure on law enforcement to make an arrest. This is how the Commonwealth has described the community's reaction to the murder of Mr. Lascoli:

> The description of the neighborhood as a peaceful and enjoyable neighborhood, where children from different families played together in complete safety, was shattered by this event. The entire community surrounding the Lascoli residence was shaken to the core. As noted by a number of family members, and Mr. Brunner, children no longer played together, parents were afraid to leave their children outside. Where the families in the neighborhood had previously left doors and windows unlocked, they now were shut and locked. People were leery of even opening their door when visitors came until the defendant was apprehended. It is not unreasonable to evaluate the effect on the neighborhood as devastating.

17

Commonwealth's Re-Sentencing Memorandum (10/2/2019) at 37-38; *see also* N.T. 6/26/2019 at 201-10. The burden of litigating such a high-profile case for a defendant who steadfastly maintained his innocence also impacted Mr. Miller.

### D   Jury Verdicts.

The jury, seemingly troubled by the inconsistent evidence, deliberated for four days before returning a guilty verdict.[18] N.T. 5/19/1990 at 41 (deliberations commence); N.T. 5/23/1990 at 3 (verdict). Mr. Rodgers was found guilty of First-Degree Murder, Robbery, and Aggravated Assault (2 counts). When the jury later returned a life verdict – after just two hours of deliberations – it found, among other things, the "possibility of someone else being involved because of circumstantial evidence, i.e., excess clothing, period of time required to find clothing in the park" as a mitigating factor. N.T. 5/24/1990 at 153.

### E   Frankie's Life Before June 1988.

"Frankie's story is one of resilience and overcoming 'adjustment difficulties' early in life, as he has risen above the daunting challenges he faced growing up." Report of Dr. James Garbarino (7/5/2017) at 2, attached as Appendix 24.

---

[18] The length of jury deliberations can be a factor to consider when assessing whether prejudice occurred. *See*, *e.g.*, *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("The length of jury deliberations can be one factor in determining how close the jury viewed the case to be"); *Murtishaw v. Woodford*, 255 F.3d 926, 973 (9th Cir. 2001) (including length of jury deliberations as a factor in weighing whether prejudice occurred); *Edmunds v. Tice*, 2020 U.S. Dist. LEXIS 217567, *34-35 (E.D. Pa. 2020) (finding prejudice based on length of jury deliberations and citing *Dugas* and *Murtishaw* as support for granting relief on a claim of ineffective assistance of counsel for failure to object to improper jury instructions).

Frankie was born two months premature, on November 3, 1970, in Fort Stewart, Georgia. Frankie Rodgers Social History (6/7/2019) at 4, attached as Appendix 25; Report of Dr. Anne McBride (6/17/2019) at 4, attached as Appendix 26; Appendix 24 at 2. An MRI revealed ventricular asymmetry in Frankie's brain consistent with neonatal brain damage. N.T. 5/24/1990 at 43. This data suggests there was a possible brain injury present at Frankie's birth. *Id*.

Frankie's mother, Christine "Chris" Houtz, is a white woman. His father, Raymond Thomas, was a Black man. Appendix 25 at 4. Raymond was shot and killed by his brother-in-law, about a month after Frankie's birth. Appendix 25 at 5; Appendix 26 at 4; Appendix 24 at 2.

Frankie moved frequently while growing up. Appendix 24 at 2. Frankie usually resided with Chris, his older half-brother David, his younger half-sister Mechille, and/or his paternal Aunt Roxanne (Roxie). Appendix 26 at 4 Chris was an alcoholic who could drink a gallon of whiskey in two days. Appendix 25 at 61; *see also* N.T. 6/28/2019 at 1163.

Chris occasionally mothered her children, but she mostly drank and used drugs. *Id.*; *see also* N.T. 6/28/2019 at 1104; Appendix 26 at 11. Frankie recalled once finding drunk adults, some with needles in their arms, passed out on the floor of their home. Appendix 25 at 8. Pastor Paul Johnson recalled telephone calls from Frankie and his siblings asking for help because Chris had fallen, was bleeding, or had been beaten. N.T. 6/28/2019 at 1045. Some of Chris's injuries and assaults made the newspapers. *Id.* at 1058-68; *see also Altoona Mirror*, "Two Arrested" (11/10/1977), attached as Appendix 27; *Altoona Mirror*, "Treated at Mercy" (6/10/1978), attached as Appendix 28; *Altoona Mirror*, "Treated at Altoona Hospital" (6/12/1978), attached as Appendix 29; *Altoona Mirror*, "House entered" (9/4/1979), attached as Appendix 30; *Altoona Mirror*, "Woman hurt" (10/17/1979), attached as Appendix 31; *Altoona Mirror*, "Claims abduction" (12/7/1979), attached as Appendix 32; *Altoona Mirror*, "Claims assault" (2/25/1981), attached as

19

Appendix 33; *Altoona Mirror*, "Held at gunpoint" (7/24/1982), attached as Appendix 34. Pastor Johnson noted many more incidents of abuse occurred, but did not make the news. N.T. 6/28/2019 at 1069. Chris admitted she drank in front of her children. N.T. 5/24/1990 at 91. Chris testified she suffered from a really bad drinking problem and, if she could do things differently, she should have stayed away from drugs. *Id.* at 94-95.

Chris faced numerous criminal charges throughout Frankie's childhood. Appendix 26 at 8; *Altoona Mirror*, "Woman Charged in Theft of Television" (4/1/1977), attached as Appendix 35; *Altoona Mirror*, "Issued citations" (1/13/81), attached as Appendix 36; N.T. 6/28/2019 at 1054-57, 1064. She also struggled with depression, cutting her wrists and legs and overdosing several times. Defense Appendix 25 at 6; Appendix 26 at 9; *see also* N.T. 6/26/2019 at 367. She was committed to a mental health facility more than once. Appendix 24 at 14; N.T. 6/26/2019 at 401.

Frankie, at age 8, would be out until 1:00 am. Appendix 25 at 8 From ages 10-12, Frankie was sexually abused by a friend of his mother's. Appendix 26 at 12-13; Appendix 25 at 10; Appendix 24 at 4-5, 12; N.T. 6/26/2019 at 398; N.T. 6/27/2019 at 871. But when he returned home, he always made sure Chris had not passed out with a lit cigarette. Appendix 25 at 8.

Frankie struggled in school, repeating the first grade. *Id*. at 9. He was diagnosed with learning disabilities and placed in special education classes. N.T. 5/15/1990 at 121; Appendix 25 at 9. His poor elementary school performance was attributed to both cognitive and behavior problems. Appendix 24 at 25. A counselor noted Frankie was often unhappy and his mother did not support him in efforts to succeed at school. *Id*. He would later repeat the tenth grade. Appendix 25 at 9.

By age 10 or 11, Frankie used marijuana almost daily. Appendix 26 at 10; N.T. 6/27/2019 at 880. This was a consistent habit until his arrest for Mr. Lascoli's murder. *Id.*

20

Chris became romantically involved with Frankie's Aunt Roxie. This was a violent and abusive relationship, with both partners drinking and abusing drugs. Appendix 25 at 11; N.T. 6/26/2019 at 400-01. While they were together, neither worked. The family subsisted on public assistance and food stamps, but there was never enough food. Appendix 25 at 13; Appendix 24 at 13; N.T. 6/26/2019 at 400. At times, the children subsisted on soda pop. Appendix 25 at 13. CYS received more than one report that Chris was not adequately feeding her children. N.T. 5/24/1990 at 93. Mechille got in trouble for stealing cake mix and other food items from a neighbor's refrigerator. *Id*.

Regarding his racial identity, school reports indicated Frankie was called racial epithets, including Oreo cookie, and he was upset by this. N.T. 5/23/1990 at 46-47; Appendix 25 at 20. He encountered similar treatment at home, where his mom called him a "bastard nigger child." Appendix 25 at 7; Appendix 24 at 12; N.T. 6/2620/19 at 378, 397; *see also* Report of Dr. Bruce Wright (3/14/2019) at 3, attached as Appendix 37. These issues were part of his first mental health referral at 8 years old. Appendix 24 at 14; N.T. 6/26/2019 at 379, 404.

Frankie was in Roxie's custody from the ages of 11-14. Frankie's mother did not punish him, but Roxie would, often with violence. N.T. 5/23/1990 at 29; Appendix 25 at 12; Appendix 26 at 5; Appendix 24 at 12; N.T. 6/26/2019 at 398; N.T. 6/28/2019 at 1104-05. The situation was so dire that Frankie attempted to kill himself. Appendix 25 at 12. When he finally ran away, Roxie attempted to kill herself by jumping from the third floor of a building. *Id*.; *see also* Appendix 26 at 5; Appendix 24 at 14.

Frankie returned to Chris' home and his schoolwork immediately suffered. His GPA dropped from 3.21 in 8th grade to 2.0 in the 9th. Appendix 25 at 15; Appendix 24 at 26.

21

In 1986, Frankie became maimed after blasting caps he had found abandoned by a railroad detonated in his hand. Appendix 25 at 15; Appendix 26 at 8; Appendix 24 at 9; *see also* Appendix 37 5, He subsequently experienced hearing loss, high blood pressure, nightmares, and loss of appetite. Appendix 25 at 15; Appendix 24 at 9. In addition, Frankie tried to hide his hand because his peers made fun of his disfigurement. N.T. 5/23/1990 at 46; N.T. 5/24/1990 at 48; Appendix 24 at 9; Appendix 25 at 16.

It was around this same time that Frankie started getting in trouble – facing juvenile charges for offenses including underage drinking, burglaries, robbery, and extortion. N.T. 5/23/1990 at 20-24; *see also* Appendix 37 at  4; Appendix 26 at 11-13. Frankie committed these offenses for two reasons: so he could get money and so he could fit in better with the people with whom he hung out. N.T. 5/23/1990 at 26. His behavior ultimately landed him in a juvenile detention home when he was 15 or 16 years old. *Id.* at 24. "While in Blair County Detention Home in 1987 (when he was 17) he was diagnosed with a range of mental health issues that can be traced to the trauma and mis-socialization he experienced in his life (rather than some underlying pathology of mind, spirit, and heart)." Appendix 24 at 21.

As a child, Frankie experienced chronic trauma, "witnessing violence and assaults, disruptions, emotional, psychological maltreatment, not as one bad day, but as a long period of very bad days." N.T. 6/26/2019 at 383; *id.* at 371. Dr. James Garbarino found Frankie had an ACE[19] score of 10, which "indicates that his level of childhood adversity was worse than 999 out of 1000 people in America, and offers a clear rationale for his troubled early life evidencing

---

[19]    Dr. Garbarino described the ACE scale [Adverse Childhood Experiences] as a "series of ten questions … that were developed to be a very transparent, simple way of mapping the degree to which kids have experienced adversity growing up." N.T. 6/26/2019 at 391.

multiple forms of developmental damage." Appendix 24 at 11; *see also* N.T. 6/26/2019 at 396. At the time of his arrest, Frankie experienced what Dr. Garbarino called "adolescence squared … the generic immaturity of adolescence … interacting with [Frankie's] specific immaturity resulting from trauma and adversity." Appendix 24 at 23.

   *F   Mr. Rodgers' Life While in Prison.*

   Mr. Rodgers became an adult in prison. *Id.*, Exhibit 2 at 27. He struggled early, receiving approximately 44 infractions in his first five years in prison. N.T. 6/27/2019 at 739. From 2001 - 2010 he received fourteen infractions, and from 2011 - 2019 there were seven. *Id.* at 749-750.

   Today, experienced corrections officers view Mr. Rodgers as someone who does not cause problems. N.T. 6/27/2019 at 157, 654, 682. Lieutenant Brian Swank has never known Mr. Rodgers to be in a significant conflict in prison. *Id.* at 157, 654. Lieutenant Swank and Captain Robert Bakos have not known Mr. Rodgers to have been violent in the violent world of prison. *Id.* at 656, 681. As further proof, Mr. Rodgers has had no misconducts for violence in three decades in state prison. *See*, *e.g.*, N.T 6/26/2019 at 266, 415-16; N.T. 6/27/2019 at 750-51, 792, 895.

   Frankie Rodgers "has demonstrated resilience, rehabilitation, and transformation in overcoming the extreme adversity of his childhood and adolescence, and is today a mature and pro-social [52]-year-old man." Appendix 24 at 29. As a result, the judge at the resentencing proceedings in 2019 said that he could not rule out the possibility of rehabilitation. N.T. 1/17/2020 at 14. The court, thus, vacated Mr. Rodgers' sentence of life without parole and imposed a sentence of 40 years to life. *Id.* at 20.

23

## APPLICABLE LEGAL STANDARDS

Mr. Rodgers sets forth the general legal standards arising from the allegations contained in the claims below.

### A.  Review Under 28 U.S.C. §2254

Under 28 U.S.C. §2254, a petitioner has the burden of demonstrating that the state court's determination was "'contrary to' federal law then clearly established in the holdings of [the Supreme] Court," "'involved an unreasonable application of' such law," or "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. §2254(d)(1), (2)).

"A state court decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth' in Supreme Court precedent, or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different' from that reached by the Supreme Court." *Randolph v. Sec'y*, 5 F.4th 362, 373 (3d Cir. 2021) (quoting *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000))).

A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 413). A federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63 (2003), and *Williams*, 529 U.S. at 407). In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable," the state court's decision must have been

24

more than incorrect or erroneous. *Id.* (citing *Lockyer*). The state court's application must have been "objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409).

"[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Lambert v. Blackwell*, 387 F.3d 210, 234-35 (3d Cir. 2004).

Where the state court decision is contrary to or an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts in light of the state court record, this Court must accord no deference to the state court determination and must engage in de novo review of a petitioner's claim. *Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011) (citing *Bronshtein v. Horn*, 404 F.3d 700, 724 (3d Cir. 2005)); *Boyd v. Waymart*, 579 F.3d 330, 336 n.7 (3d Cir. 2009) (en banc) (per curiam) (Scirica, CJ, concurring).

## B. Due Process Standards and Trial Rights

Due Process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970); *Francis v. Franklin*, 471 U.S. 307, 313 (1965).

Due process also affords a criminal defendant the "right to a verdict based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574 (1981). That right is also protected by the Sixth Amendment. When a defendant is afforded a jury trial, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion." *United States v. Gaudin*, 515 U.S. 506, 514 (1995).

25

An accused has a constitutional right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U. S. 479, 485 (1984); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses. *Holmes*, 547 U.S. at 324; *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Rock v. Arkansas*, 483 U.S. 44, 51 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *United States v. Cronic*, 466 U.S. 648, 656 (1984); *Washington v. Texas*, 388 U.S. 14, 23 (1967); *In re Oliver*, 333 U. S. 257, 273 (1948).

When a State mandates certain trial, capital sentencing, and appellate procedures, it creates Fourteenth Amendment life and liberty interests in those procedures. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *see also Ford*, 477 U.S. at 428-29; *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by federal constitutional law. *Ford*, 447 U.S. at 428-29; *Evitts*, 469 U.S. at 393; *Hicks*, 447 U.S. at 346.

## C. Prosecutorial Misconduct

The prosecution's "interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.... It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Because of the prosecutor's prominent role as representative of the Commonwealth, and the mantle of respect and authority this role creates in the jury's eyes, jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused, when they should properly carry none." *Berger*, 295 U.S. at 88; *accord Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) (citing *Berger*). "For this

26

reason, misconduct by the prosecutor ... must be scrutinized carefully." *Drake*, 762 F.2d at 1459; *see also United States v. Young*, 470 U.S. 1, 7-8 (1985). Prosecutors have a "heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices." *Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991).

When the prosecutor's argument infects the trial with unfairness, due process is violated. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). When a prosecutor's misconduct implicates specific provisions of the Bill of Rights, however, a petitioner need not demonstrate that the misconduct rendered his proceedings fundamentally unfair. Instead, proof that the error was not harmless is all that is required. *Gaudin*, 515 U.S. at 526; *see also Donnelly*, 416 U.S. at 643.

### D. Brady/Napue Due Process Standards

Due Process also requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). A prosecutor's duty to disclose is especially important in a homicide case. *Kyles*, 514 U.S. at 422. The duty to disclose continues past a defendant's arrest, conviction, and sentencing. *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976).

"Favorable evidence" under *Brady* includes evidence that impeaches the prosecution's theory or witnesses. *Bagley*, 473 U.S. at 676; *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *see also Breakiron v. Horn*, 642 F.3d at 133-34; *Simmons v. Beard*, 590 F.3d 223, 235 (3d Cir. 2009); *Wilson v. Beard*, 589 F.3d 651, 662 (3d Cir. 2009).

Favorable evidence is material, and its non-disclosure prejudicial, "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would

have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). This "does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75-76 (2012) (quoting *Kyles*, 514 U.S. at 434). When there is a reasonable probability that the withheld evidence, if presented, could have provided a "reasonable doubt" about a petitioner's guilt, culpability, or degree of guilt, he is entitled to relief. *Kyles*, 514 U.S. at 434; *Trombetta*, 467 U.S. at 485.

Further, in assessing materiality, the Court must consider "any adverse effect" the prosecution's suppression of evidence had on the defendant's ability to prepare for trial or present a defense. *Bagley*, 473 U.S. at 683; *United States v. Perdomo*, 929 F.2d 967, 972 (3d Cir. 1991).

The presentation of false, inaccurate, or misleading testimony or argument deprives a defendant of a fair trial if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *Giglio*, 405 U.S. at 153-54. Where the prosecution's suppression of evidence is compounded by the prosecution's use of, or failure to correct, false evidence, the materiality standard is lowered. "[I]n those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 103-04 (1976), *holding modified by Bagley*, 473 U.S. 667. Thus, where the prosecution provides, or fails to correct, false evidence, that evidence is material where there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103; *see also Napue*, 360 U.S. at 271.

### E. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must show: (A) counsel's deficient performance, *i.e.*, that his attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (B) prejudice, *i.e.*, that confidence in the result of the original proceeding is undermined as a result of counsel's deficiencies, *id.* at 694; *see also Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel actually investigates, *id.* at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4.1(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). The duty to investigate is especially exacting in a capital case (which this was), where "counsel's duty to investigate all reasonable lines of defense is strictly observed." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997); *see also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.7, Investigation (rev. ed. 2003) ("2003 ABA Guidelines"); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1, Investigation (1st ed. 1989) ("1989 ABA Guidelines").

Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 371.

29

*Strickland* prejudice is met if there is a reasonable probability of a different outcome, including a verdict of a lesser offense or lesser degree of guilt. *Breakiron v. Horn*, 642 F.3d at 138 ("To show prejudice, Breakiron must establish that there is a reasonable probability that the jury would have convicted him of theft only and not of robbery if counsel had requested the theft instruction to which he was entitled."). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see also Strickland*, 466 U.S. at 693.

The general standards of *Strickland* also apply to appellate ineffectiveness. *See*, *e.g.*, *Roe v. Flores-Ortega*, 528 U.S. 420 (2000) (applying the *Strickland* standard to the consideration of appellate counsel's ineffectiveness); *United States v. Mannino*, 212 F.3d 835 (3d Cir. 2000). The ABA Guidelines describe "the obligation in terms no one could misunderstand in the circumstances of a case like this one," *Rompilla*, 545 U.S. at 387: "[a]ppellate counsel should seek, when perfecting an appeal, to present all arguably meritorious issues." 1989 ABA Guideline 11.9.2.(D), Duties of Appellate Counsel. Recognizing the unique nature of a capital appeal, the Commentary to Guideline 11.9.2. (D) advises against raising "only the best of several potential issues," noting that "[w]hen a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited."

Where there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim [falls] outside the range of reasonably competent assistance." *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011); *Claudio v. Scully*, 982 F.2d 798, 799 (2d Cir. 1992); *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (petitioner may

establish appellate counsel ineffectiveness "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").

### F.  Cumulative Constitutional Error

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. *See*, *e.g., Williams*, 529 U.S. at 397-98 (court must consider cumulative effect of all mitigating evidence); *Kyles*, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due process guarantee of fundamental fairness, necessitating relief); *Donnelly*, 416 U.S. at 639 (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights). In assessing *Brady* materiality, courts are to consider the cumulative, or collective, effect of all of the relevant undisclosed evidence. *Kyles*, 514 U.S. at 436.

The standard to be applied in determining whether due process has been violated by a collection of constitutional errors is the standard for harmless constitutional error set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 632 n.7 (1993) – the errors cumulatively considered must have a "substantial and injurious effect or influence in determining the jury's verdict."

A petitioner need not prove any single error (or here a series of errors) prejudicial. Rather, a court's doubt concerning the harmlessness of any error or errors must be resolved in favor of the petitioner. *Brecht*, 507 U.S. at 640-41 (Stevens, J. concurring); *O'Neal v. McAnnich*, 513 U.S. 432, 437 (1995). If the Court finds itself in equipoise as to the effect of these cumulative errors, such

31

that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting *O'Neal*, 513 U.S. at 437).

## G. Entitlement to an Evidentiary Hearing

An evidentiary hearing is appropriate when a habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts. *See Townsend v. Sain*, 372 U.S. 293, 312-19 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). In deciding whether to grant a hearing, a court must accept a petitioner's factual allegations as true, and view those "factual assertions in the light most favorable to him." *Zilich v. Reid*, 36 F.3d 317, 321 (3d Cir. 1994). Where the petitioner makes a *prima facie* showing that the facts (assumed to be true) entitle him to relief, an evidentiary hearing should be granted. *Siehl v. Grace*, 561 F.3d 189, 198 (3d Cir. 2009).

Thus, federal habeas review is appropriate. However, because exhaustion and default are defenses that must be asserted by Respondents and can be waived, Mr. Rodgers reserves his right to respond to any such default and procedural bar arguments that Respondents may choose to assert. Mr. Rodgers expects that the Commonwealth's answer will demonstrate that there exist material factual disputes regarding both questions of default and the merits of Mr. Rodgers' claims.

In *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2010), the Supreme Court held that federal courts analyzing state habeas claims under section 2254(d)(1) are limited to the factual record before the state court. This does not mean, however, that an evidentiary hearing is never available to state habeas petitioners in federal court, nor does it mean that a federal court cannot consider evidence that was not before the state court.

First, a federal court's review is not limited to the state court record if the state court failed to adjudicate a claim on the merits because *Pinholster* only applies to claims subject to section

32

2254(d). *Pinholster*, 131 S.Ct. at 1398 ("[R]eview under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Where a state court did not reach the merits of the claim, section 2254(d) does not apply, *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002), and a federal habeas court may conduct an evidentiary hearing. *See Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012).

Second, a federal court's review is not limited to the state record where a petitioner has demonstrated that section 2254(d) does not bar habeas relief. Where a habeas court finds the state court's merits determination was unreasonable, contrary to clearly established law, or an unreasonable determination of the facts, it may conduct a hearing. *See Pinholster*, 131 S.Ct. at 1412 (Breyer, J., concurring); *cf. id.* at 1411 n.20 (majority opinion) (explaining that because the petitioner failed to overcome section 2254(d)'s limitation on relief, the Court's "analysis [was] at an end" and it could not consider the evidence he presented to the district court); *Brown v. Wenerowicz*, 663 F.3d 619, 629 n.4 (3d Cir. 2011) (noting "that our jurisprudence applying §2254(e)(2) remains applicable 'where §2254(d)(1) does not bar federal habeas relief'") (quoting *Pinholster*, 131 S.Ct. at 1401)).

In this case, section 2254(d) does not bar habeas relief or it does not apply. *Pinholster* therefore does not prevent this Court from granting an evidentiary hearing on any issues of material fact.

Section 2254(e)(2) likewise does not prevent this Court from granting an evidentiary hearing. Under section 2254(e)(2), a habeas petitioner must demonstrate that he was not at fault for failing to develop in state court the evidence he is now seeking to develop in federal court or demonstrate that he can meet two narrow exceptions before an evidentiary hearing may be held.

*See Williams v. Taylor*, 529 U.S. 420, 430 (2000) (holding that a petitioner is at fault if he failed to exercise diligence in developing and presenting evidence).

Here, section 2254(e)(2) does not apply because Mr. Rodgers diligently attempted to develop the factual basis of his claims in state court. He requested a hearing on his PCRA proceedings, but the PCRA court held a hearing only as to penalty-phase claims and denied and dismissed his guilt-phase claims without a hearing. *See Thomas v. Horn*, 570 F.3d 105, 125-26 (3d Cir. 2009) (holding that an evidentiary hearing was not barred where petitioner requested, but was denied, hearing in state court); *Hardcastle v. Horn*, 368 F.3d 246, 261 n.6 (3d Cir. 2004) ("[P]ost-AEDPA, evidentiary hearings are permitted where, as here, the state courts fail[] to resolve the factual issue on which [the petitioner's] habeas petition rests. In such cases the failure to develop the factual record would not be [petitioner's] fault." (citations omitted) (internal quotation marks omitted); *Lark v. Sec'y Pennsylvania Dept. of Corrections*, 645 F.3d 596 (3d. Cir. 2011) (remanding for evidentiary hearing on merits of Petitioner's claim, where Petitioner raised a claim in a successor PCRA petition that was dismissed by the state court as untimely, but the state rule was inadequate bar to federal review).  He also requested discovery, which the PCRA court denied.

Finally, this Court may grant a hearing to address questions of procedural default, and whether a petitioner overcomes any procedural default through proof of cause and prejudice, and/or proof that his conviction represents a miscarriage of justice. *See Holloway v. Horn*, 355 F.3d 707, 716 (3d Cir. 2004) (district court "has authority to grant a hearing on a petitioner's ability to establish cause to excuse a procedural default, and therefore §2254(e)(2) is inapplicable to those hearings."); *Cristin v. Brennan*, 281 F.3d 404, 412-13 (3d Cir. 2002).

For the foregoing reasons, Mr. Rodgers requests an evidentiary hearing after full discovery to establish all material disputed facts which, if proved, would entitle him to relief.

**CONSTITUTIONAL CLAIMS**

**I   TRIAL   COUNSEL'S   REPRESENTATION   WAS   CONSTITUTIONALLY DEFICIENT AND MR. RODGERS WAS PREJUDICED.**

### A   *Introduction.*

Mr. Rodgers catalogues herein numerous errors and omissions committed by counsel, which deprived him of his right to counsel.

### B   *Relevant Constitutional Law.*

*Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the standard for evaluating an ineffective assistance of counsel claim. To prevail, a petitioner must show both: (1) that counsel's deficient performance fell below "an objective standard of reasonableness," *id*. at 688; and (2) prejudice stemming from counsel's deficiencies that undermines confidence in the result of the proceedings, *id*. at 694.

While the petitioner "must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance," *id*. at 689, strategic choices resulting from lack of diligent preparation and investigation are not protected by the presumption in favor of counsel, *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003). The Court emphasized in *Wiggins* that its decision rested on *Strickland*'s "limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'   A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"   *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 690-91). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 521-22 (citing *Strickland*, 466 U.S. at 690-91). In assessing deficient performance, the court must examine counsel's overall performance throughout the case rather than each asserted error in isolation. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

To establish prejudice, the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In assessing prejudice, a court must examine the cumulative effect of counsel's errors, though even one error may be sufficient to deprive the defendant of a fair trial. *Id.* at 687 *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984) (Sixth Amendment violation found where defendant demonstrates that specific errors of counsel undermined the reliability of the proceeding). In fact, "[t]here are instances . . . where a reliable trial does not foreclose relief when counsel has failed to assert rights that may have altered the outcome." *Lafler v. Cooper*, 566 U.S. 156, 169 (2012).

"There are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. In such cases, prejudice is presumed. Circumstances of this magnitude are present when counsel is available to assist the defendant, but, in the circumstances, any lawyer, even a fully competent one, would be unable to provide effective assistance of counsel. *Id.* at 659-60; *see also Bell v. Cone*, 535 U.S. 685, 696 (2002) (*Cronic* established three situations in which prejudice would be presumed; the third was a case "where counsel is called upon to render assistance under circumstances where

36

competent counsel very likely could not.");[20] *see also Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (per curiam) ("The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time."). Where a conflict of interest exists, counsel's most basic duty of loyalty is in jeopardy, and "facts are scrutinize[d] differently than in other ineffective assistance of counsel cases." *Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998) (citing *Strickland*, 466 U.S. at 692).

### C   *Trial Counsel's Performance was Prejudicially Deficient.*

#### 1   *Counsel's alcohol abuse and marital problems created a conflict that interfered with his duty to zealously represent Mr. Rodgers.*

On July 18, 1988, an information was filed charging James Franklin Rodgers with Patsy Lascoli's death and related offenses. The Blair County Public Defender, at the time Norman Callan, was appointed to represent Mr. Rodgers.

The week of February 1, 1989, J. Randall Miller was assigned as Mr. Rodgers' chief trial counsel. Application for Leave to Withdraw as Counsel (9/23/1991) at 1, attached as Appendix 23. Roughly four months later, in June of 1989, Mr. Miller was appointed Blair County Public Defender. *Id.* That position was part-time and paid $24,000/year. *Randall Miller named Blair public defender*, Altoona Mirror (7/29/1989), attached as Appendix 38. Initially, the county commissioners planned to appoint Mr. Miller as the "acting public defender." Appendix 23 at 1. However, after Mr. Miller indicated this was unacceptable and after Public Defender staff and

---

[20]   The first two situations, not applicable here, are the complete denial of counsel and when counsel fails entirely to subject the prosecution's case to meaningful adversarial testing. *Cronic*, 466 U.S. at 659-662.

attorneys wrote to the county commissioners threatening to resign *en masse*, the full appointment of public defender was made. *Id.*

Unbeknownst to Mr. Rodgers, Mr. Miller faced a number of struggles and challenges as he prepared for Mr. Rodgers' trial. Mr. Miller was drinking to excess and confronting significant marital discord, which adversely affected his ability to effectively investigate, prepare, and litigate Mr. Rodgers' case. Mr. Miller's spouse actively interfered with his efforts to prepare Mr. Rodgers' case, a fact that Mr. Miller did not advise Mr. Rodgers of until after trial:

> I never told you about this, but by late 1989 my wife had come to despise me and my business, and especially the part of my business that was and is your case. At each step along the way – from trial preparation through the Supreme Court work that I did last spring – she went out of her own way to make my work as difficult as she could make it; even during trial, night after night she would find some pretext to leave me alone at home with our three young children, forcing me to go without sleep after she returned to prepare for the resumption of trial the next morning. About half of my brief to the Superior Court of Pennsylvania was written between 11:30 P.M. and 6:30 A.M.

Letter from Randy Miller (12/21/1992) at 1, attached as Appendix 21. Mr. Miller also admitted to problematic drinking at the time of trial, stating that he thought things would be better after he "stopped drinking." *Id*. at 2.

Mr. Rodgers' trial commenced on April 30, 1990, well within the period of marital conflict and drinking identified by Mr. Miller. N.T. 4/30/1990. The jury returned guilty verdicts for first degree murder, robbery, and two counts of aggravated assault on May 23, 1990. N.T. 5/23/1990 at 3. Following a sentencing hearing, the jury sentenced Mr. Rodgers to life imprisonment on May 24, 1990. N.T. 5/24/1990 at 152. Just a few months later, on October 3, 1990, Mr. Miller was charged with a DUI in Blair County. Letter from Randy Miller (1/24/1992) at 1-2, attached as Appendix 22.

Following Mr. Miller's DUI, on March 8, 1991, post-verdict motions were denied.[21] Subsequently, on April 3, 1991, the trial court sentenced Mr. Rodgers to life without the possibility of parole for the first-degree murder conviction and to 5 to 10 years aggregated and concurrent for the remaining charges.

Based upon his admissions, Mr. Miller was living with the burden of his marital difficulties and his problematic drinking throughout his representation of Mr. Rodgers. Appendix 21 at 1. His marriage was falling apart, his wife was actively sabotaging his trial preparation, and he turned to alcohol.[22] *See id.* During the time he was working on Mr. Rodgers' post-verdict motions and appeal, he was fighting his own criminal DUI case, pursuing a civil case against the county for unlawful termination, and attending court-ordered alcohol rehab. Perhaps this is why the Superior Court spent the better part of four pages of its direct appeal opinion chastising Mr. Miller for filing a brief that "d[id] not comport with either the spirit or the letter of the pertinent appellate rules." Superior Court Opinion (2/26/1992) at 6, attached as Appendix 40. The court toyed with the idea of quashing the brief, but did not. *Id.* at 8.

"Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflict of interest." *Strickland*, 466 U.S. at 688; *accord Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment

---

[21]  On January 21, 1992, Miller was admitted to the Accelerated Rehabilitative Disposition (ARD) Program for a drunk driving charge made on October 3, 1990. Appendix 4; Appendix 1 at 4.

[22]  Mr. Miller was asked to resign as Blair County Public Defender just days after filing post-trial pleadings on Mr. Rodgers' behalf. Motion for Leave to Withdraw as Counsel for the Defendant (4/2/1991), attached as Appendix 39. As of December 17, 1990, Mr. Miller's bill remained unpaid. *Id.* Four months later, he moved to withdraw because of his unpaid bill, indicating it created a conflict of interest between himself and Mr. Rodgers. *Id.*

cases hold that there is a correlative right to representation free from conflicts of interest."). No one, not even the best defense lawyer, could perform effectively in the circumstances described above. An attorney is duty-bound to protect his client in these circumstances – especially when the defense attorney is representing a youth who is necessarily more reliant on his counsel. *See Miller v. Alabama*, 567 U.S. 460, 477-78 (2012) (noting that juveniles may be less able to assist their attorneys because of the hallmarks of youth). Mr. Miller's performance was ineffective in numerous ways. His deficient performance is discussed below.

As a result of the actual conflict of interest created by trial counsel's marital conflicts and his drinking, Mr. Rodgers was denied effective assistance of counsel. As a result of counsel's personal circumstances, a conflict of interest arose that interfered with his duty of loyalty and obligation to represent Mr. Rodgers. The real impact of this conflict is evidenced by the numerous trial deficiencies Mr. Rodgers identifies in this petition.

Even if this Court determines that Mr. Miller's actions do not amount to a conflict of interest as defined by *Wood* and its progeny, his alcohol abuse, marital problems, and financial burdens lend support to the argument that his performance was deficient under *Strickland*.

This sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient, and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

2   *Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witnesses.*

(1) *David Houtz.*

During its case-in-chief the Commonwealth presented the testimony of Mr. Rodgers' half-brother, David Houtz. N.T. 5/3/1990 at 127 *et seq.* Most significantly, Mr. Houtz testified about a telephone conversation that he had with Melissa O'Schea on July 15, 1988. *Id.* at 133. In his police statement, Mr. Houtz indicated that he had just been released from jail, his brother was under investigation for murder, and he wanted to "know exactly what was going on." *Id.* at 135. When he claimed during his trial testimony not to recall the specifics of a purported phone call with Ms. O'Schea, Mr. Houtz was shown his police statement, which the Commonwealth then had him read:

> Yes, I did. It was about three days ago. It was on the subject of my brother, Frankie Rodgers, and Patsy Lascoli's murder. I pleaded with her basically to tell me what happened the night of the murder. I asked her if she was involved with Frankie. Her first reply was no.
>
> So we talked for a couple of minutes. Finally she gave in. She told me Frankie took the - - yes, she told me Frankie talked to her on the phone on the night of the murder and was - - needed clothing form her. And I started asking her what else she knew, and that's when Frankie rushed in the room and asked me who I was talking to. And I told him it was Melissa O'Schea, and at that moment he took the phone from me.

N.T. 5/3/1990 at 136-37.

Immediately after this testimony, Mr. Miller requested at sidebar that the Commonwealth provide him with details of any plea agreement or understanding that it had with Mr. Houtz. *Id.* at 137. Mr. Haberstroh indicated he was unaware that there were any charges pending against Houtz. *Id.* Mr. Miller then indicated that Mr. Houtz had charges pending of criminal conspiracy, burglary, and theft. *Id.* at 137-38. Mr. Haberstroh reiterated on his and Mr. Sill's behalf that "there is no

41

agreement, plea agreements of any type" with Mr. Houtz.[23]    *Id.* at 138. The court asked the prosecution to recheck their files. In response, Mr. Haberstroh stated:

> The only one who may know it would be [District Attorney] Consiglio signed the information, but I have no knowledge. I doubt that any agreement would be made without my knowledge.

*Id.*

On cross examination, Mr. Houtz testified that he was not on probation; it ended three months ago before January 20, 1990. N.T. 5/3/1990 at 141. Mr. Houtz also testified that there was no plea agreement between himself and the Commonwealth. *Id.* at 143.

Counsel failed to object and/or properly cross-examine Mr. Houtz on two key points. First, counsel failed to object to Mr. Houtz's testimony regarding his phone conversation with Melissa O'Schea. This was known false testimony, which counsel could have excluded from the jury's consideration.

Notably, the Commonwealth put Ms. O'Schea on the stand during the homicide trial, but did not ask her about this telephone call. N.T. 5/3/1990 at 194-206. Instead of the hearsay-laden testimony of Mr. Houtz about a conversation ostensibly between Ms. O'Schea and Mr. Rodgers, the Commonwealth could have asked her directly to relay what she said to Mr. Houtz and to Mr. Rodgers. A fair assumption is that these questions were not asked because the Commonwealth knew she would testify as she later acknowledged while being deposed.

Furthermore, neither police report of an interview with Melissa O'Schea contains any mention of this telephone call that she supposedly participated in – because it did not happen. *See*

---

[23] *See infra* Claim II.C.1.(1), demonstrating that Mr. Houtz in fact had a plea deal with the Commonwealth.

Melissa O'Schea Statement (6/23/1988), attached as Appendix 42; Melissa O'Schea Statement (6/29/1988), attached as Appendix 43.

The police brought in Ms. O'Schea one more time to interview her. On July 18, 1988, at 1:48 pm, Mr. Houtz gave his statement to the police about this conversation he was told about. Statement of David Houtz (7/18/1988), attached as Appendix 44. Just seven hours later, Ms. O'Schea was brought back for further questioning. The police had her sign a rights waiver form. Melissa O'Schea Rights Form (7/18/1988), attached as Appendix 45. There, however, is no corresponding statement from Ms. O'Schea. This means that Mr. Houtz gave a bombshell statement in the early afternoon and the police sought to confirm it with the actual source of the information. When that source, Ms. O'Schea, did not confirm it, they recorded no statement. Counsel had the necessary proof, but failed to use it to cross-examine Mr. Houtz.

Alternatively, counsel should have impeached his testimony with the testimony of Melissa O'Schea, who would have testified that no phone call took place.[24]

Second, Mr. Miller failed to adequately cross/impeach Mr. Houtz with the fact that he was on probation at the time of Mr. Rodgers' trial and thus when his most recent charges were filed. As noted above, Mr. Houtz told the jury he was not on probation. However, Mr. Miller had documentary evidence that demonstrated Mr. Houtz was in fact on probation. Specifically, post-trial Mr. Miller advised Mr. Rodgers:

---

[24] As part of the civil lawsuit brought by Mr. Lascoli's family against Mr. Rodgers, Melissa O'Schea was deposed on April 2, 1991. *See* Court Reporter's Invoice, attached as Appendix 41. On information and belief, Ms. O'Schea said under oath while being deposed that she did not have this conversation with Mr. Houtz. It simply did not happen.

Mr. Rodgers has been seeking to obtain this three-decade old deposition and will continue to do so.

> And documents proving that David lied under oath about the termination of the probation ordered in September 1988 by Judge Kopriva *were in my files* even as he testified for Mr. Haberstroh from the witness stand.

Letter from Randy Miller (1/25/1992) at 3 (emphasis added), attached as Appendix 46.[25]  Mr. Miller did not make a strategic decision not to use these materials to impeach Mr. Houtz; rather, Mr. Miller simply failed to do so. *Id.* ("On the other hand I had some good ideas, one of which – during the confusion that momentarily set in as the defense began to fall apart under the strain of the trial court's rulings in the week of May 21 – once again slipped my mind.").

Mr. Houtz was an important witness for the Commonwealth. He was not some random person off the street, he was Mr. Rodgers' brother. When Mr. Miller corrected Mr. Houtz stating that he and Mr. Rodgers were "half-brothers," Houtz affirmed their "real" relationship:

> If that's the way - - I mean if that's legal. I mean we grew up together. I mean we both came from our same mother. I mean I consider that as a real brother.

N.T. 5/3/1990 at 150. The power and impact of a brother implicating his own flesh and blood in a murder cannot be understated. Competent counsel would have used Houtz's probationer status as impeachment evidence:

> A key prosecution witness's prior criminal history and resultant parole status clearly constitute important impeachment evidence. It is beyond the range of professionally reasonable judgment to forego investigation of, and impeachment based upon, such evidence absent some apparent strategic reason that might explain or excuse counsel's failure.

---

[25]  In addition to the evidence he had in his files, shortly after trial he received confirmation from Mr. Houtz's attorney that the deal had been consummated at the preliminary hearing months before Mr. Rodgers' trial. Letter from Attorney Timothy Sullivan (11/9/1990), attached as Appendix 17 ("the Plea Agreement was offered by Assistant District Attorney Richard Consiglio earlier at the Preliminary Hearing, however, it was not actually entered into and signed by my client [Mr. Houtz] until October 5, 1990.").

*Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013) *abrogated on other grounds*, *Dennis v. Sec'y, Pennsylvania Dep't. of Corr.*, 834 F.3d 263 (3d Cir. 2016).

It would not have been merely helpful for counsel to impeach Mr. Houtz; it was defense counsel's admitted trial strategy. *See* Appendix 46. Counsel recognized the need to impeach Mr. Houtz but failed to execute the impeachment by using *evidence in his own file* because of "confusion" and because it "slipped [his] mind." *Id.*

To show a reasonable probability of a different outcome, a petitioner must show that the jury could have disbelieved the critical witness if he had been impeached. *Smith v. Cain*, 565 U.S. 73, 76 (2012). Evidence of a witness's motive to lie is more valuable impeachment than prior inconsistent statements because the motive explains why the witness would lie. *Reynoso v. Giurbino*, 462 F.3d 1099, 1113 (9th Cir. 2006) (citing *Stephens v. Hall*, 294 F.3d 210, 224 (1st Cir. 2002)). Mr. Houtz had a reason to implicate his brother, a reason which he hid from the jury. Given the critical nature of this witness, Mr. Rodgers was prejudiced.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### *(2) Timothy Bowling.*

Timothy Bowling testified that while he went to school with Mr. Lascoli's grandchildren, Mr. Bowling had never seen or talked to Mr. Lascoli. N.T. 5/3/1990 at 165. Mr. Bowling protested too much and his testimony went too far. In fact, contrary to his trial testimony, he told police that he had said "hi" to Mr. Lascoli. Timothy Bowling statement to police (6/24/1988) at 4, attached as Appendix 47. There were questions about Mr. Bowling's credibility that defense counsel

45

illustrated during cross-examination. *See* N.T. 5/3/1990 at 172 *et seq.* However, counsel failed to

cross-exam Mr. Bowling on his familiarity with Mr. Lascoli.

The Commonwealth's case hinged on several people – the Bowling brothers, their friends,

and associates – pointing the finger at Mr. Rodgers.[26] Given the nature of their testimony, each

---

[26]    For example, Timmy Bowling testified that he was riding around in a car with his brother Tommy, Serena Henry, and Tammy Ickes the night Mr. Lascoli was killed. N.T. 5/3/1990 at 170, 173. He testified that he was dropped off at Tommy's and Maria Pierce's place at about 9:00 pm. *Id.* at 173.

Initially, Ms. Henry told the police that she had been in this car with these people until around 9:00 pm. N/T 5/10/1990 at 63. She added that she saw Mr. Rodgers wearing the jams later found in Prospect Park. *Id.* at 64. She, however, was re-interviewed by the police a few weeks later when the police discovered that she actually was on the phone talking *long distance* to Tammy Ickes in Bedford County from 8:18 pm to 9:06 pm. N.T. 5/17/1990 at 199-200; N.T. 5/10/1990 at 102-03. Which of course means that neither Ms. Henry nor Ms. Ickes was in the car with Timmy and Tommy Bowling. And, furthermore, Ms. Henry did not see Mr. Rodgers wearing the jams. Ms. Henry then admitted that she lied. N.T. 5/10/1990 at 64-65. She also explained that the reason she lied was because she "was basically talked into doing it because Timmy told me that it would help Tommy out." *Id.* at 65.

In her final statement to the police, Ms. Henry was asked why she initially told the police her false story:

> Q. Why did you tell Officer Sassano that you were with Tommy Bowling?
>
> A. On the way over here to City Hall on June the 24th, Timmy Bowling told me that we should get our stories straight.
>
> Q. What did Timmy Bowling ask you to tell the Police?
>
> A. Told me to tell them that I was with Tommy that night and that I seen Frankie outside Tommy's apartment with jams on.
>
> Q. Why did Timmy Bowling want you to tell the Police that story?
>
> A. I think Timmy wanted me to cover for Tommy.
>
> Q. Did you tell the Police this story because you wanted to cover for Tommy?
>
> A. I felt that Tommy might have been involved in this Murder and I told the Police this story because I wanted to help him.

46

supported the other. Damage to the credibility of any one of them damaged the Commonwealth's case in its entirety.

To show a reasonable probability of a different outcome, the petitioner must show that the jury could have disbelieved the critical witness if he had been impeached. *Smith*, 565 U.S. at 76. Evidence of a witness's motive to lie is more valuable impeachment than prior inconsistent statements because the motive explains why the witness would lie. *Reynoso*, 462 F.3d at 1113 (citing *Stephens*, 294 F.3d at 224). Timothy Bowling had a reason to implicate Mr. Rodgers – his brother was an alternative suspect identified by the defense. N.T. 5/18/1990 at 12, 17-18, 24, 36-42, 44, 64-65. Because the Commonwealth's case was dependent on less than "perfect" stories told by witnesses who had reasons to implicate Mr. Rodgers, damage to one witness damaged the Commonwealth's case. As a result, counsel's failure to establish that a Commonwealth witness was lying was prejudicial.

---

Q. What made you believe that Tommy might have been involved in this murder?

A. On June 7th I had received a telephone call from Tommy at my home at or around 10:20 PM, which was unusual because it was so late.

Q. What did Tommy Bowling want when he called you that night?

A. I think he might have wanted me to come in and pick him up but I'm not sure.

Q. Is there any other reason, other than that telephone call, that made you believe that Tommy was involved in that Murder?

A. The picture of the white coat and the aqua shirt I believe to be Tommy's. Also after the murder happened he wanted to leave town right away with me because Tommy was going to Job Corps and he wanted me to move to Pittsburgh with him.

Serena Henry statement to police (7/12/1988), attached as Appendix 48.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### (3) David Riley.

David Riley, who worked for the Blair County Detention Home,[27] testified that he previously had seen the colorful shorts, or "jams," introduced as Commonwealth Exhibit 4 at trial. Mr. Riley testified that the jams were with Mr. Rodgers in August 1987. N.T. 5/4/1990 at 153-54. Mr. Riley said that he put the initials "F.R." on the tag inside of the shorts. *Id.* at 155. In cross-examining Mr. Riley, trial counsel only asked three questions, all related to the initials. *Id.* at 156. However, effective counsel would have been able to use Exhibit 205 to impeach Mr. Riley's testimony that linked Mr. Rodgers to the blood-stained jams.

Exhibit 205 is an admission form and logs from the detention center. *Id.* at 152. Exhibit 205 reveals what Mr. Rodgers' clothing and property Mr. Rodgers had with him when he entered and was released from the detention center. Admission Form (8/17/1987), attached as Appendix 49. Review of that document demonstrates the impossibility of Mr. Riley's testimony. There are no multi-colored jams listed on the document. Indeed, there are two "bottoms" listed in the inventory, neither of which are multi-colored jams. Page 1 of Exhibit 205 lists the "slacks" that Mr. Rodgers was wearing as "shorts." Page two of Exhibit 205 clarifies that description, indicated that Mr. Rodgers had "cutoff sweat pants." Certainly Mr. Rodgers cut off sweatpants could be labelled as "shorts," but they would not fit the description of the multi-colored jams that Mr. Riley

---

[27] When he testified at trial, Mr. Riley was part of law enforcement as a member of the Blair County Sheriff's Department. N.T. 5/4/1990 at 151.

suggested Mr. Rodgers was wearing. *See* Picture of jams (6/20/1988), attached as Appendix 50. Given that the inaccuracy of Mr. Riley's testimony is evident from a Commonwealth exhibit, counsel would have had to do little more than look at *both* pages of the document to impeach Mr. Riley's testimony. Counsel failed to do the bare minimum and thus allowed the Commonwealth to improperly link Mr. Rodgers to clothing covered in Mr. Lascoli's blood.

The "jams" were a critical piece of evidence for the Commonwealth. As the Commonwealth understood it had a circumstantial case,[28] it must have been clear that it needed to directly connect Mr. Rodgers to the jams that were stained with Mr. Lascoli's blood. During its closing argument, the Commonwealth discussed the jams eight different times. N.T. 5/18/1990 at 84, 86, 87, 87-89, 92, 93, 93-94, 113); *see*, *e.g.*, *id.* at 93-94 ("Now all of the evidence at this point, ladies and gentlemen, all of the evidence to this point ties in two people, Mr. Lascoli and the Defendant in this particular case. The Commonwealth used certain labels for civilian witnesses, Thomas Bowling, Maria Pierce, Timmy Bowling and the other witnesses that we called will all tell you what they saw, that they observed, identified clothing, identified jams.").

Evidence was found a little at a time in Prospect Park over the course of a month. The police would find some items and then would come back another day and find more in or very near to an areas they had already searched without finding more evidence. The jams were found during their second sweep of the park. On June 15, 1988 – a week after the murder – Mr. Lascoli's wallet was found in the park. N.T. 5/3/1990 at 221-22; N.T. 5/4/1990 at 13. The next day, the police returned to the park. Just about 100 feet from where they had searched the day before, they

---

[28]  In its closing argument, the Commonwealth conceded that its case against Mr. Rodgers "is based on circumstantial evidence." N.T. 5/18/1990 at 75. The jury agreed – it listed as a mitigating circumstance the "possibility of someone else being involved because of circumstantial evidence." N.T. 5/24/1990 at 153.

found the jams. The jams were not hidden. Instead, they were prominently displayed sitting on top of a cardboard box. N.T. 5/4/1990 at 50-53, 109.

Detective Sassano said that when he found the jams with a blood-like stain, he suspected that they might be connected to this case and he picked them up with a stick. N.T. 5/4/1990 at 51-52. Though there are pictures of everything else that was found in the park, as one might expect, the discovery lacked a photograph of just one item: the blood-stained jams. *Compare id.* at 50-52, 107 (no photograph of the jams); *with id.* at 58-59, 59, 61, 61-62, 62-63, 63-64, 64, 72-73, 73-74, 77, 79, 89 (photos of everything else found in Prospect Park). The cardboard box that hosted the jams *was* photographed in the park. Picture of cardboard box (6/22/1988), attached as Appendix 51.

But, it seems that there may in fact have been a picture of these jams that was not turned over to the defense. *See* N.T. 5/10/1990 at 136-37 (defense investigator testified that, during an evidence view at City Hall, he saw a picture of the jams in the park). This begs the question of why a picture would have been taken, but not given to the defense (or, alternatively, why a picture never would have been taken at the time). Relatedly, Melissa O'Schea, who washed Mr. Rodgers' clothes, testified that she had not seen the initials on the tag. N.T. 5/3/1990 at 201-02. If the jams in the park did not have "F.R." and/or "Frank" when in the park, but they did have it once later photographed in the police station, *see* Appendix 6, someone who in law enforcement with access to them wrote that on there to connect the jams to Mr. Rodgers.

Additionally, the record is clear that Mr. Rodgers was living at Tommy Bowling's apartment at the time and his clothes were kept there. *See* N.T. 5/2/1990 at 137. Other people also clearly had access to his clothes. For example, when Mr. Rodgers stopped at Tommy's apartment on June 13 to get his clothes, his clothes were scattered all over the place. Mr. Rodgers said that

Tommy said that he would collect them, wash them, and see that he got them. N.T. 5/16/1990 at 107-08. When Mr. Rodgers did pick his clothes up a few days later, the jams were not among these clothes. *Id.* Tommy similarly said that he told Mr. Rodgers that he would collect his clothes, but he says he never did and he did not remember if the clothes were ever picked up. N.T. 5/2/1990 at 171-72. Melissa O'Schea testified that she would do his laundry for him during this time. N.T. 5/3/1990 at 197. In sum, many people had access to Mr. Rodgers' clothes.

Also, as noted above in footnote 26, Timmy Bowling had asked Serena Henry to lie to the police by saying she saw Mr. Rodgers wearing the jams on the night of the murder. Once her false statement had been discovered by the police, she told them that she said this because she "felt that Tommy [Bowling] might have been involved in this Murder and [she] told the Police this story because [she] wanted to help him." Appendix 48 at 2.

Given the circumstantial nature of the offense, linking this clothing to Mr. Rodgers was a critical piece of the Commonwealth's case. Had counsel attacked Mr. Riley's testimony with the Commonwealth's own exhibit, such a transgression could have changed the jurors entire view of Mr. Riley and impacted the jurors' overall view of the Commonwealth's circumstantial case. As it is, the jurors already were questioning how the evidence kept turning up in the park. *See* N.T. 5/24/1990 at 153 (one of the reasons the jury gave for rejecting a death sentence was the "possibility of someone else being involved because of circumstantial evidence, i.e., excess clothing, period of time required to find clothing in the park"). If the jury did not believe that those jams belonged to Mr. Rodgers or if they thought that the evidence had been tampered with, then this jury that deliberated for four days may have found him not guilty.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as

51

a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### (4) Detective Cooper.

Counsel could have done more to attack Detective Cooper's testimony that Mr. Rodgers' signed his name with his left-hand. The cut to Mr. Rodgers' left hand was integral to the Commonwealth's case. It was the Commonwealth's position that Mr. Rodgers cut himself during the attack on Mr. Lascoli and that he subsequently left blood in Mr. Lascoli's pants pocket and on the grey sweater because of that wound.  While Mr. Rodgers and his mother both testified that he was right-handed, Detective Cooper testified that Mr. Rodgers' signed documents in his presence with his left hand. N.T. 5/2/1990 at 28.

Counsel, though, had at his disposal documents *that he introduced into evidence* for other purposes that confirmed that, post hand injury, Mr. Rodgers's dominant hand that he wrote with was his *right* hand and not his left. Diagnostic Evaluation and Recommendation (5/20/1987) at 17, attached as Appendix 52 at 17 (Mr. Rodgers "use[d] the [right] hand frequently to handle testing material and writing tools"); *id.* at 12 (Mr. Rodgers had "worked on strengthening his grip [with his right hand] while on the unit"); Northern Tier Youth Services Evaluations (7/31/1989), attached as Appendix 53 at 21 (a "Finger Oscillation Test" administered on April 28, 1987 indicated that his right hand was his dominant hand).

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 3   *Trial counsel failed to object to hearsay presented by the Commonwealth.*

Trial counsel has an obligation to object to errors at trial. *See, e.g., United States v. Hylton*, 294 F.3d 130, 134-36 (D.C. Cir. 2002) (finding counsel ineffective for failing to object); *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (failure to object resulted in trial court not issuing cautionary instruction); *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (deficient performance where counsel failed to object to prosecutorial misconduct); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994) (finding counsel ineffective for failing to object to aggravating circumstance).

During its case-in-chief, the Commonwealth offered the testimony of Mr. Rodgers' brother, David Houtz. Houtz testified that he spoke to Melissa O'Schea, who was Mr. Rodgers' ex-girlfriend and a witness for the Commonwealth, after Mr. Lascoli's murder. Mr. Houtz stated that Ms. O'Schea told him that Mr. Rodgers called her on the night Mr. Lascoli was killed asking for clean clothing. N.T. 5/3/1990 at 136-37.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See*, *e.g.*, *Whitfield v. Reading Co.*, 112 A.2d 113, 115 (Pa. 1955) (internal citations omitted) ("The hearsay rule of exclusion applies only to extra-judicial utterances offered as evidence of the truth of the matter asserted"). Hearsay is inadmissible except in limited circumstances. Pa.R.Evid. 802. Because Mr. Houtz's testimony did not satisfy the Rule 802 exceptions, his testimony was inadmissible. The trial court would have precluded his testimony had counsel objected. However, counsel stood mute. Attorney Miller admitted in a letter to Mr. Rodgers his failure to object was a mistake rather than a strategic decision: "[e]very second-year law student knows that testimony like this is hearsay." Appendix 46 at 3  Counsel's performance was deficient.

Counsel's failure to object prejudiced Mr. Rodgers. Counsel's omission meant that the jury was left to accept as true that Mr. Rodgers had asked his former girlfriend for clean clothing on the night of the murder.[29]

This testimony bolstered the Commonwealth's case that Mr. Rodgers had stabbed Mr. Lascoli by suggesting that he needed a change of clothing as a result. *See*, *e.g.*, N.T. 5/18/1990 at 113-14 (Commonwealth's closing: "He got blood all over him and grabbed the first thing that he could find. He wasn't worried whether it was a smock. If I put this on me and I stuck it down in these pants, somebody is going to think it's a shirt, but at least I've got my blood covered up."). Moreover, the jury heard this evidence from a particularly compelling source – Mr. Rodgers' own brother. Counsel's performance was prejudicially deficient.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 4   *Trial counsel failed to object to the admission of irrelevant evidence.*

The Commonwealth introduced a knife that had been discovered by Joseph Kawtoski, an electrician who was doing repairs in the apartment building in which Mr. Rodgers' mother lived. N.T. 5/9/1990 at 104-05. He found the knife lying on a ceiling panel in a bathroom drop ceiling in

---

[29]   Melissa O'Schea was not asked about this conversation during her testimony, even though she testified in the Commonwealth's case-in-chief. *See* N.T. 5/3/1990 at 194-206. And, no police report of Ms. O'Schea's statements mentioned this phone call. Appendix 42; Appendix 43. When she was brought in for questioning a third time - eight hours after Mr. Houtz first pitched this phone call - she signed a rights form, but there was no statement generated. In a now-missing deposition, it seems that Ms. O'Schea said this conversation did not happen. *See supra* n. 24.

an empty apartment on the first floor. *Id.* at 105-07. Mr. Rodgers' mother did live in the building – *on the third floor*. N.T. 5/4/1990 at 145-47. Mr. Kawtoski's testimony did not establish possession. Multiple people lived in the six-unit apartment building. Fingerprints did not link Mr. Rodgers to the knife. Indeed, the only testimony that attempted to establish possession was that of Melissa O'Schea and she testified that Exhibit 28 was ***not*** Mr. Rodgers' knife. N.T. 5/3/1990 at 217-18.

Moreover, the Commonwealth did not even demonstrate that Exhibit 28 was the murder weapon. Testing on the knife showed that there was merely a trace amount of blood, which was insufficient amount for any testing whatsoever. State Police Crime Lab Report (9/2/1988), attached as Appendix 54. There was no blood or DNA evidence offered to link the weapon to Mr. Lascoli's death. Because the Commonwealth did not demonstrate that Exhibit 28 belonged to, or was ever possessed by, Mr. Rodgers, it was not admissible under the similar-weapon exception. *Christine*, 125 A.3d at 400. Subsequently, when the prosecutor moved Exhibit 28 into evidence, he referenced Melissa O'Schea's testimony in supporting its admission, even though she testified that it was *not* Mr. Rodgers' knife.[30]  N.T. 5/4/1990 at 39. Defense counsel failed to object to this irrelevant exhibit. *Id.*

Trial Exhibit 28 was inadmissible at trial because it was irrelevant. Pa.R.Evid. 402. In Pennsylvania, "[a] weapon not 'specifically linked' to the crime is generally inadmissible." *Commonwealth v. Christine*, 125 A.3d 394, 400 (Pa. 2015) (internal citation omitted). The *Christine* Court allowed for the admission of "a weapon or implement suitable to the commission of the crime charged," but only where the weapon was in the accused's possession. *Id.*

---

[30]   In fact, none of the knives presented at trial were ever identified as the murder weapon.

The theory behind *Christine* was that the fact that the weapon "was possessed may allow the inference it could have been used." *Id.* Exhibit 28, however, was not found in Mr. Rodgers' possession. Nor was it identified as ever belonging to him. The Commonwealth did not come close to establishing "a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime." *Id.* (internal citation omitted).

Trial counsel should have objected. Had he done so, the trial court would not have admitted Exhibit 28 into evidence. Exclusion of this evidence would have prevented the prosecutor from making highly inflammatory and improper arguments in closing argument.

Counsel's error was compounded when the prosecutor argued that Exhibit 28 belonged to Mr. Rodgers and that he used it to kill Mr. Lascoli. In closing argument, the prosecutor told the jury that "the knife that Mr. Kawtoski found is Rodgers, hide the knife." N.T. 5/18/1990 at 115. Again, no one identified Exhibit 28 as belonging to Mr. Rodgers. No one demonstrated that he hid the knife. Moreover, while there was a trace amount of blood found on the knife, it was not linked to either Mr. Rodgers or Mr. Lascoli. In short, there is no evidence connecting this knife with this case. This was not sufficient to make the astonishing leaps made by the prosecutor. However, the comments stood unchecked by an objection and without the resultant curative instruction because counsel once again failed to object. For this failure to object, counsel was ineffective.

This evidence and argument were prejudicial. It allowed the jury to impute ownership without evidence and to presume the weapon was used to kill Mr. Lascoli without a scintilla of evidence to support the prosecutor's argument.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as

56

a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 5   Trial counsel failed to object to the prosecutor's misstatement of evidence.

During the Commonwealth's closing argument, the prosecutor misrepresented the evidence presented at trial. In response to Mr. Rodgers' defense that he was being framed for Mr. Lascoli's murder, the prosecutor told the jury that Mr. Rodgers' blood was found at the crime scene. Specifically, the prosecutor argued that the "framers" "couldn't have possibly gotten back in the house and sprinkled his blood on the kitchen floor." N.T. 5/18/1990 Vol 16 at 16. However, no DNA evidence linked Mr. Rodgers' blood to Mr. Lascoli's kitchen. N.T. 5/7/1990 at 73 *et seq.* Serology testing found two spots in the kitchen that were consistent with Mr. Rodgers' blood type and a handful of enzymes. N.T. 5/5/1990 at 18-19, 29. This is not the same as "finding" Mr. Rodgers blood. Statistics at the time revealed that Mr. Rodgers shared type O blood with 45% of the population. N.T. 5/5/1990 at 79. Two of the enzymes tested were extremely common, shared by 90% of the population (ADA and AK), while a third (PGM) was shared by 58 1/2% of the population. *Id.*

The Commonwealth's argument was an egregious overstatement of the evidence. The prosecutor's comments, however, stood unchecked by an objection and, with no curative instruction, the jury was allowed to believe that the serology evidence from the kitchen was far more significant than it was given the circumstantial nature of the Commonwealth's case. This argument, made in a long and scientifically complex case, allowed the jury to improperly link Mr. Rodgers to the crime scene. It was prejudicial. Had counsel objected, it at the very least would have yielded a curative instruction.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 6    Trial counsel failed to investigate and defend against the charges.

#### (1) Trial counsel was ineffective for stipulating to the chain of custody concerning the blood evidence; a vial of blood had gone missing.

Mr. Rodgers was capitally-tried in 1990. During that period, "the prevailing professional norms, as outlined by the ABA Standards, required that a lawyer 'conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case. . . .'" *Bobby v. Van Hook*, 558 U.S. 4, 7 (2007) (per curiam) (citing 1 ABA Standards for Criminal Justice 4-4.1, p. 4-53 (2d ed. 1980)); *Wiggins*, 539 U.S. at 522 (same); *Williams* (*Terry*) *v. Taylor*, 529 U.S. 362, 396 (2000) (same); *see also Rompilla v. Beard*, 545 U.S. 375, 387 n.7 (2005) (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989)[31] set forth prevailing professional norms for investigation in a capital case). The 1989 ABA Guideline 11.4.1 sets forth recommendations for investigation in capital cases, which are extensive.

As the Commonwealth conceded during closing argument, the case against Mr. Rodgers "is based on circumstantial evidence." N.T. 5/18/1990 at 75. No witness placed Mr. Rodgers in or around Mr. Lascoli's home at the time of the homicide. No one witnessed Mr. Rodgers commit

---

[31]    The 1989 ABA Guidelines are available at www.americanbar.org/groups/committes/death_penalty_representation/resources/aba_guidelines/1989-guidelines/1989-guideline-11-4-1/.

the crime. Mr. Rodgers did not confess to the crime. Indeed, much of the evidence the Commonwealth presented did not point to Mr. Rodgers at all. Fingerprints processed at the crime scene did not belong to Mr. Rodgers. Bloody shoe prints from the crime scene did not match his shoes.  Mr. Rodgers' shoes did not have blood on them. The wallet the Commonwealth theorized was taken from Mr. Lascoli's pants pocket by someone with a bleeding hand did not have blood on it.  The wallet, however, did have a usable fingerprint, but it did not match Mr. Rodgers. N.T. 5/4/1990 at 147; N.T. 5/10/1997 at 5-7; Appendix 2.

The Commonwealth's case instead focused upon two pieces of forensic evidence and a cadre of witnesses who had varying, self-interested reasons in pointing the finger at Mr. Rodgers. The Commonwealth recognized their witnesses "had reputations that were perhaps a little less than exemplary and many of them live . . . different lifestyle from some of the other of us." N.T. 5/18/1990 at 94. And the Commonwealth acknowledged those witnesses' "stories were not perfection." *Id.*

Beyond these "imperfect" witnesses, the Commonwealth presented three items of clothing that may or may not have been Mr. Rodgers' where Mr. Lascoli's blood was found. The record established that multiple people, including several of the Commonwealth's imperfect witnesses, had access to these items of clothing.[32]

---

[32]   The history of the discovery and collection of these clothing items and Mr. Lascoli's wallet are fraught. On June 15, 1988, a week after the murder, an 11-year-old and her grandfather discovered the picture holder from Mr. Lascoli's wallet while walking in Prospect Park. N.T. 5/3/1990 at 221-22. When the police later processed this area, a photo technician bumped a bush and Mr. Lascoli's wallet fell on his head. N.T. 5/4/1990 at 13.

The following day, June 16, 1988, the police returned to Prospect Park. On this date, the police found "jams" spread on top of a cardboard box approximately 100 feet from where they located the wallet the day prior, but did not notice the colorful shorts spread on a box. *Id.* at 50-53, 109.

59

This meant that the Commonwealth's case hinged on the DNA analysis performed on two pieces of evidence, Mr. Lascoli's interior pants pocket and a gray sweater that was removed from his home and found in Prospect Park. Initially, various items of evidence were tested for serology by the Pennsylvania State Police Crime Lab, including Mr. Lascoli's pants pocket.[33]   N.T. 5/5/1990 at 2 *et seq.* The state crime lab analyzed the blood on Mr. Lascoli's pants pocket and it concluded that the blood on the pocket did *not match* Mr. Rodgers. *Id*. at 46-47.

However, DNA testing months later on this same evidence subsequently was performed. Lifecodes[34] found Mr. Rodgers' DNA inside of Mr. Lascoli's pants pocket.  N.T. 5/7/1990 at 29.

---

On June 22, 1988, almost one week after the second trip to Prospect Park, the police returned and recovered a pair of men's size 46 blue jeans, a yellow jacket, a smock, and a doily. *Id*. at 59-64. These items were found out in the open approximately twenty feet from where the jams were found six days before and also were unnoticed by the police. *Id*. at 115-16. These items were identified as belonging to Mr. Lascoli. *Id*. at 66.

On July 7, 1988, a full month after Mr. Lascoli was killed, the police returned to Prospect Park for the fourth time. During this trip, the police found a gray Penn State sweatshirt with the sleeves and neck area cut as well as a gray button-down sweater in an area that previously had been searched. N.T. 5/3/1990 at 120 ("we would have went past the sweat shirt and sweater"). This shirt belonged to Mr. Rodgers' brother, David Houtz, N.T. 5/3/1990 at 129-31, but some witnesses said Mr. Rodgers also had worn it, *id*. at 129,154, while another said that Tsani Johnson, another friend, was last seen wearing it. N.T. 5/2/1990 at 160.

[33]   Serology testing with the state crime lab found two spots in the kitchen that were consistent with Mr. Rodgers' blood type. N.T. 5/5/1990 at 18-19, 29. This is not the same as "finding" Mr. Rodgers blood. Statistics at the time revealed that Mr. Rodgers shared type O blood with 45% of the population. N.T. 5/5/1990 at 79. Moreover, two of the enzymes tested were extremely common, shared by 90% of the population (ADA and AK) while a third (PGM) was shared by 58 1/2% of the population. *Id*.

[34]   Just prior to Mr. Rodgers' trial, Lifecodes was involved in an early DNA case in New York, *People v. Castro*. There, Lifecodes initially said that blood found on the defendant's wristwatch matched the victim's blood. After a lengthy pre-trial hearing (complete with defense experts, unlike Mr. Rodgers' case), the trial judge ruled that Lifecodes "failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty." *People v. Castro*, 545 N.Y.S.2d 985, 999 (N.Y. Sup.Ct. 1989). The results of a match, therefore, were not admissible because of "unresolved

Appendix 12. However, Mr. Rodgers' blood from the pocket did not have bacteria present despite the intervening conditions and passage of time. *Id*. Mr. Rodgers' blood sample, which was taken from him in a hospital and put into a tube, also did not have bacteria. *Id*. Mr. Rodgers' blood sample and the pocket sample also shared another oddity: Lifecodes found that neither contained human DNA. *See id.*

Mr. Lascoli's pants were sent for DNA testing months after the initial DNA testing in this matter. N.T. 5/7/1990 at 26-27. Moreover, this evidence was maintained in Detective Sassano's home refrigerator prior to delivering it to Lifecodes. N.T. 5/4/1990 at 139; Sassano/Lutz Police Report (8/4/1988), attached as Appendix 56.

The sweater shares a similar history. When the State Police Lab tested it, the lab only found Group B human blood and the tests for enzymes were "inconclusive," meaning it did not find blood that was consistent with Mr. Rodgers. N.T. 5/5/1990 at 39. Mr. Lascoli was Group B blood, while Mr. Rodgers is Group O. Lifecodes, however, was asked to test this item and its test found that there was a mixture of blood that was consistent with both Mr. Lascoli and Mr. Rodgers. N.T. at 5/17/1990. Another oddity: this sample tested negative for Y-chromosome, which would make

---

ambiguities." *Id*. at 998. Also, the *Castro* Court found Lifecodes' techniques for determination of the probability of a match was unreliable. *Id*. Eventually, the experts for the prosecution and the defense took the extraordinary step of issuing a joint written statement that concluded that the tests performed by Lifecodes "were not scientifically reliable enough to support the assertion that the samples . . . do or do not match." John Caleb Dougherty, *Beyond* People v. Castro*: A New Standard of Admissibility for DNA Fingerprinting*, J. Contemporary Health L. and Pol'y 269, 285 n.95 (1991).

Similar flaws were present in Mr. Rodgers' case. Lifecodes issued a supplemental report in Mr. Rodgers' case that acknowledged that its original calculation of the probability of a match was inaccurate, just like its results in *Castro*. Lifecodes Revised Statistical Analysis (9/6/1989), attached as Appendix 55; *see also* N.T. 5/8/1990 at 198-99.

it consistent only with Mr. Lascoli's sample and inconsistent with Mr. Rodgers' sample that was positive for Y-chromosome. Appendix 12.

Given the centrality of the DNA evidence to the Commonwealth's case, the tortured history of the police's recovery of physical evidence in this case, the inconsistent findings between the state police lab and Lifecodes, as well as unusual maintenance of such evidence in an officer's home, counsel should have investigated and attacked this evidence on a host of fronts.

For example, Lifecodes itself had a troubled history. *See* n. __, *supra.* [previous page] Despite being aware of this information, counsel "papered" the trial court with mounds of information that should have been presented to the court by way of expert testimony, a lazy and deficient presentation. Instead, counsel admitted that he was bluffing with the threat of calling a DNA expert. *See* Appendix 46 at 1, ("call my apparent bluff on the prospective appearance or nonappearance of Dr. Eric Lander for the defense during the Frye hearings and at rial in your case").

Subsequently, at trial, counsel stipulated to the chain of custody "prepared overnight by the prosecution and the police." *Id.* Miller and his co-counsel "barely glanced" at the document that was prepared. *Id.* Counsel should have investigated and challenged the chain of custody of the Commonwealth's evidence, particularly because a purple-topped tube of Mr. Rodgers' blood had disappeared. *See* Appendix 13 at 2. ("Physical Evidence Not in the Custody of the Prothonotary…14 One purple-topped vacutainer of suspect's blood") Had counsel done his job, he would have realized this.

In Pennsylvania, "gaps in the chain of custody go to the weight that is afforded evidence not its admissibility." *Commonwealth v. Copenhefer*, 719 A.2d 242, 256 (Pa. 1998). So, while a challenge to the chain of custody would not have barred the Commonwealth from presenting

various pieces of evidence, it could have significantly impacted and aided Mr. Rodgers' defense. This is so because Mr. Rodgers' trial defense was that he did not kill Patsy Lascoli, but rather that he was being framed for the murder. This discovery could have been a gamechanger in Mr. Rodgers' case. That a vial of Mr. Rodgers' blood was missing would have provided compelling support for Mr. Rodgers' claims of fabrication.

Trial counsel argued and insinuated that Mr. Rodgers was being framed, but that was all counsel was able to do. He pointed to the motives of the witnesses. He reminded the jurors about the differences in the testing by the state crime lab and Lifecodes, he questioned Detective Sassano about the delayed testing and his unusual storage of the clothing that was tested.  He suggested that a rag from Bowling's house was taken to the scene and squeezed out to plant Mr. Rodgers' blood. N.T. 5/19/1990. at 69. However, counsel did not have evidence (or missing evidence) to support a frame. The Commonwealth flagged the problem in closing argument:

> [T]hey had to come up with some other explanation of Mr. Rodgers' hand in Mr. Lascoli's pocket, and the explanation they came up with is that this Detective, who didn't have a blood vile [sic] with him at the time, one was in July and one was in October, and made reference to him taking it home and putting it in his refrigerator and keeping the trousers at home with his family so that he could leave to go to Valhalla, New York at four o'clock in the morning and that somehow Detective Sassono [sic] mixed that up.

N.T. 5/18/1990 at 93. This is much like the argument offered by the state in *House v. Bell*, 547 U.S. 518 (2006):

> nothing that the defense has introduced in this case explains what blood is doing on his jeans, all over [House's] jeans, that is scientifically, completely different from his blood.

*Id.* at 542. Much like *House*, the missing vial of blood offers an "alternative explanation that, if credited, would undermine the probative value of the blood evidence." *Id.*

An attorney who had adequately investigated and prepared could have demonstrated to the jury that a vial of blood was missing. His chosen defense of a frame would have had substantial legs, even more so given the fact that neither Mr. Rodgers' blood sample nor his blood found on the pocket had bacteria and both returned tests that they did not contain human DNA. Similarly, with respect to the sweater, while Lifecodes said Mr. Rodgers' blood was present, the sample tested negative for Y-chromosome, which would make it consistent only with Mr. Lascoli's sample. A missing vial of blood coupled with these findings would have given real life to Mr. Rodgers' chosen defense. Had the defects in the chain of custody been attacked, had counsel determined that a vial of Mr. Rodgers' blood was missing, these findings "would have caused the jury to weigh any evidence that was presented by the Commonwealth in a different manner." *Commonwealth v. Copenhefer*, 719 A.2d 242, 256 (Pa. 1998).

There should be no question that the DNA evidence was a key factor in persuading the jury. *See House*, 547 U.S. at 541 (noting that DNA evidence "likely was a factor in persuading the jury not to let him go free). While jurors might not be inclined to believe that the police planted evidence, the missing vial of Mr. Rodgers' blood when considered with the earlier serology testing and the latter DNA testing, could have changed at least one juror's mind on this point. Certainly, the Commonwealth would have had a much more difficult time making the argument that there was no vial of blood available with which to plant Mr. Rodgers' blood on Mr. Lascoli's clothing.

### (2) Trial counsel was ineffective for undertaking a truncated investigation that failed to find a crucial witness who would have not invoked her Fifth Amendment right not to incriminate herself.

Trial counsel did some measure of investigation that turned up promising leads. William Harshberger testified that on the night of the murder, while walking near Mr. Lascoli's house, he

heard at least three distinct voices in the house. N.T. 5/14/1990 at 33. After walking a few blocks, Harshberger saw two young people "walking sort of fast" from Mr. Lascoli's home. *Id.* at 34-35. He gave a detailed description of them; neither was Mr. Rodgers. *Id.* at 35-37, 58-59. The trial court did not permit the testimony of several exculpatory witnesses who would have support the defense. *See* N.T. 5/11/1990 at 11-12 (Mike Anthony's inculpatory statements); N.T. 5/16/1990 at 195-213 (Constable's statements from Shawn Thomas that Mr. Rodgers did not commit the homicide); N.T. 5/14/1990 at 12-19 (Melissa O'Schea would not testify and answer questions about her involvement in the murder[35]). Mr. Miller was realized the circle of people who could provide information about this case. The potential helpful witnesses he identified were all ones who he would be asking if they were involved in the murder. Which, of course, means that they all potentially could attempt to invoke their privilege against self-incrimination.

Against that backdrop, counsel should have found a member of this circle who would not be in a position to invoke the Fifth Amendment. Had he continued down this path, he would have discovered Estelle Pierce. Ms. Pierce would have testified that "[i] the early hours of June 8, 1988, Tommy [Bowling] and Maria [Pierce, her sister] told Timmy [Bowling] and I to get rid of a bag

---

[35]   Through her attorney, Ms. O'Schea informed the court that she did not want to implicate herself in the following ways: "whether or not she was one of several people at the Lascoli house and the various things she allegedly witnessed there," "whether or not prior to the murder, these [alternative suspects] were at her residence," "whether or not Mike Anthony and Shawn Thomas were at her house washing clothes during the early hours of June 8th," "[t]he area of inquiry regarding the brown-handled knife," "whether or not she spoke with Linda Tabor or this Rich … Johnson about the killing," "conversations with Kim Hileman … in which she implicated herself or described what events took place at the time Lascoli was killed," "whether or not she had a conversation with Rodgers … at his mother's house … indicating that he should leave," whether she took "that brown-handled knife and drop[ped] it down between the wall where it may have fallen into the area above the first floor apartment bathroom ceiling," and the "area of inquiry dealing with the assault charges that were allegedly attempted to be brought against Mike Anthony early in 1990 and whether or not Mr. Anthony made a threat to my client regarding whether or not he would tell the story about Mr. L." N.T. 5/14/1990 at 12-19.

of clothes. We were scared so we took the clothes to an empty apartment downstairs." Declaration of Estelle Pierce, attached as Appendix 57. Furthermore, "[w]hen the police started asking questions about the Lascoli murder, Tommy and Maria told us a story to tell them about us all being home watching a basketball game with Isabel Bowling. That wasn't true. Ms. Bowling never came over and she never watched basketball. We were  not watching basketball that night." *Id.*

As noted throughout, the Commonwealth admitted that they had a circumstantial case against Mr. Rodgers. *See* N.T. 5/18/1990 at 75 (the Commonwealth's case "is based on circumstantial evidence"). The jury also indicated that one of its mitigating circumstances was the "possibility of someone else being involved because of circumstantial evidence, i.e., excess clothing, period of time required to find clothing in the park." N.T. 5/24/1990 at 153. On top of that, this jury took four days to decide on a verdict. This was a clear statement that the jury questioned the Commonwealth's version of events. *See, e.g., Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("The length of jury deliberations can be one factor in determining how close the jury viewed the case to be"); *Murtishaw v. Woodford*, 255 F.3d 926, 973 (9th Cir. 2001) (including length of jury deliberations as a factor in weighing whether prejudice occurred); *Edmunds v. Tice*, 2020 U.S. Dist. LEXIS 217567, *34-35 (E.D. Pa. 2020) (finding prejudice based on length of jury deliberations and citing *Dugas* and *Murtishaw* as support for granting relief on a claim of ineffective assistance of counsel for failure to object to improper jury instructions).  Had counsel prepared properly for trial, it is probable at least one juror would have had a reasonable doubt about Mr. Rodgers' guilt.

This was not a clearcut case as evidenced by the fact that the jury deliberated for four days before returning a guilty verdict. N.T. 5/19/1990 at 41 (deliberations commence); N.T. 5/23/1990 at 3 (verdict announced). Moreover, during the penalty phase, it found, among other things, the

"possibility of someone else being involved" to be a mitigating factor. N.T. 5/24/1990 at 153. This was a clear statement that the jury questioned the Commonwealth's version of events. Had counsel prepared properly for trial, it is probable at least one juror would have had a reasonable doubt about Mr. Rodgers' guilt.

This sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 7    *Trial counsel failed to object to improper prosecutorial closing argument.*

#### *(1) Trial counsel did not object when the prosecutor improperly diminished the beyond-a-reasonable-doubt standard.*

The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). The "jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *accord Ring v. Arizona*, 536 U.S. 584 (2002) (holding that aggravating factors must be proved to a jury beyond a reasonable doubt).

In closing argument, the prosecutor told the jurors that, "[i]f in the end you say to yourself, I believe this could be the facts, then you have overcome reasonable doubt." N.T. 5/18/1990 at 76. However, the reasonable doubt standard is far more demanding than indicated by the prosecutor. It requires far more than a juror believing this *could* be the facts. *Id.*

"This reasonable doubt standard of proof requires the finder of fact 'to reach a subjective state of near certitude of the guilt of the accused.'" *Travillion v. Superintendent Rockview SCI,* 982 F.3d 896, 902 (3d Cir. 2020) (citing *Jackson v. Virginia,* 443 U.S. 307, 315 (1979); *In re*

*Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). "Could" simply does not satisfy the reasonable doubt standard. *See* N.T. 5/18/1990 at 76.

However, trial counsel did not object and the trial court offered no curative instruction. *See id.* The result was to leave the jury with the impression that it was permitted to find Mr. Rodgers guilty of the charged offenses "based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana*, 498 U.S. 39, 41 (1990). As such, Mr. Rodgers was prejudiced.

#### (2) Trial counsel failed to object when the prosecutor urged the jury to make an assessment that required expert testimony.

In closing argument, the prosecutor urged the jury to compare a known shoe to an unknown shoe impression. He told the jury it could determine if the two items were a match:

> You have in evidence the shoes of Mr. Lascoli and I believe there are other photographs that show his shoes. And if you look, the lines, the distinct lines, this circle on this exhibit is on the matting. The footprint is distorted. This one is rather clear. You make a comparison. You apply every day life, knowledge that you've gained in common sense. And I submit to you, ladies and gentlemen, that you will have no doubt that that footprint matches Mr. Lascoli's shoe sole.

N.T. 5/18/1990 at 82. However, such a comparison and determination of a "match" requires skills outside the kin of lay people.

An assessment of this type requires expert assistance. A person does not simply eyeball a photograph and a pair of shoes, then decide they match. The process is distinct and complicated, beginning with a comparison of "'class characteristics' (such as design, physical size, and general wear) and then moving to 'identifying characteristics' or 'randomly acquired characteristics (RACs)' (such as marks on a shoe caused by cuts, nicks, and gouges in the course of use)." *Report to the President Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, at 12, 114 (Sept. 2016) (footnote omitted) (hereinafter referred to as "PCAST Report") *available at* https://obamawhitehouse.archives.gov/sites/default/files/

68

microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf. The first step ensures that there are no inconsistencies in class characteristics between the known shoe and the impression. *Id.* at 115. While a positive identification can be made based on one RAC, it can be done so "only if that characteristic is confirmable; has sufficient definition, clarity, and features; is in the same location and orientation on the shoe outsole; and in the opinion of an experienced examiner, would not occur again on another shoe." *Id.* (internal citation omitted). "The entire process – from choice of features to include (and ignore) and the determination of rarity – relies entirely on an examiner's subjective judgment." *Id.* at 116. The PCAST report focused on the ability of trained professionals and their ability to assess RACs and found the science wanting. "In contrast to latent fingerprint analysis and firearms analysis, there is little research on which to build with respect to conclusions that seek to associate a shoeprint with a particular shoe (identification conclusions)." *Id.* at 117. This is a challenging task for an expert to opine on and is not suitable for lay-person assessment. The prosecutor's improper suggestion allowed jurors to take a strong piece of evidence that favored Mr. Rodgers' defense and turn it against him, despite lacking both the skill and the training to make the assessment that the prosecutor encouraged. As such, Mr. Rodgers' defense was damaged, and he was prejudiced.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

   **8.  *In the first DNA case in Pennsylvania, trial counsel failed to present an expert at the* Frye *hearing to show the unreliability of the lab's results.***

Mr. Rodger's trial was the first DNA case litigated in Pennsylvania. At that time, DNA identification was an emerging science. As such, there was a *Frye* hearing conducted before trial. *See* N.T. 4/2/1990; N.T. 4/3/1990; N.T. 4/4/1990; N.T. 4/5/1990. Trial counsel was ineffective for not employing an expert to counter the Commonwealth's experts to talk about the novel science. This was true even though counsel had secured funding to hire a DNA expert. *See* Order (7/6/1989), attached as Appendix 58. Instead of presenting such an expert, counsel decided that he would try to somehow game the system by bluffing with a threat to call a DNA expert. *See* Appendix 46 at 1, ("call my apparent bluff on the prospective appearance or nonappearance of Dr. Eric Lander for the defense during the Frye hearings and at rial in your case"). This, of course, is no strategy at all and counsel, thus was ineffective.

The DNA testing in this case was conducted by a New York-based lab called Lifecodes. Several months before the *Frye* hearing, a New York court had found that results of Lifecodes' testing was unreliable and inadmissible. *People v. Castro*, 545 N.Y.S.2d 985 (N.Y.Sup.Ct. 1989). There, Lifecodes initially said that blood found on the defendant's wristwatch matched the victim's blood. After a lengthy pre-trial hearing (complete with defense experts, unlike Mr. Rodgers' case), the trial judge ruled that Lifecodes "failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty." *Id.* at 999. The results of a match, therefore, were not admissible because of "unresolved ambiguities." *Id.* at 998. Also, the court found that the way Lifecodes determined the

probability of a match was unreliable.[36] *Id.* Eventually, the experts for the prosecution and the defense took the extraordinary step of issuing a joint written statement that concluded that the tests performed by Lifecodes "were not scientifically reliable enough to support the assertion that the samples . . . do or do not match." John Caleb Dougherty, *Beyond* People v. Castro*: A New Standard of Admissibility for DNA Fingerprinting*, J. CONTEMPORARY HEALTH L. AND POL'Y 269, 285 n.95 (1991).

Despite a recent finding that Lifecodes' results were unreliable, counsel nonetheless did not present an expert to do the exact same thing in Mr. Rodgers' case. An expert at the *Frye* hearing would have been able to show the same unreliability of Lifecodes' work in Mr. Rodgers' case. When Mr. Rodgers was requesting DNA testing in state court, an expert identified the many problems that were evident in Lifecodes' testing and analysis, which rendered the results unreliable. An expert at the *Frye* hearing in 1990 would have been able to say the exact same things.

The DNA technology used at the time was called RFLP testing. It required a very large sample of DNA, about 30,000 cells. N.T. 7/3/2018 at 33-34. The results had to be measured to compare them to each other to make sure that they were exactly the same size, but the measurements would be not always be precise. As a result, the bands being compared on slides called autorads might actually be similar in size instead of being a true match. *Id.* at 35.

If the sample was not in good condition, it might not produce reliable results. *Id.* at 33. For example, exposure to bacteria, as occurred here, could interfere with RFLP testing. The RFLP

---

[36]   Lifecodes issued a supplemental report in Mr. Rodgers' case that acknowledged that its original calculation of the probability of a match was inaccurate, just like its results in *Castro*. *See* Appendix 55; *see also* N.T. 5/8/1990 at 198-99.

technique used specific bacteria to "cut" the DNA at certain known points and then determine the size of the area that had been cut. *Id.* at 29-30, 40. If bacteria was present, however, the DNA could have been cut in other areas that would mimic what the intended cut would have done. *Id.* at 32-33. This could lead to unreliable results. *Id.* at 39, 40-41, 45. Bacteria also could have led to bands that did not migrate as they were supposed to do. *Id.* at 41, 45. Finally, RFLP testing could produce "artifacts," which "are banding patterns that are not necessarily a result of somebody's DNA profile." *Id.* at 38, 93. An issue could arise at each step of the process that could produce an artifact at the end. For example, a sample that was degraded by the presence of bacteria could produce an artifact. *Id.* at 38-39.

Comparing the results between gels instead of on the same gel, as happened in this case, made comparisons difficult. For example, Gel 815 did not contain Mr. Rodgers' sample or Mr. Lascoli's sample. Their samples were analyzed on a different gel. That made comparing the pants-pocket results on Gel 815 more susceptible to error because they had to be compared to a different gel. *Id.* at 93-94.

Mr. Lascoli's "DNA was not analyzed properly." N.T. 7/3/2018 at 39. Mr. Lascoli's "sample was not present in enough amount to show a clear banding pattern for us to be able to know what his known DNA profile would look like. And therefore, the lab's assertion that there's a mixture and that mixture could be consistent with the presence of the victim I believe was built on a very shaky premise." *Id.* at 39, 43. Because Mr. Lascoli's sample was present in very small amounts and because it contained bacteria, "[w]e don't know exactly what we're looking at." *Id.* at 40. It could be his DNA pattern or it could be "manifestations of artifacts." *Id.* Therefore, Mr. Rodgers' expert in 2018 testified that he could not determine "whether he is present or not present in [an] evidentiary sample." *Id.*

72

Also, the gel that was used to analyze the pants pocket contained a mystery sample that was not identified by Lifecodes. *Id.* at 45-46. It is unclear whether that sample is relevant to this case or not. *Id.* at 48. "If it was relevant to the case, it's important to figure out which sample it was. If it's not relevant to the case, was this based on a sample – a control sample that the lab or the analyst was trying to analyze on the same gel?" *Id.* This is an indication that Lifecodes was "not following the proper procedures here in order to identify all the samples." *Id.* "[T]o be testing a different sample on [this gel] gives me a lot of questions about their quality of work." *Id.* Mr. Rodgers' 2018 expert said that "if you see something like that, that's the basis for a non-conformity report to be issued by the lab." *Id.* at 49.

Furthermore, the chart that Lifecodes prepared noting its results, *see* Appendix 12, contained no key. Assuming that an X in a column meant a positive result, then bacteria was present in Mr. Lascoli's blood sample and the gray sweater, but it was not present in Mr. Rodgers' sample or the pants pocket. *Id.* Mr. Rodgers' sample contained a Y-chromosome, but Mr. Lascoli's did not. *Id.* Human DNA was detected in Mr. Lascoli's sample, but Mr. Rodgers' sample did not contain human DNA and neither did the pants pocket. *Id.*

Both of these people should have had results indicating their DNA was human. N.T. 7/3/2018 at 51. Both of these men should have had a Y-chromosome. *Id.* Mr. Rodgers' DNA, having been taken from his arm in a hospital, should not have had bacteria, which it did not. *Id.* at 51. Mr. Lascoli's blood, though, might have had bacteria. *Id.* at 52.

Lifecodes could have done more when it saw the developing problems with the testing. They should have obtained a better sample of Mr. Lascoli's DNA. "And they should've repeated their analysis in all other samples because of that and all of their correlations." *Id.* at 41-42.

73

If trial counsel had presented such testimony at the *Frye* hearing, the trial court would have followed the New York court in *Castro* and not allowed the unreliable Lifecodes' results to be presented at trial. *See*, *e.g.*, *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989) (finding that DNA testing had "gained acceptance in the scientific community," but holding that the results in this particular case were inadmissible because the lab did not follow the appropriate standards and controls, which meant "the test results lack foundational adequacy and, without more, are thus inadmissible").

If the Commonwealth's admittedly circumstantial case had gone to trial without the DNA evidence, this jury, which took four days to reach a verdict, would have returned with a not guilty verdict. As noted throughout this petition, the many questions about this case – from the lack of Mr. Rodgers' fingerprints among those found at the scene to the questions surrounding the serial deposits of evidence in Prospect Park to Detective Sassano spending the night in his house with the evidence to the initial exclusion of Mr. Rodgers' blood type from the tested items (and not even considering what the jury did not hear about topics such as the excluded testimony of those who would have testified about the involvement of others and the ways in which David Houtz's testimony was untruthful) – would have led to a different result.

This sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 9.   Trial counsel was ineffective for failing to secure an expert on shoeprint evidence.

As noted above, the Commonwealth relied upon the bloody shoeprint at the scene to try to convince the jury that the only people who were there were Mr. Lascoli and Mr. Rodgers. N.T. 5/18/1990 at 82. Testimony had already established that the print did not match Mr. Rodgers or first responders. N.T. 5/1/1990 at 21-22 (prints did not belong to Mr. Lascoli's son-in-law); *id.* at 39-42 (paramedic's shoes); 5/2/1990 at 63-64 (paramedics boots did not match the print); *id.* at 66 (Police Continuation Report notes that Mr. Rodgers' confiscated shoes do not match any shoeprints at the scene); *id.* at 86-87 (testimony about Mr. Rodgers' shoes). With every other known person eliminated, if the shoe did not match Mr. Lascoli, then necessarily another person was at the scene. This would have gutted the Commonwealth's theory that Mr. Rodgers – and only Mr. Rodgers – was involved in this homicide. *See* N.T. 5/18/1990 at 78-79 (Commonwealth's closing that ridiculed the defense theory that more than one person was involved), 94-95 (same), 96-98 (same), 96-97 ("There is absolutely no evidence, ladies and gentlemen, that there was more than one individual"), 116 ("And I submit to you, ladies and gentlemen, that it shows beyond a reasonable doubt that Frankie Rodgers, this Defendant and no one else, went out to Mr. Lascoli's house, had a deadly weapon, a knife, placed it in a vital part of the body . . . and killed Patsy Lascoli").

During the middle of trial, the Commonwealth wanted to present the testimony of Detective Sassano to opine on whether the bloody shoe prints matched Mr. Lascoli's shoe. N.T. 5/4/1990 at 91-98. Trial counsel objected. *Id.* at 93. Counsel noted that he had asked for "any comparisons that have been made by anyone with any shoes, including the victim's and the defendant's and matched up or compared to the footprint on the carpet." *Id.* at 94. He received no such information. *Id.* at 95. The prosecutor responded that "[t]here's no scientific testing conducted." *Id.* at 96. Instead,

during one of the breaks in the middle of trial, Detective Sassano "took them out and took a look at [the shoes and the prints]." *Id.* The trial court sustained the objection, but said that the jury would be able to make the comparison itself. *Id.* at 97.

The Commonwealth, during its closing, invited the jury to do just that.

> You will have, ladies and gentlemen, in the courtroom with you some photographs, and I apologize for them, but it's a fact. You will see in the carpet a footprint and when you get this in the jury room with you, you can examine it closely. You have in evidence the shoes of Mr. Lascoli and I believe there are other photographs that show his shoes. And if you look, the lines, the distinct lines, this circle on this exhibit is on the matting. The footprint is distorted. This one is rather clear. You make a comparison. You apply every day life, knowledge that you've gained in common sense. And I submit to you, ladies and gentlemen, that you will have no doubt that that footprint matches Mr. Lascoli's shoe sole. You look at it when you get up there.

N.T. 5/18/1990 at 81-82.

Trial counsel was ineffective for not presenting a shoe print expert to provide a scientific answer to whether that print was made by Mr. Lascoli.

Had an expert been presented, the jury would have learned that the comparison that the Commonwealth asked them to undertake in the jury room should have been in the province of a scientifically trained expert. And, that expert would have told the jury that the print(s) did <u>not</u> belong to Mr. Lascoli's shoes. And, armed with that, counsel would have been on firm footing to tell the jury that at least one unknown person was there when Mr. Lascoli was killed.

Based upon the crime scene pictures, the shoe print on the blue carpeting does not match Mr. Lascoli's shoes. Report of Dr. Alicia Wilcox (8/25/2023) at 6, attached as Appendix 59. An expert would have noted that Mr. Lascoli's shoes have "a series of equally spaced horizontal lines with a smooth crescent-shaped area in the heel and toe areas. The is a raised heel area. The horizontal lines run all the way to the edge of the outsole." *Id.* at 5. His shoes also contain two "V"

76

shaped patterns visible in the arch area. The pictures also show a small amount of red/brown staining, which would be consistent with blood. These stains are "on the medial side of the toe area of the right outsole and on the center of the heel of the left outsole." *Id.* This is significant because "[t]hese two red/brown areas are not of sufficient size to account for [the] impression" on the blue carpeting in the picture. *Id.* In other words, there is a full shoe print on the carpet, but only small spots of blood on the shoes.

An expert would have used this information to tell the jury that the border on the outsole of the print is inconsistent with the shoes that lack such a border. *Id.* at 6. This shoe did not make this print.

Furthermore, an expert would have explained why the Commonwealth's invitation to just look at the prints is not supported by science. The way a trained scientist would examine this evidence is to first look to see if the outsoles (the edges of the shoes and prints) match. If not, the examination ends with "a conclusion of Source Exclusion." *Id.* at 6. If they did match – which they did not in this case – then the scientist would take the next step and test impressions of the known footwear to compare to the shoeprint. *Id.* If the shoes are different sizes, a finding of exclusion is made. If the sizes are similar, then the scientist will examine the wear patterns on the shoes to determine whether the shoeprint is consistent with those wear patterns. *Id.* If all of matches, the scientist must still examine whether both the shoes and the prints share the same Randomly Acquired Characteristics. Only when all of those characteristics are shared by both the shoe and the print are met may a match be determined. *Id.*

As that did not happen here, the Commonwealth's "conclusion that [the] impression … 'matches' the victim's outsole design is **not supported by the evidence in this case**." *Id.* at 7 (emphasis original). The argument made by the Commonwealth in its closing "draws conclusions

that are unrecognizable in and badly out of step with the forensic community, both now and at the time." *Id.*

Armed with this information, trial counsel then could have shown the jury that, not only is that not Mr. Lascoli's shoe, but its location vis-a-vis Mr. Lascoli's body and the Commonwealth's theory about how the crime happened mean that he could not have put a shoe print beyond where his body was found. The Commonwealth's theory is that

> the defendant knocked on the victim's door, when Mr. Lascoli opened the door to admit him, the defendant, without warning, premeditatedly began stabbing Mr. Lascoli in the face. The sudden, and unexpected attack, caught Mr. Lascoli by surprise, obviously injuring him severely. As a result of the initial attack, Mr. Lascoli clearly went to the floor. Thereupon, the defendant continued to brutally stab Mr. Lascoli apparently in the chest area. It is obvious that Mr. Lascoli rolled onto his stomach and attempted to crawl away. While he was crawling away the defendant continued to stab him in the back, shoulders, back of the neck and so on and so forth.

Commonwealth's Re-Sentencing Memorandum (10/2/2019) at 35-36. If he went to the floor after the initial attack, was stabbed in the chest, rolled over, and tried to crawl away, there is no way that he could have also stepped in his own blood and put those prints past the point where he was crawling.

As noted throughout, this was a jury that took four days to reach a verdict. They already were discussing the "possibility of someone else being involved." N.T. 5/24/1990 at 153. An expert opinion that an unexplained bloody shoe print was present at the crime scene would have taken the jury from the "possibility" of another person being involved to a certainty. The jury would have returned with a verdict of not guilty of first-degree murder.

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as

a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

### 10. Trial counsel failed to review the trial exhibits before they went to the jury for deliberations.

Commonwealth's Exhibit 205 was Mr. Rodgers' "admission form to the Blair County Detention Home" dated August 17, 1987. N.T. 5/4/1990 at 147-48. Exhibit 205 contained identifying information, property, inventory, and lists the offense for which Mr. Rodgers was admitted to the juvenile facility as "Robbery." *See* Appendix 49. The Commonwealth moved to admit and trial counsel objected to "the admission of the whole of that exhibit and submission to the jury." N.T. 5/10/1990 at 19. The court received the exhibit into evidence and indicated that it would "take up the question of what exhibits will be sent out to the jury and whether it will be necessary to do any didacting [sic] when it will be sent out later." *Id.* Exhibit 205 did ultimately go to the jury in unredacted form.

Jurors were exposed to this exhibit during trial phase deliberations. Eight jurors testified during the PCRA hearing, five of whom had at least some recollection of Exhibit 205 or the information that it contained.

At the PCRA hearing, Tammy Leedy testified that "I believe I saw it," that, "I just remember seeing it so I checked I did," that "I just recall reading some of the things like the um – the personal property so I mean I --- I remember seeing it . . .," and that "I'm --- I'm sure I remember seeing this." N.T. 3/21/2003 at 9, 16, 18, 20 (PCRA Hearing Transcript). Although she could not state exactly when she saw it, she saw it and she remembered it.

Likewise, Lois Laurence testified that "I'm sure we looked at one like this one" when presented with a copy of Exhibit 205. *Id.* at 32. When asked, "[d]id you see that document at some

point when you were a jury (sic) on the case of James Franklin Rodgers?" she replied "Yes." *Id.* at 32-33. She remembered seeing "a document like that" and indicated yes when asked "And when you say you remember seeing it you were able to read it and look at it, what not?" *Id.* at 33. She also denied on cross-examination that the information she remembered came from another document, testifying that "the stuff I'm reading on there is familiar" and that "this looks familiar." *Id.* at 34. She did not remember when she would have seen it during trial. *Id.* at 74.

Marlene Elliot initially testified that "I may have seen it but I'm - - - I definitely can't say for sure. We saw so many things." *Id.* at 41. However, she later testified that "well, either I saw it or someone that did see it of the jurors may have commented on it" and that "it's a good possibility we did see it." *Id.* at 47-48.

Scott Smith also initially testified that "I don't remember see it actually, no." *Id.* at 24. Upon further questioning, he indicated that he did remember at least part of it, saying "I remember the part about - - - about the personal. I remember seeing that in the trial" and that "I remember seeing this about the personal property but I was wondering what it had to do with the trial." *Id.* at 26, 28. He also indicated that he saw it during the first part of the trial, during the "guilt part." *Id.* at 28.

Barbara Hecker testified that "I recognize or recall information but I don't know if I actually saw this particular document. I do recall information that is included in this document." *Id.* at 23.

The three remaining testifying jurors indicated that they either did not remember the document from trial or had no recollection of it at all.

The Commonwealth was able to present the jury with evidence of a conviction for a prior robbery offense through the back door. The Commonwealth was not required to jump through any

evidentiary hoops to present a prior similar conviction. However, the improper result was the same, the jury was able to presume that because Mr. Rodgers had committed the same crime previously "he was more likely to commit that crime for which he is being tried," stripping him of the "presumption of innocence." *Commonwealth v. Aguado*, 760 A.2d 1181, 1186 (Pa. 2000) (quoting *Commonweal v. Spruill*, 391 A.2d 1048, 1049-50 (Pa. 1970)). "Evidence of prior criminal activity is probably only equaled by a confession in its prejudicial impact on a jury." *Aguado*, 760 A.2d at 1187 (quoting *Spruill*, 391 A.2d at 1050).

Defense counsel's objection demonstrated his recognition of the prejudice stemming from this document. However, he abandoned that objection, ensuring Exhibit 205 went to the jury. *See* N.T. 5/18/1990 at 120-21 (the only exhibits that did not go to the jury were Exhibits 225-228 and 235-240).

The sub-claim must be considered with the other sub-claims pled herein that allege that counsel's performance was deficient at Mr. Rodgers' trial and that Mr. Rodgers was prejudiced as a result. *Strickland*, 466 U.S. at 687. Mr. Rodgers is entitled to discovery, expansion of the record, an evidentiary hearing and, thereafter, relief on this sub-claim.

**D  *Conclusion.***

*Strickland* makes clear that this Court does not review trial counsel's errors in a vacuum considering each error or omission separately, assessing prejudice individually. Rather, *Strickland*'s prejudice test requires the Court to consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced at trial and in postconviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397; *Buehl v. Vaughn*, 166 F.3d 163, 180 (3d Cir. 1999) (reviewing cumulative prejudicial impact of ineffective

assistance allegations). Courts must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, 466 U.S. at 695-96. Determinations of prejudice require a cumulative assessment of counsel's errors:

> Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 696. Mr. Rodgers' carries that burden.

Mr. Rodgers was represented by distracted, conflicted, alcohol-abusing counsel who failed in challenging the Commonwealth's case and in defending his client. Counsel allowed the admission of Exhibit 28, which, while irrelevant, was turned into the murder weapon by the prosecutor. Counsel allowed the Commonwealth to urge the jury to reach a conclusion that required expert testimony, which was to the detriment of his client and his chosen defense. He allowed the jury to receive a document that told it this was not the first time Mr. Rodgers had been accused of robbery. He failed to challenge the Commonwealth's witnesses' interests in testifying and allowed for the admission of damning hearsay testimony that counsel knew, or should have known, was untrue. Meanwhile, counsel failed in the most basic of tasks, to review the Commonwealth's evidence and chain of custody, an act which would have provided him with the piece of evidence that would have added substantial weight to his evidence that Mr. Rodgers was being framed – his missing vial of blood. At least one juror in this case did not believe the Commonwealth's case as it was presented as evidenced by the finding as a mitigating factor that others were involved in this offense. And despite the DNA results and what the prosecution described as compelling circumstantial evidence against Mr. Rodgers, the jury still deliberated for four days before finding

82

him guilty of first-degree murder. N.T. 5/19/1990 at 41 (deliberations commence); N.T. 5/23/1990 at 3 (verdict announced). Moreover, during the penalty phase, it found, among other things, the "possibility of someone else being involved" to be a mitigating factor. N.T. 5/24/1990 at 153. This was a clear statement that the jury questioned the Commonwealth's version of events. Had counsel prepared properly for trial, it is probable at least one juror would have had a reasonable doubt about Mr. Rodgers' guilt. *See Dugas*, 428 F.3d at 335; *Edmunds*, 2020 U.S. Dist. LEXIS at *34-35.

Counsel's performance was prejudicially deficient. There is a reasonable probability that the result of the proceedings would have been different but for counsel's prejudicially deficient performance. Separately, and cumulatively, counsel's deficient performance rendered Mr. Rodgers' trial unfair and prejudiced him. As such, this error had a substantial and injurious effect or influence in determining the jury's sentence. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Minimally, this Court should have grave doubt about the error's impact. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

## II  THE PROSECUTOR ENGAGED IN MISCONDUCT DURING THE TRIAL.

### A  *Introduction.*

The Commonwealth committed egregious acts of misconduct during Mr. Rodgers trial that violated his rights to a fair trial and due process.

### B  *The Constitutional Standard.*

The role of the prosecutor in a criminal trial is unique. They are no ordinary advocate seeking victory. Rather, as the Supreme Court has noted:

> [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

Prosecutorial misconduct includes "improper insinuations and assertions calculated to mislead the jury." *Id*. at 85. A petitioner is entitled to relief where the prosecutor's misconduct prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or where the prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78. The court must view the proceedings as a whole when assessing the impact of the prosecutor's misconduct, considering the misconduct in context when determining if it was sufficient to undermine the fairness of the proceedings. *See United States v. Young*, 470 U.S. 1, 16-17 (1985); *see also Darden v. Wainwright*, 477 U.S. at 182 (applying *Young*); *Donnelly*, 416 U.S. at 647-48 (comparing "ordinary trial error of a prosecutor"

84

with the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process").

### C   *Claims of Misconduct.*

#### 1   *The Prosecutor Presented Known False Evidence.*

Federal law establishes that "a conviction obtained through use of false evidence" known to the prosecution violates the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal cites omitted); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal cite omitted) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'"); *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017). This holds true whether the state solicits the testimony directly or simply fails to correct the false evidence. *Napue*, 360 U.S. at 269 (internal cites omitted); *Haskell*, 866 F.3d at 146.

Mr. Rodgers need not demonstrate prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), to succeed on his claim. Rather, the Third Circuit has held that "*Brecht* does not apply when the State has knowingly presented or failed to correct perjured testimony. In those circumstances, a petitioner carries his burden when he makes the reasonable likelihood showing required by *Giglio* and *Napue*." *Haskell*, 866 F.3d at 141.

To establish his claim, Mr. Rodgers must demonstrate that 1) the witness committed perjury; 2) the Commonwealth knew or should have known his testimony was false; 3) the Commonwealth did not correct the false testimony; and 4) there was a reasonable likelihood that the perjured testimony affected the jury verdict. *Id.* at 146.

85

During its case-in-chief, the Commonwealth presented the testimony of David Houtz.  N.T. 5/3/1990 at 127 *et seq*. Mr. Houtz testified that he spoke with Melissa O'Schea by phone on July 15, 1988. *Id*. at 133. In his police statement, Mr. Houtz indicated that he had just been released from jail, his brother was under investigation for murder, and he wanted to "know exactly what was going on" so he reached out to Mr. Rodgers' former girlfriend, Melissa O'Schea. *Id*. at 135. When he claimed not to recall the specifics of the purported phone call with O'Schea, Houtz was shown his police statement, which the Commonwealth then had him read:

> Yes, I did. It was about three days ago. It was on the subject of my brother, Frankie Rodgers, and Patsy Lascoli's murder. I pleaded with her basically to tell me what happened the night of the murder. I asked her if she was involved with Frankie. Her first reply was no.
>
> So we talked for a couple of minutes. Finally she gave in. She told me Frankie took the - - yes, she told me Frankie talked to her on the phone on the night of the murder and was - - needed clothing form her. And I started asking her what else she knew, and that's when Frankie rushed in the room and asked me who I was talking to. And I told him it was Melissa O'Schea, and at that moment he took the phone from me.

*Id.* at 136-37.

Immediately after this testimony, trial counsel requested at sidebar that the Commonwealth provide him with details of any plea agreement or understanding that it had with Houtz. *Id*. at 137. Mr. Haberstroh indicated he was unaware of any charges pending against Houtz. *Id*. Trial counsel then indicated that Houtz had charges pending of criminal conspiracy, burglary, and theft. *Id*. at 137-38. Mr. Haberstroh reiterated, on his and Mr. Sill's behalf, that "there is no agreement, plea agreements of any type" with Mr. Houtz. *Id*. at 138. The court asked the prosecution to recheck their files. In response, Mr. Haberstroh stated:

> The only one who may now it would be Consiglio signed the information, but I have no knowledge. I doubt that any agreement would be made without my knowledge.

*Id*. The matter was not addressed again by the court or either party.

On cross examination, Mr. Houtz testified that he was not on probation and that it ended three months ago before January 20, 1990. *Id.* at 141. Houtz also testified that there was no plea agreement between himself and the Commonwealth. *Id*. at 143.

### (1) David Houtz Committed Perjury.

Mr. Houtz committed repeated perjury during his testimony. First, despite his testimony to the contrary, Mr. Houtz was on probation when he testified. *See* Appendix 44 at 3; Affidavit of David Houtz (5/21/2000), attached as Appendix 60.

Second, despite his and the Commonwealth's denials, Mr. Houtz did receive a plea deal in exchange for his testimony. *See* N.T. 5/3/1990 at 142-43. Assistant District Attorney Richard Consiglio offered Mr. Houtz a plea deal at Houtz's preliminary hearing on February 7, 1990 (over three months before Mr. Houtz testified. Appendix 16. Mr. Houtz's attorney confirmed this in a letter he sent to Mr. Rodgers' attorney on November 9, 1990, where he pointed out that "the Plea Agreement was offered by Assistant District Attorney Richard Consiglio earlier at the Preliminary Hearing, however, it was not actually entered into and signed by my client until October 5, 1990." Appendix 17. Furthermore, Mr. Houtz's plea colloquy form notes that promises and / or deals were made in exchange for his guilty plea. Appendix 15 (Question 35 asked whether "any promises [have] been made to you or deals made with you in connection with your guilty plea" and Mr. Houtz's answer was "yes Plea Ag."). The plea deal was signed on October 5, 1990. *Id.* For his cooperation, Mr. Houtz earned the Commonwealth's recommendation that he "be sentenced to the low end of the standard range and that sentences run concurrently." Appendix 16. The Commonwealth also nolle prosse'd charges of theft, receiving stolen property, criminal trespass,

criminal conspiracy, and criminal mischief and did not oppose immediate work release. *Id.* Mr. Houtz also served his time at the county jail instead of state prison. *Id.* The Commonwealth justified this agreement based on the case facts, judicial economy, Mr. Houtz's youth, and his ***cooperation***. *Id.*

Third, the conversation Mr. Houtz testified about between himself and Melissa O'Schea was a work of fiction. Mr. Houtz reports that Detective Cooper stated that Melissa O'Schea informed him "that on the night of the murder [Mr. Rodgers] called her and asked her for some clean clothes." Appendix 60 at 2. Det. Cooper also told Mr. Houtz that Melissa O'Schea had given this information to Mr. Houtz during a telephone call. *Id.* Det. Cooper told Mr. Houtz that he knew this conversation happened and Mr. Houtz could avoid jail time by agreeing that it happened. In his affidavit, however, Mr. Houtz stated that this was untrue; he did not have this conversation with Ms. O'Schea. Appendix 60 at 1. Because he was scared and was facing five to ten years on burglary charges (not to mention Detective Cooper indicating that he could charge Mr. Houtz with hindering a police investigation), Mr. Houtz agreed to say what Detective Cooper told him. *Id.* Neither police report of an interview with Melissa O'Schea contains any mention of this telephone call that she supposedly participated in – because it did not happen. *See* Appendix 42; Appendix 43. When Mr. Houtz was re-arrested shortly before Mr. Rodgers' trial, Detective Cooper again approached him, indicating that Mr. Houtz would be able to make bail (even though he had picked up additional charges while on probation) and that Mr. Houtz would serve county-time and receive work release if he cooperated with the Commonwealth. Appendix 60. Mr. Houtz agreed to testify, and a deal was made at his preliminary hearing, though Mr. Houtz was told that the deal would not be signed until after he testified. *Id.* Mr. Houtz lied at Mr. Rodgers' trial when he said he received no deal. *Id.*

Mr. Houtz lied about his purported conversation with Melissa O'Schea, that he was not on probation, and that he did not have a deal. Prong one of *Haskell* is met. *Haskell*, 866 F.3d at 146.

Mr. Houtz's plea deal was made in Blair County. The prosecution **offered** the deal to him at his arraignment. There is no question that the Commonwealth knew or should have known that his testimony was false when he denied that a plea deal had been made.

Mr. Houtz's probation stemmed from charges in Blair County. Just like the plea, the Commonwealth knew or should have known that his testimony was false.

Finally, the prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Mr. Houtz's account of his telephone call with Ms. O'Schea puts law enforcement directly involved in fabricating this lie. *See* Appendix 60. It is particularly telling that the Commonwealth did not ask Melissa O'Schea about this telephone call during her testimony. *See* N.T. 05/03/1990 at 193-220; *see also supra* n. 24 and related text (concerning Melissa O'Schea's deposition, where she denied that this phone call occurred). The Commonwealth knew or should have known that Mr. Houtz did not speak to Ms. O'Schea and that his testimony was false. Prong two of *Haskell* is met. *Haskell*, 866 F.3d at 146.

The Commonwealth stood mute while Mr. Houtz falsely testified that he was not on probation. It allowed him to falsely implicate Mr. Rodgers in Mr. Lascoli's death through his fictional account of a phone call with Melissa O'Schea without saying a word. Most significantly, the Commonwealth affirmatively corroborated Mr. Houtz's false testimony that he was not receiving a deal for his testimony.

Prong three of *Haskell* is met. *Haskell*, 866 F.3d at 146.

89

Mr. Houtz was an important witness for the Commonwealth. He was not some random person off the street; he was Mr. Rodgers' brother. When Mr. Miller corrected Mr. Houtz stating that he and Mr. Rodgers were "half-brothers," Mr. Houtz affirmed the significance and import of their relationship:

> If that's the way - - I mean if that's legal. I mean we grew up together. I mean we both came from our same mother. I mean I consider that as a real brother.

N.T. 5/3/1990 at 150.

The power and impact of a brother implicating his own flesh and blood in a murder cannot be understated. As the Supreme Court has indicated, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Id.* at 269. Where the false testimony "could . . . in any reasonable likelihood have affected the judgement of the jury," a new trial is required. *Giglio*, 405 U.S. at 154 (citing *Napue*, 360 U.S. at 271). This false testimony had a reasonable likelihood it would affect the jury's judgment. *Id.* Given the importance of Mr. Houtz and his relationship to Mr. Rodgers, the jury likely credited his testimony above all others. And, he told the jury that Mr. Rodgers needed to change his clothes on the night that Mr. Lascoli was stabbed 78 times. The clear message given to the jury was that Mr. Rodgers needed to change out of his blood-covered clothing. Mr. Houtz's testimony was particularly important because the Commonwealth admitted its case against Mr. Rodgers was circumstantial, *see* N.T. 5/18/1990 at 75 (Commonwealth in closing admitting the case against Mr. Rodgers "is based on circumstantial evidence"), and that its witnesses had "a little less than exemplary" reputations and that their "stories were not protection." *Id.* at 94.

In addition to fabricated facts, Mr. Houtz's false testimony left the jurors without key information that would have impacted the jury's view of his credibility: that he was a probation

and had a sweet plea deal hung in the balance of his testimony. "Given [Mr. Houtz's] central role, knowledge of the benefit [he] received in exchange for [his] testimony – substantial help with [his] own pending criminal charges – poses a reasonable, and significant, likelihood of affecting the judgement of the jury." *Haskell*, 866 F.3d at 146-47 (citing *Napue*, 360 U.S. at 270). Tarnishing his credibility would have had a significant impact on the Commonwealth's case.

Prong four of *Haskell* is met. *Haskell*, 866 F.3d at 146.

### *(2) The Commonwealth Knew or Should Have Known that David Riley's Testimony Was Inaccurate.*

As noted above, David Riley, who worked at the Blair County Detention Home, testified that he previously had seen the colorful shorts, or "jams," introduced as Commonwealth Exhibit 4 at trial. Mr. Riley testified that the jams were with Mr. Rodgers in August 1987. N.T. 5/4/1990 at 153-54. Exhibit 205 is an admission form from the detention center. *Id.* at 152. Exhibit 205 reveals what Mr. Rodgers' clothing and property Mr. Rodgers had with him when he entered and was released from the detention center. Admission Form (8/17/1987), attached as Appendix 47. Review of that document demonstrates the impossibility of Mr. Riley's testimony. There are no multi-colored jams listed on the document. Indeed, there are two "bottoms" listed in the inventory, neither of which are multi-colored jams. Page 1 of Exhibit 205 lists the "slacks" that Mr. Rodgers was wearing as "shorts." Page two of Exhibit 205 clarifies that description, indicated that Mr. Rodgers had "cutoff sweat pants." Certainly Mr. Rodgers cut off sweatpants could be labelled as "shorts," but they would not fit the description of the multi-colored jams that Mr. Riley suggested Mr. Rodgers was wearing. *See* Appendix 50. If Mr. Riley did not process these jams, then he did not write "F.R." or "Frank" on them. And, this would be consistent with Melissa O'Schea's

testimony that she had not seen this on the tag when washing his clothes. *See* N.T. 5/3/1990 at 201-02.

The inaccuracy of Mr. Riley's testimony is evident from an exhibit introduced by the Commonwealth. As its own evidence contradicted the testimony of one of its witnesses, the Commonwealth knew or should have known that this testimony was false. Yet the Commonwealth did not take any action to correct Mr. Riley's inaccurate testimony.

Mr. Riley's inaccurate testimony is part of the larger attempt to connect Mr. Rodgers to the jams. Timmy Bowling had asked Serena Henry to lie to the police by saying she saw Mr. Rodgers wearing the jams on the night of the murder. Once her false statement had been discovered by the police, she told them that she said this because she "felt that Tommy [Bowling] might have been involved in this Murder and [she] told the Police this story because [she] wanted to help him." Appendix 48 at 2. The police either did not photograph the jams in the park or they did not turn over the photograph to the defense. Because of this, there is no evidence showing whether the tag on the jams had an "F.R." and/or "Frank" written on them at the time they were discovered. *But see* N.T. 4/3/1990 at 201-02 (Melissa O'Schea's testimony that she did not see the initials on the tag when she washed Mr. Rodgers' clothes). The Commonwealth's entire case that was centered around the jams would have been called into question by the jury. During its closing, the Commonwealth sought to highlight the importance of the jams by discussing them eight different times. N.T. 5/18/1990 at 84, 86, 87, 87-89, 92, 93, 93-94, 113).

### (3) Conclusion.

Mr. Rodgers has established all four *Haskell* factors for these claims. He has demonstrated that his convictions were obtained in violation of the Fourteenth Amendment. *Napue*, 360 U.S. at 269; *see also Giglio*, 405 U.S. at 153 ("deliberate deception of a court and jurors by the

presentation of known false evidence is incompatible with 'rudimentary demands of justice'");

*Haskell*, 866 F.3d at 146. Relief from his conviction is warranted.

### 2    The Commonwealth Misrepresented Evidence to Secure Admission of Exhibit 28.

Commonwealth's Exhibit 28, the knife found in a drop ceiling of an empty apartment, was inadmissible because it was irrelevant. Pa.R.Evid. 402. In Pennsylvania, "[a] weapon not 'specifically linked' to the crime is generally inadmissible." *Commonwealth v. Christine*, 125 A.3d 394, 400 (Pa. 2015) (internal citation omitted). The *Christine* Court allowed for the admission of "a weapon or implement suitable to the commission of the crime charged," but only where the weapon was in the accused's possession. *Id*.

The theory behind *Christine* was that the fact that a weapon "was possessed may allow the inference it could have been used" in the offense. *Id*. However, Exhibit 28 was not found in Mr. Rodgers' possession. Nor was it identified as belonging to him. The Commonwealth did not come close to establishing "a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime." *Id*. (internal citation omitted).

The knife, Exhibit 28, was discovered by Joseph Kawtoski above a drop ceiling while he was doing electrical work. N.T. 5/9/1990 at 104. Mr. Rodgers' mother lived on the third floor of this apartment building. N.T. 5/4/1990 at 145-47. The knife was found in a first-floor apartment. N.T. 5/9/1990 at 104-05. However, Mr. Kawtoski's testimony did not establish possession. Multiple people lived in the apartment building. Fingerprints did not link Mr. Rodgers to the knife. Indeed, the only testimony offered to establish possession of this knife was that of Melissa O'Schea – and she testified that Exhibit 28 was <u>not</u> Mr. Rodgers knife. N.T. 5/3/1990 at 217-18.

93

Not only did the Commonwealth fail to establish Exhibit 28 belonged to Mr. Rodgers, it also did not demonstrate Exhibit 28 was the weapon used to kill Mr. Lascoli. There was no blood or DNA evidence that linked the weapon to Mr. Lascoli's death. Because the Commonwealth did not demonstrate that Exhibit 28 belonged to or was possessed by Mr. Rodgers, it was not admissible under the similar-weapon exception. *Christine*, 125 A.3d at 400 (footnote omitted).

The Commonwealth, unwilling to proceed to trial without a murder weapon, referenced Melissa O'Schea's testimony to secure Exhibit 28's admission, even though Ms. O'Schea testified that Exhibit 28 was not Mr. Rodgers' knife. N.T. 5/4/1990 at 39. The Commonwealth's reference to Ms. O'Schea's testimony as supporting the admission of Exhibit 28 was factually inaccurate, misleading, and contrary to Pennsylvania law.

In the context of closing arguments, the Third Circuit has made clear that a prosecutor may not misstate or misrepresent evidence. *See United States v. Fulton*, 837 F.3d 281, 306, & n.189 (citations omitted). It is also clear that the Commonwealth cannot lie to or mislead the trial court. "Not only does the prosecutor, like all officers of the court, owe a duty of candor to the tribunal, see PA. RULES OF PROF'L CONDUCT r. 3.3, the government is held to a higher standard than private attorneys. That is, the prosecution's interest is to see that 'justice shall be done,' rather than merely 'win a case.'" *Murrel v. Giroux*, 2018WL 509371 (M.D.Pa. 2018) (citing *Berger*, 295 U.S. at 88; *United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016)); *United States v. Casas*, 425 F.3d 23, 40 (1st Cir. 2005) ("Prosecutors have a duty of candor to the court.").

The prosecutor's improper and misleading reliance on Melissa O'Schea's testimony, which did not prove possession or ownership, to secure admission of Exhibit 28 was misconduct.

### 3  Closing Argument.

#### (1) The Prosecution Misrepresented Blood Evidence.

During the Commonwealth's closing argument, the prosecutor misrepresented the blood evidence presented at trial. In response to Mr. Rodgers' defense that he was being framed for Mr. Lascoli's murder, the prosecutor told the jury that Mr. Rodgers' blood was found at the crime scene. Specifically, the prosecutor argued that the "framers" (Mr. Rodgers' defense was that he was being framed for the offense by several of the Commonwealth's witnesses, including Tommy Bowling and his friends and family) "could not have possibly gotten back in the house and sprinkled [Mr. Rodgers'] blood on the kitchen floor." N.T. 5/18/1990 at 116.  However, no DNA evidence linked Mr. Rodgers' blood to Mr. Lascoli's kitchen. N.T. 5/7/1990 at 73 *et seq*. Serology testing found two spots in the kitchen that were consistent with Mr. Rodgers' blood type and a handful of enzymes. N.T. 5/5/1990 at 18-19, 29. This is not the same as "finding" Mr. Rodgers blood.  Statistics at the time revealed that Mr. Rodgers shared type O blood with 45% of the population. N.T. 5/5/1990 at 79. Two of the enzymes tested were extremely common, shared by 90% of the population (ADA and AK) while a third (PGM) was shared by 58½% of the population. *Id.* Given the very real limitations of serology evidence, the Commonwealth's argument was an egregious overstatement of the evidence. However, the prosecutor's comments stood unchecked, which allowed the jury to believe that the serology evidence from the kitchen was far more significant than it was. Given the circumstantial nature of the Commonwealth's case, this argument made in a long and scientifically complex case allowed the jury to improperly link Mr. Rodgers to the crime scene. It was prejudicial.

### (2) The Prosecution Misrepresented the Evidence Related to Exhibit 28.

In closing, the prosecutor argued that Exhibit 28 was Mr. Rodgers' knife and that he used the weapon to kill Mr. Lascoli. The prosecutor told the jury: "the knife that Mr. Kawtoski found is Rodgers, hide the knife." N.T. 5/18/1990 at 115. Again, no one identified Exhibit 28 as belonging to or being possessed by Mr. Rodgers. No one demonstrated that he hid the knife. Moreover, while there was a trace amount of blood found on the knife, it was not linked to either Mr. Rodgers or Mr. Lascoli. The knife was not found where Mr. Rodgers was living at the time, but instead was found in the drop ceiling of an apartment two floors below where Mr. Rodgers' mother lived. N.T. 5/9/1990 at 104-07. This utter absence of evidence was insufficient to make the astonishing leaps made by the prosecutor. It allowed the jury to impute ownership without evidence and to presume the weapon was used to kill Mr. Lascoli without a scintilla of evidence to support the prosecutor's argument.

Furthermore, as part of the same argument, the prosecutor vouched for Mr. Kawtoski's credibility: "You've heard Mr. Kawtoski in this case. I submit to you, ladies and gentlemen, worth of substantial credibility, I submit." N.T. 5/18/1990 at 104-05. The prosecutor may not usurp the jury's role and vouch for a witness' credibility.

### (3) The Prosecutor Improperly Diminished the Beyond-a-Reasonable Doubt Standard.

The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). The "jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *accord Ring v. Arizona*, 536 U.S. 584 (2002) (holding that aggravating factors must be proved to a jury beyond a reasonable doubt).

In closing argument, the prosecutor told the jurors that, "[i]f in the end you say to yourself, I believe this could be the facts, then you have overcome reasonable doubt." N.T. 5/18/1990 at 76. However, the reasonable doubt standard is far more demanding than indicated by the prosecutor. It requires far than a juror believing this **could** be the facts. *Id.*

"This reasonable doubt standard of proof requires the finder of fact 'to reach a subjective state of near certitude of the guilt of the accused.'" *Travillion v. Superintendent Rockview SCI,* 982 F.3d 896, 902 (3d Cir. 2020) (citing *Jackson v. Virginia,* 443 U.S. 307, 315 (1979); *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). "Could" simply does not satisfy the reasonable doubt standard. *See* N.T. 5/18/1990 at 76.

The prosecutor's inaccurate statement of the law was not objected to by trial counsel nor was it corrected by a curative instruction from the trial court. The result was to leave the jury with the impression that it was permitted to find Mr. Rodgers guilty of the charged offenses "based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana*, 498 U.S. 39, 41 (1990). As such, Mr. Rodgers was prejudiced.

### (4) The Prosecutor Urged the Jury to Make an Assessment that Required Expert Testimony.

In closing argument, the prosecutor urged the jury to compare Mr. Lascoli's shoes to an unknown shoe impression. He told the jury it could determine if the two items were a match:

> You have in evidence the shoes of Mr. Lascoli and I believe there are other photographs that show his shoes. And if you look, the lines, the distinct lines, this circle on this exhibit is on the matting. The footprint is distorted. This one is rather clear. You make a comparison. You apply every day life, knowledge that you've gained in common sense. And I submit to you, ladies and gentlemen, that you will have no doubt that that footprint matches Mr. Lascoli's shoe sole.

N.T.5/18/1990 at 82. However, such a comparison and determination of a "match" requires skills outside the knowledge of lay people.

An assessment of this type requires expert assistance. A person does not simply eyeball a photograph and a pair of shoes, then decide they match. The process in distinct and complicated, beginning with a comparison of "'class characteristics' (such as design, physical size, and general wear) and then moving to 'identifying characteristics' or 'randomly acquired characteristics (RACs)' (such as marks on a shoe caused by cuts, nicks, and gouges in the course of use)." *Report to the President Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, at 12, 114 (Sept. 2016) (footnote omitted) (hereinafter referred to as "PCAST Report") *available at* https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf. The first step ensures that there are no inconsistencies in class characteristics between the known shoe and the impression. *Id.* at 115. While a positive identification can be made based on one RAC, it can be done so "only if that characteristic is confirmable; has sufficient definition, clarity, and features; is in the same location and orientation on the shoe outsole; and in the opinion of an experienced examiner, would not occur again on another shoe." *Id.* (internal citation omitted); *see also* Report of Alicia Wilcox (8/27/2023), attached as Appendix 59.

This is a challenging task for an expert to opine on and is not suitable for lay-person assessment. The prosecutor's improper suggestion allowed jurors to surmise that the shoeprint in question was made by Mr. Lascoli. If true, that supports the Commonwealth's central theory that Mr. Rodgers committed this crime by himself. As noted below in Claim __, the Commonwealth's suggestion to the jury is not supported by science. If an expert had testified, the jury would have heard that the print was not made by Mr. Lascoli's shoes. See Appendix 59. As all other known shoes had already been eliminated, that means that another, unknown person made this print. As noted elsewhere, Mr. Rodgers defended against the charges by arguing that he did not kill Mr.

98

Lascoli. An unidentified bloody footprint, not matched to Mr. Rodgers, the first responders, or law enforcement, was a powerful piece of evidence supporting Mr. Rodgers' defense and suggesting to the jurors that there was reasonable doubt about Mr. Rodgers' guilt. Certainly, the jury had real questions about the Commonwealth's case, which argued that Mr. Rodgers was the lone offender, as evidence by its finding of the "possibility of someone else being involved because of circumstantial evidence i.e. excess clothing period of time required to find clothing in the park." *See* N.T. 5/24/1990 at 153. Without the prosecutor's improper argument, that finding might have reached the level of reasonable doubt.

The prosecutor's improper suggestion allowed jurors to take a strong piece of evidence that favored Mr. Rodgers' defense and turn it against him, without the skill or training needed to make the assessment. As such, Mr. Rodgers' defense was damaged, and he was prejudiced.

### 4    The Prosecutor Failed to Review the Trial Exhibits Before They Went to the Jury for Deliberations.

Commonwealth Exhibit 205 was Mr. Rodgers' admission form to the Blair County Detention Home dated August 17, 1987. N.T. 5/4/1990 at 147-48. Exhibit 205 contained identifying information, property, inventory, and listed the offense for which Mr. Rodgers was admitted to the juvenile facility as "Robbery." *See* Appendix 49. The Commonwealth moved to admit Exhibit 205 and trial counsel objected to "the admission of the whole of that exhibit and submission to the jury." N.T. 5/10/1990 at 19. The Court received the exhibit into evidence and indicated that it would "take up the question of what exhibits will be sent out to the jury and whether it will be necessary to do any didacting [sic] when it will be sent out later." *Id.* Exhibit 205 did ultimately go to the jury in unredacted form.

99

Jurors were exposed to this exhibit during trial phase deliberations. Eight jurors testified during the PCRA hearing, five of whom had at least some recollection of Exhibit 205 or the information that it contained.

At the PCRA hearing, Tammy Leedy testified that "I believe I saw it," that "I just remember seeing it so I checked I did," that "I just recall reading some of the things like the um – the personal property so I mean I --- I remember seeing it . . .," and that "I'm --- I'm sure I remember seeing this." N.T. 3/21/2003 at 9, 16, 18, 20 (PCRA hearing testimony from jurors). Although she could not state exactly when she saw it, she saw it and she remembered it.

Likewise, Lois Laurence testified that "I'm sure we looked at one like this one" when presented with a copy of Exhibit 205. *Id.* at 32. When asked, "[d]id you see that document at some point when you were a jury (sic) on the case of James Franklin Rodgers?" she replied "Yes." *Id.* at 32-33. She remembered seeing "a document like that" and indicated yes when asked "And when you say you remember seeing it you were able to read it and look at it, what not?" *Id.* at 33. She also denied on cross-examination that the information she remembered came from another document, testifying that "the stuff I'm reading on there is familiar" and that "this looks familiar." *Id.* at 34. She did not remember when she would have seen it during trial. *Id.* at 74.

Marlene Elliot initially testified that "I may have seen it but I'm --- I definitely can't say for sure. We saw so many things." *Id.* at 41. However, she later testified that "well, either I saw it or someone that did see it of the jurors may have commented on it" and that "it's a good possibility we did see it." *Id.* at 47-48.

Scott Smith also initially testified that "I don't remember see it actually, no." *Id.* at 24. Upon further questioning, he indicated that he did remember at least part of it, saying "I remember the part about --- about the personal. I remember seeing that in the trial" and that "I remember

100

seeing this about the personal property but I was wondering what it had to do with the trial." *Id.* at 26, 28. He also indicated that he saw it during the first part of the trial, during the "guilt part." *Id.* at 28.

Barbara Hecker testified that "I recognize or recall information but I don't know if I actually saw this particular document. I do recall information that is included in this document." *Id.* at 23.

The three remaining testifying jurors indicated that they either did not remember the document from trial or had no recollection of it at all.

The Commonwealth was able to present the jury with evidence of a prior conviction for robbery through the back door. The Commonwealth was not required to jump through any evidentiary hoops to present a prior similar conviction. However, the improper result was the same, the jury was able to presume that because Mr. Rodgers had committed the same crime previously "he was more likely to commit that crime for which he is being tried," stripping him of the "presumption of innocence." *Commonwealth v. Aguado*, 760 A.2d 1181, 1186 (Pa. 2000) (quoting *Commonwealth v. Spruill*, 391 A.2d 1048, 1049-50 (Pa. 1970)).

"Evidence of prior criminal activity is probably only equaled by a confession in its prejudicial impact on a jury." *Aguado*, 760 A.2d at 1187 (quoting *Spruill*, 391 A.2d at 1050). This evidence allowed the jury to presume that Mr. Rodgers had a propensity for committing robberies. It was highly prejudicial. The prosecution's failure to ensure that this exhibit was not received by the jury in un-redacted form was misconduct.

### D   *Cumulative Prejudice.*

The Commonwealth's misconduct is considered cumulatively, and "in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (internal citations omitted).

Here, the misconduct was significant. In a case where the evidence was circumstantial, and the Commonwealth's witnesses were of questionable reliability, the Commonwealth presented Mr. Rodgers' brother who lied repeatedly – about his interest in testifying, the plea deal that waited for him, and about a phone call that strongly suggested Mr. Rodgers was covered in blood on the night of the murder. The prosecutor misled the trial court and got it to admit Exhibit 28, so that the prosecutor could tell the jury that it was the murder weapon and it belonged to Mr. Rodgers – though the evidence was to the contrary. The prosecutor misrepresented blood evidence, misstated the reasonable doubt standard, and then told the jury to make an expert determination about Mr. Lascoli's shoe prints for which they lacked the skill and expertise. Finally, the prosecutor allowed the jury to receive an unredacted version of exhibit 205, which revealed to the jury that Mr. Rodgers had a prior conviction for robbery. This misconduct is sufficient to undermine the fairness of the proceedings. *See Young*, 470 U.S. at 16-17; *see also Darden*, 477 U.S. at 182 (applying *Young*); *Donnelly*, 416 U.S. at 647-48 (comparing "ordinary trial error of a prosecutor" with the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process"). This error had a substantial and injurious effect or influence in determining the jury's sentence. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Minimally, this Court should have grave doubt about the errors' impact. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

### E    *Conclusion.*

The Commonwealth committed egregious acts of misconduct at Mr. Rodgers' trial. Separately, or cumulatively, Mr. Rodgers has presented a meritorious claim. Alternatively, considered cumulatively with the other errors raised, this error had a substantial and injuries effect on the trial verdict.

**III THE SUPERIOR COURT OF PENNSYLVANIA UNREASONABLY DENIED RELIEF ON MR. RODGERS' CLAIM THAT HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED WHEN THE TRIAL COURT ERRONEOUSLY REFUSED TO SUPPRESS STATEMENTS HE MADE WHILE IN CUSTODY, UNCOUNSELED, AND THE FOCUS OF POLICE INVESTIGATION INTO MR. LASCOLI'S HOMICIDE.**

### A   *Legal Standard*

The Fifth Amendment to the United States Constitution provides in part "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that in order to protect an accused's Fifth Amendment right against self-incrimination during a custodial interrogation, certain procedural safeguards must be employed. These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. An interrogation is custodial whenever a person is under arrest, detained, or incarcerated – even if the custody initially results from charges unrelated to the subject of the questioning. See *Mathis v. United States*, 391 U.S. 1, 4 (1968); *Commonwealth v. Whitley*, 457 A.2d 507, 508 (Pa. 1983) (defining "interrogation" as police conduct "calculated to, expected to, or likely to, evoke admissions"). In Pennsylvania, moreover, *Miranda* warnings are required before police can question a person who, while not in custody on any matter, is the focus of a criminal investigation. *Commonwealth v. D'Nicuola*, 292 A.2d 333, 336 (Pa. 1972).

While any custodial interrogation entails "inherently compelling pressures," the safeguards provided by the Fifth Amendment and protected by *Miranda* warnings are more necessary and become "more acute when the subject of custodial interrogation is a juvenile." *J.D.B. v. North*

104

*Carolina*, 564 U.S. 261, 269 (2011). The question of whether a juvenile suspect knowingly and voluntarily waived his rights requires "an inquiry into the totality of the circumstances surrounding the interrogation." *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979). In such cases, a court must specifically evaluate "the juvenile's age, experience, education, background, [and] intelligence" and whether he has "the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* at 725.

### B    *State Court Proceedings.*

On June 10, 1988, two days after Mr. Lascoli's murder, Mr. Rodgers – who was 17 years old at the time – was taken into police custody pursuant to a bench warrant issued on the grounds that he was allegedly in violation of his juvenile probation. *Rodgers*, 605 A.2d at 1238. After Mr. Rodgers was apprehended, he was brought to Altoona Police Headquarters by Officer Mitchell F. Cooper, a detective with the Juvenile Division of the Altoona Police Department who was also part of the team investigating the Lascoli homicide. N.T. 3, 5/2/90 at 2. Once at the police department, Detective Cooper "talked with Mr. Rodgers regarding his knowledge of the victim, Mr. Lascoli," as Detective Cooper "had received prior information that Mr. Rodgers' mother, Christine Houtz, had been an acquaintance of Mr. Lascoli."[37] *Id.* at 6. Mr. Rodgers was not given *Miranda* warnings, nor was he offered the opportunity to have an attorney, his mother, or another responsible adult present with him for questioning. N.T. 9/16/1988, Motion to Suppress Oral

---

[37] Detectives interviewed Mr. Lascoli's family to determine whether they had any information about who might have murdered their relative. Mr. Lascoli's son-in-law, Ronald Riley, reported to Sgt. Andrew Epple that Mr. Lascoli was going with a woman by the name of Chris and that she had two sons, Frankie and David. N.T. 2, 5/1/1990 at 73.

Statement Given to Police; N.T. 9/25/1989, Third Motion for an Order Suppressing Oral Statements.

At trial, Detective Cooper acknowledged that immediately following the homicide he was ordered "to gather as much background information on Mr. Lascoli as to who he may have known and what events took place in the days preceding his death." N.T. 5/2/1990 at 6. As he testified at trial, "[d]ue to the amount of blood at the scene . . . there was discussion as to the possibility of whoever was responsible for the act may have been injured also." *Id.* at 2. As part of his investigation, Detective Cooper was charged with "check[ing] the two hospitals in the city of Altoona to attempt to determine if anyone had been treated at the hospitals for any type of injuries that may have been a result of cutting or some type of lacerations." *Id.* at 3-4. Detective Cooper was also familiar with many of the key players in this case – including Kimberly Hileman, Thomas Bowling, and David Houtz – from previous criminal investigations. Therefore, at the time Mr. Rodgers was detained and questioned on June 10, Detective Cooper (1) was aware that Mr. Rodgers knew Mr. Lascoli and was the son of his sometime paramour[38]; (2) knew that Mr. Rodgers had been to Mr. Lascoli's home and was familiar with his residence and routine; and (3) was actively searching for anyone who may have been injured by a knife and left blood at the Lascoli crime scene.

---

[38] This would have been highly relevant information, as any experienced detective, like Detective Cooper, would have known that among violent crimes, homicide is the least likely to be committed by a stranger. *See, e.g.,* Timrots, Anita D. and Rand, Michael R., *Violent Crime by Strangers and Nonstrangers*, Bureau of Justice Statistics Special Report, Jan. 1987 (available at https://www.ojp.gov/pdffiles1/Digitization/103702NCJRS.pdf); *see also* Harrell, Erika, *Violent Victimization Committed by Strangers, 1993-2010* (from 1993 to 2008, among homicides reported to the FBI for which the victim-offender relationship was known, between 73% and 79% were committed by offenders known to the victims) (https://bjs.ojp.gov/library/publications/violent-victimization-committed-strangers-1993-2010).

106

At the hearing on the motion to suppress, the preliminary hearing, and at trial, Detective Cooper claimed that during his questioning of Mr. Rodgers he "noticed" open cut wounds on two fingers of Mr. Rodgers' left hand. Detective Cooper testified that he inquired about the nature and source of the injuries. because he believed information regarding Mr. Rodgers' wounds would be needed by juvenile detention staff. Mr. Rodgers allegedly stated that a week earlier, on June 3, 1998, he had been "fooling around" with a knife along with Tommy Bowling and the knife slipped, causing the cuts on his hand. N.T. 8/3/1988 at 46-55; N.T. 5/2/1990 at 12. At the preliminary hearing and in later litigation regarding Mr. Rodgers' statements, the Commonwealth and Detective Cooper repeatedly denied that Mr. Rodgers was a suspect in the Lascoli homicide on June 10, 1988.

Trial counsel Randy Miller stipulated his acceptance of Detective Cooper's preliminary hearing testimony, *see* N.T. 10/4/1988 at 23-26, but continued to litigate suppression of Mr. Rodgers' statements, ultimately filing three motions to suppress Mr. Rodgers' statements as uncounseled admissions given during a custodial interrogation. N.T. 9/25/1989, Third Motion for an Order Suppressing Oral Statements. After a suppression hearing, the court allowed Mr. Rodgers' June 10 statements to be admitted at trial over trial counsel's continuing objections. *See, e.g.*, N.T. 5/2/1990 at 4-5. However, discovery obtained after the suppression hearing revealed that Detective Cooper's sworn testimony during the preliminary hearing of how he came to ask Mr. Rodgers about the cuts on his hands was false, or at the very least incomplete. During those proceedings, Detective Cooper claimed that the wounds were clearly visible and "seeping," which prompted him to ask Mr. Rodgers about their provenance. N.T. 5/2/1990 at 11. However, what Detective Cooper did not reveal to the suppression court or the preliminary hearing court was that Mr. Rodgers' cuts were covered with either Band-Aids or tape, and that he directed Mr. Rodgers

to remove the bandages so he could inspect the cuts. Appellant's Opening Brief on Appeal, *Commonwealth v. Rodgers*, at 7.

On appeal, Mr. Miller argued that the trial court erred under *Miranda*, *Fare*, and related state caselaw when it admitted and refused to strike Mr. Rodgers' uncounseled custodial statements as unconstitutionally obtained. As discussed above, an inquiry into whether a juvenile defendant's custodial statements were obtained in violation of his constitutional right against self-incrimination depends on the totality of the evidence. On appeal, the Superior Court determined that the suppression court made "five explicit factual findings" which the appellate court found crucial to resolution of this claim:

> (1) at the time of the conversation between appellant and Detective Cooper, appellant was not a suspect in the police investigation of Mr. Lascoli's death; (2) appellant's custodial status in no way related to the murder investigation; (3) the police investigation of the murder had not yet focused upon appellant; (4) the conversation between Detective Cooper and appellant was not designed nor intended by the officer to elicit information regarding Mr. Lascoli's murder; and (5) on June 10, 1988, appellant was not given the prophylactic warnings regarding his constitutional rights prescribed by *Miranda v. Arizona*."

*Rodgers*, 605 A.2d at 1238; Suppression Court Memorandum, N.T. 1/4/1991 at 2-3. The Superior Court found that the record "supports these factual findings, and we discern no lower court error in this regard." *Rodgers*, 605 A.2d at 1238. Additionally, the Superior Court agreed with the suppression court that as a matter of law, Mr. Rodgers was not entitled to notice of his *Miranda* rights and that no Fifth Amendment violation had occurred. Specifically, the Court held: "In light of the suppression court's properly supported factual finding that the conversation between Detective Cooper and appellant was not designed nor intended to elicit an admission, we discern no error of law in the lower court's decision to refuse suppression of the challenged statement." *Id.*

C  **The Superior Court's denial of this claim was unreasonable under §2254(d).**

The Superior Court's holding that Mr. Rodgers was not a suspect at the time of Detective Cooper's interrogation and that the interrogation was not custodial is an unreasonable determination of the facts in the state court record. *See* §2254(d)(2). Detective Cooper was actively looking for someone with injuries consistent with a knife attack. He was aware that Mr. Rodgers was the child of a close companion of Mr. Lascoli, knew Mr. Lascoli personally, and had been to his home. And he knew that there didn't appear to be a break-in at Mr. Lascoli's home, indicating that the victim was familiar with the perpetrator. It was unreasonable for the state courts to find that Mr. Rodgers wasn't a suspect, especially after he noticed the apparently "seeping" cuts on Mr. Rodgers' hands. At the very least, Detective Cooper could and should have given Mr. Rodgers a *Miranda* warning once he saw those cuts. Similarly, it was unreasonable for the state courts to accept Detective Cooper's pretense for querying Mr. Rodgers about the cuts on his hands. The issue does not turn on how the police choose to characterize an interrogation or detention. *See, e.g.*, *Escobedo v. Illinois*, 378 U.S. 478, 490-91 (1964); *Commonwealth v. Banks*, 239 A.2d 416 (1968) (defendant was the subject of a custodial interrogation despite detectives' claim that he was brought to the police station merely as a "witness") (citing *Escobedo*). If it were otherwise, the police could, as Detective Cooper did here, "evade the procedural safeguards required by *Escobedo* and *Miranda* to protect one's privilege against self-incrimination during police questioning by interviewing everyone as 'a witness.'" *Banks*, 239 A.2d at 419.

The Superior Court's denial of this claim was also contrary to clearly established federal law on custodial interrogations and *Miranda* rights. There is no question that Mr. Rodgers was in custody, *see Rodgers*, 605 A.2d at 1238. And there is no question that Detective Cooper was aware

109

of Mr. Rodgers' connection to Mr. Lascoli, was actively looking for someone with "cutting" or "laceration" type injuries, and observed cuts on Mr. Rodgers' hands. Under *Miranda* and its progeny, these facts support a finding that Mr. Rodgers' custodial status related to the Lascoli investigation. Even if one determines that Mr. Rodgers was not picked up by the police because he was a suspect in the Lascoli murder (a concession Mr. Rodgers expressly does not make), there can be little doubt that he became a suspect once Detective Cooper saw the cuts on his hands. There was nothing stopping Detective Cooper from reading Mr. Rodgers his *Miranda* rights after seeing the cuts on his hands. Under the law, Mr. Rodgers' custodial interrogation required the protection of *Miranda*, and it was contrary to clearly established law on the right against self-incrimination for the lower courts to find otherwise. *See United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (where questioning is "reasonably likely to elicit an incriminating response from the suspect," it rises to the level of "interrogation" and *Miranda* warnings are required).

D  **To the extent that this Court finds the record undeveloped or the issue procedurally barred, trial and appellate counsel Randy Miller was ineffective in litigating this issue.**

As described in detail above (*see* Claim I.C.1), counsel Randy Miller was struggling with serious personal and professional issues during Mr. Rodgers' trial and appeal. Consequently, Mr. Miller admitted that he made a number of serious lapses during his representation of Mr. Rodgers. *See* Appendices 21, 22, and 46.

Mr. Miller was ineffective for failing to move for a recess and a suppression hearing once he was aware of the extent of Detective Cooper's falsehoods. As Mr. Miller admitted in a letter to Mr. Rodgers after the trial, "Making a record for appeal is an indispensable skill of a criminal defense attorney. I prefer to win at trial, and sometimes I am not as careful on this score as perhaps I should be. Sometimes, too – like after I discovered that Detective Cooper had directed you to

110

remove the Band-Aids from your fingers at City Hall on June 10, 1988 – there is too little time to consider all of the legal ramifications of the facts as they unfold. . . . Though a second motion for suppression was made, a recess for a second suppression hearing should have been demanded, on the new grounds indicated above, at the close of the Commonwealth's case." Appendix 46 at 2.

Mr. Miller also unreasonably failed to present evidence supporting suppression of Mr. Rodgers' statement under *Fare*'s totality of the circumstances test. When he was questioned by Detective Cooper on June 10, 1988, Mr. Rodgers was a 17-year-old juvenile with a documented (and readily available) history of drug and alcohol abuse, brain damage, and learning disabilities. *See* Appendices 24, 25, and 26. He was not offered the opportunity to consult with legal counsel, a parent, or another trusted adult when Detective Cooper questioned him about the cuts on his hands. And he was misled as to the nature of the interrogation, thinking that he was in custody solely because of the juvenile warrant. All of these factors combine under *Fare* to render his June 10 custodial statement unknowing and unvoluntary. To the extent that trial and appellate counsel failed to adequately plead and argue this claim under *Fare* and its progeny, counsel rendered ineffective assistance. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Commonwealth v. Liebel*, 825 A.2d 630, 633-34 (Pa. 2003). *See also Rodgers*, 605 A.2d at 1238 n. 14 (noting that appellate counsel failed to "fully expand[]" the claim by neglecting to "stat[e] appellant's age on the relevant date" and failing to "discuss[] his experience and comprehension level at that time," but finding no prejudice because Mr. Rodgers was not subject to a custodial interrogation on June 10, 1988).

E    **Mr. Rodgers was prejudiced by the admission of his June 10, 1988 statements.**

The Commonwealth's case relied heavily on Detective Cooper's testimony about Mr. Rodgers' uncounseled, custodial June 10 statements. The statements (which were neither recorded

111

nor contemporaneously documented) led detectives to speak with Thomas Bowling; served as the predicate for his July 1988 statements; and were used against Mr. Rodgers as impeachment evidence during his trial testimony. Mr. Rodgers was prejudiced.

## PRAYER FOR RELIEF

For the foregoing reasons, Petitioner James Franklin Rodgers respectfully requests that this Court:

1. Grant such discovery that is necessary for full and fair resolution of the claims contained in this Petition;

2. Grant leave to amend this Petition, if deemed necessary;

3. Provide Mr. Rodgers an opportunity to supplement this Petition with additional briefing;

4. Conduct an evidentiary hearing on all claims involving disputed issues of fact;

5. Order that Mr. Rodgers' convictions be vacated.

Respectfully submitted,

/s/ Kirk J. Henderson
KIRK J. HENDERSON
Assistant Federal Public Defender

CELESTE BACCHI
Assistant Federal Public Defender

LISA B. FREELAND
Federal Public Defender

Federal Public Defender Office for the
   Western District of Pennsylvania
1001 Liberty Avenue
Suite 1500
Pittsburgh, Pennsylvania 15222
412-644-6565

Dated:  August 28, 2023

113

**CERTIFICATE OF SERVICE**

I, Kirk J. Henderson, hereby certify that on this date I caused the foregoing document to be served on the following via first-class United States Mail:

First Assistant District Attorney Nichole Smith
Blair County District Attorney's Office
423 Allegheny Street
Suite 421
Hollidaysburg, PA 16648

/s/ Kirk J. Henderson
KIRK J. HENDERSON
Assistant Federal Public Defender

CELESTE BACCHI
Assistant Federal Public Defender

LISA B. FREELAND
Federal Public Defender

Federal Public Defender Office for the
    Western District of Pennsylvania
1001 Liberty Avenue
Suite 1500
Pittsburgh, Pennsylvania 15222
412-644-6565

Dated:  August 28, 2023