**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES FRANKLIN RODGERS, | ) | |
| | ) | Case No. 3:23-cv-00196 |
| *Petitioner*, | ) | |
| | ) | Chief District Judge Cathy Bissoon |
| v. | ) | |
| | ) | |
| LAUREL R. HARRY, et al., | ) | |
| | ) | |
| *Respondents*. | ) | |

# <u>MEMORANDUM OPINION</u>

Currently pending before the Court is a Petition for Writ of Habeas Corpus ("Petition") filed through counsel by Petitioner James Franklin Rodgers ("Petitioner").[1] ECF No. 5. The Petition was filed pursuant to 28 U.S.C. § 2254 and seeks relief from Petitioner's convictions out of Blair County, Pennsylvania stemming from the killing of Pasquale J. Lascoli at his home in Altoona, Pennsylvania, in June 1988.[2] For the reasons that follow, both the Petition and a certificate of appealability will be denied.

---

[1] Petitioner has been represented in federal habeas proceedings by the Federal Public Defender's Office in Pittsburgh, Pennsylvania, since they were appointed by this Court in January 2009. *See Rodgers v. Rozum, et al.*, No. 3:06-cv-00046, ECF No. 14 (W.D. Pa.). According to the state court docket, the Federal Public Defender has also represented Petitioner in the underlying Blair County state court proceedings since at least 2013.

[2] Petitioner was approximately seventeen-and-a-half years old at the time of the offenses. The Commonwealth sought the death penalty, but Petitioner received a sentence of life imprisonment without the possibility of parole. Following the United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), Petitioner's sentence was vacated, and he was resentenced to a term of forty years to life imprisonment.

## I. **Background**[3]

The following is a brief recitation of the factual background of this case as set forth on direct appeal by the Pennsylvania Superior Court in its Memorandum dated February 26, 1992.

> The events underlying the instant appeal transpired at some time between the hours of 11:30 p.m. and 3:00 a.m. on the night of June 7-8, 1988 when the seventy-two year old victim in the case was assaulted and robbed in his Altoona, Pennsylvania home. A subsequent autopsy disclosed that the perpetrator inflicted at least seventy (70) stab wounds on the victim, Pasquale J. Lascoli. Although many of the wounds were superficial, one thrust of the knife penetrated the victim's heart causing a fatal hemorrhage. Mr. Lascoli's wallet was discovered in a near-by city park several days after the murder.
>
> The subsequent police investigation of the homicide uncovered the facts that appellant not only knew Mr. Lascoli, but that he had proposed a plan to burglarize the victim's residence only a few days before the murder occurred. Further, the fingers of the appellant's left hand were observed to be cut and bleeding in the early morning hours of June 3, 1988. Forensic DNA testing of blood stains on various items of apparel disclosed Mr. Lascoli's blood on clothing worn by appellant on the night of the murder, while appellant's blood was detected on the inside pocket of the trousers worn by the victim at the time of his death. This pocket was the location in which Mr. Lascoli had customarily carried his wallet.
>
> Appellant was ultimately arrested and charged with criminal homicide, robbery, aggravated assault, reckless endangerment of another, theft by unlawful taking/disposition, and receiving stolen property. Appellant's pre-trial motion for change of venire was granted, and a jury was impaneled in Lebanon County. The trial was held at the Blair County Courthouse in May of 1990, with the Honorable Ellis W. Van Horn, Jr. of Bedford County specially presiding.

ECF No. 20-6 at 3-4.

---

[3] The Court recognizes the lengthy and somewhat procedurally complex history of this case, a circumstance that is unsurprising given the significant passage of time since Petitioner's conviction. The Court has carefully reviewed the extensive record, which includes 21 volumes of trial transcripts alone, and familiarized itself with the relevant state court pleadings and proceedings. Because this opinion is written primarily for the parties, the Court recounts only those facts and the procedural history necessary to resolve Petitioner's claims.

The Commonwealth pursued the death penalty against Petitioner. A jury trial was held from April 30, 1990, through May 23, 1990, and at its conclusion, Petitioner was found guilty of murder in the first degree, robbery, and aggravated assault. The following day, the jury returned a sentencing verdict of life imprisonment after finding that the murder was accompanied by various mitigating circumstances which were not outweighed by the aggravating circumstance unanimously found (i.e., a killing committed while in the perpetration of a felony). Post-verdict motions were denied, and Petitioner was sentenced on April 3, 1991.[4] The Superior Court affirmed Petitioner's judgment of sentence on February 26, 1992.[5] ECF No. 20-6 at 3-25. The Supreme Court of Pennsylvania denied a petition for allowance of appeal on October 20, 1992. *Commonwealth v. Rodgers*, 615 A.2d 1311 (Pa. Oct. 20, 1992). Petitioner did not seek review in the United States Supreme Court.

Petitioner, acting *pro se*, filed his first petition for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA") on May 13, 1994.[6] Counsel was appointed, and an amended petition was filed on Petitioner's behalf on January 26, 1995. After the PCRA court heard oral argument on the need for an evidentiary hearing, the court issued an order on June 27, 1997, denying a hearing and relief on all issues except one: whether trial counsel was ineffective for not pursuing an objection to Commonwealth Exhibit No. 205 being sent out with the jury during deliberations on Petitioner's guilt. ECF No. 20-9 at 2-33. An evidentiary hearing was held on

---

[4] Petitioner's trial documents can be found on the docket at ECF No. 20-1.

[5] Petitioner's direct appeal documents can be found on the docket at ECF Nos. 20-2, 20-3, 20-4, 20-5, 20-6, and 20-7.

[6] Petitioner's PCRA documents can be found on the docket at ECF Nos. 20-8 and 20-9.

March 21, 2003, at which eight of the twelve jurors appeared and testified. On May 14, 2003, the PCRA court entered an order, titled "Supplement to Our Opinion and Order of June 27, 1997," which denied relief on the remaining claim. ECF No. 20-9 at 65-66. A "Second Supplement" was entered on June 12, 2003. ECF No. 20-9 at 67-68. The issue regarding Commonwealth Exhibit 205 was the sole claim raised on appeal, and the Superior Court affirmed the denial of PCRA relief on July 13, 2004.[7] ECF No. 20-10 at 38-46. The Superior Court denied reargument on September 22, 2004, ECF No. 20-10 at 57, and the Supreme Court of Pennsylvania denied Petitioner's petition for allowance of appeal on February 24, 2005. *Commonwealth v. Rodgers*, 868 A.2d 1199 (Pa. Feb. 24, 2005).

On August 23, 2012, Petitioner filed a second PCRA petition, which challenged his mandatory life without parole sentence in light of the then recent Supreme Court case *Miller v. Alabama*, 567 U.S. 460 (2012).[8] The PCRA court granted relief on Petitioner's sentencing claim and held resentencing hearings from June 26 to June 29, 2019. On January 17, 2020, the resentencing court sentenced Petitioner to serve forty years to life imprisonment. ECF No. 20-12 at 51-83. The Superior Court affirmed his judgment of sentence on August 30, 2021, *Commonwealth v. Rodgers*, 2021 WL 3855857 (Pa. Super. Aug. 20, 2021), and the Supreme Court of Pennsylvania denied his petition for allowance of appeal on May 31, 2022.[9] *Commonwealth v. Rodgers*, 279 A.3d 498 (Pa. May 31, 2022).

---

[7] Petitioner's PCRA appeal documents can be found on the docket at ECF No. 20-10.

[8] Documents related to these proceedings can be found on the docket at ECF No. 20-12.

[9] The Court notes that the physical state court records provided to this Court show that Petitioner filed a petition to retest DNA evidence in 2018, which the trial court appears to have granted in

## II. Federal Habeas Standards

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"), habeas relief is only available for "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 98-100 (2011); *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

The majority of federal habeas claims need only be analyzed under § 2254(d)(1), which applies to questions of law and mixed questions of law and fact. In applying § 2254(d)(1), the federal habeas court's first task is to ascertain what law falls within the scope of the "clearly

---

2019. However, the record contains no reference to results from any DNA testing that may have been conducted as a result of that order, nor does it reflect that Petitioner pursued any post-conviction relief thereafter based on the results of such testing.

established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). The phrase "clearly established," as the term is used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 363, 412 (2000). Thus, "clearly established Federal law" is restricted to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, the federal habeas court must determine whether the state court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to" clearly established Federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id*. at 405, 406. A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Id*. at 406. Thus, the issue in most federal habeas cases is whether the adjudication by the state court survives under § 2254(d)(1)'s "unreasonable application" clause.

A state court decision is an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. To satisfy his burden under this provision of AEDPA's standard of review, the petitioner must do more than convince the federal habeas court that the state court's decision was incorrect. He must show that it "was objectively unreasonable." *Id*. at 409. This means that the petitioner must prove that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

As the Supreme Court has noted:

> …. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer*, *supra*, at 75, 123 S. Ct. 1166.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Richter*, 562 U.S. at 102.

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits. *See Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768, 776 (3d Cir. 2017) (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires."). The Court of Appeals for the Third Circuit has explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient. That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," *Williams*, 529 U.S. at 389, 120 S.Ct. 1495. *See also Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred. *See Lafler v. Cooper*, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

*Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 281 (3d Cir. 2016) (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals' decision because "[t]he panel

majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Woods*, 558 U.S. at 301 (quoting *Collins*, 546 U.S. at 341-42).

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court[.]" *O'Sullivan v. Boerckel*, 562 U.S. 838, 845 (1999).

In order to "exhaust" a federal constitutional claim, a state prisoner must "fairly present" it through the proper procedures in state court before he litigates the claim in a federal habeas petition. *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000) (citing 28 U.S.C. § 2254(b)); *see also O'Sullivan*, 526 U.S. at 848; *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). This requires the state prisoner to have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement. *O'Sullivan*, 526 U.S. at 845. In Pennsylvania, this means that a petitioner must have first presented every federal constitutional claim raised in his federal habeas petition to the Superior Court either on direct or PCRA appeal. *See, e.g.*, *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

Additionally, in order to "fairly present" a claim in the state courts to satisfy the exhaustion requirement, "[b]oth the legal theory and the facts on which a federal claim rests must have been presented to the state courts." *Gibson v. Scheidemantel*, 805 F.2d 135, 138 (3d Cir. 1986) (citing *Picard v. Connor*, 404 U.S. 270, 277 (1971)). "This requires that the claim brought in federal court be the substantial equivalent of that presented to the state court." *Id.* The Third Circuit has held that a state prisoner may "fairly present" a federal claim to state courts without specifically referencing the federal Constitution or a federal statute in four ways:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 229 (3d Cir. 2017) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261-62 (3d Cir. 1999)).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless*, 172 F.3d at 260. However, in such cases applicants are considered to have procedurally defaulted their claims. *See Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012). The doctrine of procedural default, like the doctrine of exhaustion, is "grounded in concerns of comity and federalism." *Coleman*, 501 U.S. at 730. A Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the Superior Court and he cannot do so now because the state courts would decline to address the claims on the merits because state procedural rules (such as, for example, the PCRA's one-year statute of

limitations) bar such consideration; or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for that reason the Superior Court declined to address the federal claim on the merits (often referred to as the "adequate and independent state ground doctrine"). *See Rolan*, 680 F.3d at 317 ("Procedural default occurs when a claim has not been fairly presented to the state courts . . . and there is no additional state remedies available to pursue . . . or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule . . . .).

Federal courts may not consider procedurally defaulted claims. However, there are two recognized exceptions to the procedural default doctrine. First, a petitioner may avoid the default of a claim by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. "'Cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[.]" *Id*. at 753. The Supreme Court has explained:

> It has long been the rule that attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel. *See Edwards v. Carpenter*, 529 U.S. 466, 451 (2000). An error amounting to constitutionally ineffective assistance is "imputed to the State" and is therefore external to the prisoner. *Murray*, *supra*, at 488. Attorney error that does not violate the Constitution, however, is attributed to the prisoner under "well-settled principles of agency law." *Coleman*, supra, at 754. It follows, then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default.

*Davila v. Davis*, 582 U.S. 521, 528-29 (2017).

Because there is no federal constitutional right to counsel in a PCRA proceeding, a petitioner cannot rely on PCRA counsel's ineffectiveness to establish the "cause" necessary to

overcome the default of a federal habeas claim. *Id*. at 524. However, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court announced a narrow exception to this rule. In relevant part, it held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel be raised for the first time in a collateral proceeding, a petitioner may overcome the default of a claim of trial counsel's ineffectiveness. To do so, the petitioner must show: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial" and (2) PCRA counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984) for (3) failing to raise that claim in the "initial review collateral proceeding" (meaning to the PCRA court). *Martinez*, 566 U.S. at 17. The holding in *Martinez* is limited to defaulted claims asserting that trial counsel was ineffective. *See, e.g.*, *Davila*, 582 U.S. at 530. It does not apply to any other type of defaulted claim. *Id*. It is worth remembering that "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17.

Finally, this Court need not resolve the more complex issues of procedural default if it determines that the ineffectiveness claim has no merit, even under a *de novo* review. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (where analysis of procedural default is complex, the court may skip the issue and proceed to the merits).

The second way a petitioner may avoid the default of a claim is by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. This means that a procedural default may be excused if the petitioner presents evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless

constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id*. at 324. In only the extraordinary case will a petitioner be able to establish a "fundamental miscarriage of justice."

If the state court did not adjudicate a claim on the merits, the federal habeas court must determine whether that was because the petitioner procedurally defaulted it. *See, e.g.*, *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002). If the claim is not defaulted, or if the petitioner has established grounds to excuse his default, the standard of review at § 2254(d) does not apply and the habeas court reviews the claim *de novo*. *See*, *e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, the state court's factual determinations are presumed to be correct under § 2254(e)(1) unless the petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

## III. <u>Discussion</u>

The Petition before this Court raises the following twenty-four claims:[10]

1. Trial counsel's alcohol abuse and marital problems created a conflict and interfered with his duty to zealously represent the Petitioner.

[10] The Petition asserts three principle claims for relief, but the first two claims contain numerous sub-claims. For purposes of clarity, and for ease of reference and disposition, the Court will address each sub-claim as a separate claim.

2. Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witness David Houtz.

3. Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witness Timothy Bowling.

4. Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witness David Riley.

5. Trial counsel failed to object to known false and perjured testimony and/or failed to properly cross and impeach Commonwealth witness Detective Cooper.

6. Trial counsel failed to object to hearsay presented by the Commonwealth (David Houtz's testimony regarding statements made to him by Melissa O'Schea).

7. Trial counsel failed to object to the admission of irrelevant evidence.

8. Trial counsel failed to object to the prosecutor's misstatement of evidence (blood found in the victim's kitchen).

9. Trial counsel was ineffective for stipulating to the chain of custody concerning the blood evidence; a vial of blood had gone missing.

10. Trial counsel was ineffective for undertaking a truncated investigation that failed to find a crucial witness who would have not invoked her Fifth Amendment right not to incriminate herself (Estelle Pierce).

11. Trial counsel did not object when the prosecutor diminished the beyond-a-reasonable-doubt standard during closing argument.

12. Trial counsel failed to object when the prosecutor urged the jury in closing argument to make an assessment that required expert testimony (shoe impression).

13. In the first DNA case in Pennsylvania, trial counsel failed to present an expert at the *Frye* hearing to show the unreliability of the lab's results.

14. Trial counsel was ineffective for failing to secure an expert on shoeprint evidence.

15. Trial counsel failed to review the trial exhibits before they went to the jury for deliberations (Exhibit 205).

16. The prosecutor presented known false evidence; David Houtz committed perjury.

17. The prosecutor presented known false evidence; the Commonwealth knew or should have known that David Riley's testimony was inaccurate.

18. The prosecutor misrepresented evidence to secure admission of Exhibit 28.

19. The prosecutor misrepresented blood evidence during closing argument.

20. The prosecutor misrepresented the evidence related to Exhibit 28 during closing argument.

21. The prosecutor improperly diminished the beyond-a-reasonable-doubt standard during closing argument.

22. The prosecutor urged the jury to make an assessment that required expert testimony during closing argument (shoe impression).

23. The prosecutor failed to review the trial exhibits before they went to the jury for deliberations (Exhibit 205).

24. The Superior Court of Pennsylvania unreasonably denied relief on Petitioner's claim that his Fifth Amendment right against self-incrimination was violated when the trial court erroneously refused to suppress statements he made while in custody, uncounseled, and the focus of police investigation into Mr. Lascoli's homicide.

*See* ECF No. 5.

Respondents submit that, except for claims 15 and 24, Petitioner failed to exhaust his claims in the state courts, and they additionally submit that because there is no procedural mechanism by which Petitioner can return to state court to have his claims reviewed on their merits, the claims are now procedurally defaulted.

In a Reply brief, Petitioner recognizes that his claims are indeed unexhausted except for claims 15 and 24, but he argues that, for various reasons, this Court must nevertheless decide them on their merits. The Court has given due and careful consideration to the many arguments submitted by Petitioner, but for the reasons discussed below, it finds that, except for claims 15 and 24, Petitioner's claims are procedurally defaulted and that he has not satisfied any recognized exception to overcome the default and allow for merits review of those claims.

As recognized by both parties, claims 15 and 24 are subject to AEDPA deference because they were adjudicated on their merits by the Pennsylvania Superior Court. However, Petitioner is not entitled to habeas relief on those claims because he has not demonstrated that the relevant state court decision was contrary to or an unreasonable application of United States Supreme Court precedent, nor has he demonstrated that the state court decision was an unreasonable determination of the facts in light of the evidence presented.

**A. Except for claims 15 and 24, all of Petitioner's claims are procedurally defaulted, and the Court cannot review the claims because he has not made a sufficient demonstration of any recognized exception to the procedural default doctrine to excuse the default.**

**1. Petitioner only exhausted claims 15 and 24; all other claims are procedurally defaulted.**

Petitioner recognizes that, apart from claims 15 and 24, he did not fairly present his claims through the proper state court procedures to have satisfied section 2254(b)'s exhaustion requirement.

The Court has reviewed the many relevant pleadings in the underlying criminal case and finds that claims 1-3, 5-14, 16, and 18-20 were raised by Petitioner in either his *pro se* PCRA petition, or in his counseled amended PCRA petition, and they were addressed by the state court

in Petitioner's initial PCRA proceedings.[11] [12] However, none of these claims were included in the brief on appeal to the Superior Court. Because state procedural rules would bar Petitioner from returning to state court to have these claims reviewed on their merits, they are now considered procedurally defaulted.

---

[11] In his Reply brief, Petitioner agrees that claims 1-3, 6-9, 11-13, 16, and 18-20 were raised in his PCRA proceedings. However, he states that claims 5, 10, and 14 were never raised in his PCRA proceedings. The Court disagrees with Petitioner's position and finds that these claims were, in fact, raised in Petitioner's *pro se* PCRA petition, *see* ECF No. 20-8 at 3, 7-8 (claim 5), 3 (claims 10 and 14), and they were addressed by the PCRA court in its opinion dated June 27, 1997, ECF No. 20-9 at 28-29. Indeed, in an earlier section of his Reply brief, Petitioner appears to admit that he did raise at least claims 10 and 14 in his *pro se* PCRA petition. *See* ECF 29 at 10-11.

With respect to claim 10, however, the Court agrees that the claim was never raised in the state courts insofar as it concerns the testimony of Estelle Pierce, who is the only individual identified in claim 10 of the Petition as a "crucial witness who would have not invoked her Fifth Amendment right not to incriminate herself." ECF No. 5 at 68. The claim raised in Petitioner's *pro se* PCRA petition that was addressed by the PCRA court alleged that counsel "failed to call witnesses to the stand who were willing to testify and who's [sic] testimony would have been great help to my defense." ECF No. 20-8 at 3, 8. The *pro se* PCRA petition, however, did not specifically identify Estelle Pierce as one of those witnesses. Nevertheless, this Court is somewhat perplexed by claim 10 because Estelle Pierce did testify for the defense at trial, and she did not invoke the Fifth Amendment. *See* N.T., 5/14/90, at 89-96.

The Court also agrees that claim 14 was never raised in the state courts insofar as it specifically concerns shoeprint evidence. The claim raised in Petitioner's *pro se* PCRA petition that was addressed by the PCRA court alleged that counsel failed to "properly investigate leads . . . that could have cast a major shadow of doubt on the prosecution's case." *Id*. at 3, 5-9. It did not, however, specifically mention shoeprint evidence.

[12] Due to "correspondences … received [by the court] from [Petitioner] which raised a question whether the [PCRA] Court had, in fact, a clear understanding as to what issues were to be decided[,]" ECF No. 20-9 at 3, the PCRA court considered both the claims raised in Petitioner's *pro se* PCRA petition in addition to the claims raised by counsel in the amended petition. *See id*. at 25-30.

Additionally, the Court finds that claims 4, 17, and 21-23 were never raised in the state court on either direct appeal or in Petitioner's PCRA proceedings.[13] Because state procedural rules would bar Petitioner from returning to state court to seek further review of these claims on their merits, these claims too are procedurally defaulted.

**2. Petitioner has not demonstrated cause and prejudice to overcome the procedural default of his claims.**

The majority of Petitioner's Reply brief is dedicated to addressing the procedural default of his claims, including addressing the applicability of the recognized exception of cause and prejudice. The Court will begin with an analysis of cause for which Petitioner maintains was not attributable to him and should therefore excuse the default of his claims.

Although never expressly conceded to by Petitioner in his Reply brief, it is clear to the Court that the cause of the default of claims 1-3, 5-14, 16, and 18-20, was the decision of Petitioner's attorney to not include these claims in his appellate brief to the Superior Court following the denial of relief by the PCRA court.[14] Petitioner contends that it was his desire for

[13] The Court notes that claims 21, 22, and 23 were raised in Petitioner's PCRA proceedings in terms of ineffective assistance of counsel (claims 11, 12 and 15, respectively), but only Petitioner's claim regarding Exhibit 205 (claim 15) was properly exhausted.

[14] As noted in the previous section, these claims were either raised in Petitioner's *pro se* PCRA petition, or in his counseled amended PCRA petition, and they were addressed by the PCRA court in its Opinion and Order dated June 27, 1997. Attorney Siford, the last attorney to be appointed in Petitioner's initial PCRA proceedings, and who remained his attorney of record on appeal, filed a docketing statement indicating ten issues to be raised on appeal. ECF No. 20-10 at 14-18. Ultimately, however, Attorney Siford raised only one claim in Petitioner's appellate brief. *Id*. at 20-25.

Two weeks after Attorney Siford filed his appellate brief, he moved to withdraw because he had been hired by the Blair County Public Defender's Office, which created a conflict with his representation of Petitioner. ECF No. 29-1 at 49-50. Attorney Probst was then appointed to

all of his claims to be considered on appeal, and he infers that his attorney was ineffective for "abandoning" all but only one of his claims. *See* ECF No. 29 at 29 (". . . Attorney Siford pursued only one claim on appeal to the Superior Court. His client had made clear that he wanted to pursue *all* claims."); *id*. at 24 (mentioning Attorney Siford's abandonment of "the many other claims that the post-conviction court ruled upon . . . ."); *id*. at 26 (same); *id*. at 41 (Attorney Siford "ineffectively abandoned" claims on appeal.). Whether counsel's choice to pursue only a single issue on appeal was the result of attorney error or a deliberate appellate strategy, the result is the same here. Under recognized Supreme Court precedent, such a situation does not establish cause that can be used to overcome the procedural default of a claim.

---

represent Petitioner. ECF No. 20-10 at 19. At the time Attorney Probst had been appointed, the entire record from the Court of Common Pleas, including transcripts, had already been transferred to the Prothonotary for the Superior Court, which she claimed prevented her "from reviewing [them] to determine if previous PCRA counsel had failed to adequately preserve any issues on appeal, and or whether there were other issues to be addressed in the present appeal." *Id*. at 35.

Approximately three months after she had been appointed, Attorney Probst filed a motion seeking to have the Superior Court remand the appeal to the Court of Common Pleas for further review, ECF No. 29-1 at 53-54, but the appellate court denied her request and proceeded to decide Petitioner's appeal on the briefs that had already been submitted by Attorney Siford and the Commonwealth. ECF No. 20-10 at 51-52 (stating that the "retention of new counsel does not, without more, necessitate remanding the record for further review" and noting that counsel's motion mentioned no basis for remand "other than a request to review the actions of Attorney Siford to determine if there are additional claims of ineffectiveness[,]" which does not warrant relief).

After the Superior Court issued its decision affirming the denial of PCRA relief, Attorney Probst sought reargument and or remand to allow her the opportunity "to review and address any properly preserved issues." *Id*. at 35. That request was also denied. *Id*. at 57. In her petition for allowance of appeal filed on behalf of Petitioner, Attorney Probst asserted claims of ineffectiveness on the part of trial counsel and all previous PCRA counsel, including Attorney Siford. ECF No. 29-1 at 57-65. That petition was denied. *Id*. at 111.

Under the cause and prejudice test, "cause" must be something *external* to the petitioner that cannot fairly be attributed to him. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). The Supreme Court has stated that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (quoting *Carrier*, 477 U.S. at 488). This rule has one limited qualification that was announced in *Martinez*. That is that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. That rule, however, does not apply here where the cause of Petitioner's procedural default of claims 1-3, 5-14, 16, and 18-20 was the alleged ineffectiveness of PCRA counsel on appeal. The Supreme Court has very clearly declined to expand the *Martinez* rule to the context of appellate counsel ineffectiveness stating that the equitable concerns addressed in *Martinez* simply do not apply to such claims. *Davila*, 582 U.S. at 534-35.

Presumably recognizing the non-applicability of the *Martinez* rule to these claims, Petitioner spends a significant portion of his Reply brief attempting to convince this Court that the procedural default of his claims should be excused because (1) the Pennsylvania Superior Court should have granted the request to remand that was filed by his second PCRA appellate counsel, Attorney Probst, so that she could further investigate any possible claims of ineffectiveness on the part of former counsel, and (2) at the time her request for remand was

filed, Pennsylvania courts were inconsistent and struggling with whether and how to allow for the litigation of PCRA counsel's ineffectiveness. Petitioner argues that had Attorney Probst's request for a remand been granted, then she

> could have amended the petition because it was not until years later that Pennsylvania courts required leave of court for amendments to a PCRA petition. For the claims that were raised in the PCRA court and then ineffectively abandoned on appeal, the remand would have allowed those claims to be resurrected and then exhausted on appeal. For the claims that had not been raised in the PCRA court, the remand would have re-vested jurisdiction in the PCRA court, which would have allowed for those claims to be raised there in the first instance.

ECF No. 29 at 40-41. Essentially, Petitioner argues that the "cause" of his procedural default was not Attorney Siford's choice to not include them in the appellate brief but was instead the Superior Court's failure to grant Attorney Probst's request to remand; and, he believes that had it done so, not only could Attorney Probst have raised additional claims before the PCRA court, but she also could have exhausted all of his claims on appeal.

Petitioner's speculation as to what would have occurred had Attorney Probst's request for a remand been granted is irrelevant and ignores the fact that the cause of the default at issue for claims 1-3, 5-14, 16, and 18-20 was very clearly Attorney Siford's election to forego the claims in Petitioner's appellate brief – something that is not external but rather is attributable to Petitioner under the law. Similarly, Petitioner's argument that, at the time Attorney Probst sought remand, Pennsylvania did not consistently apply the rule denying requested remands misses the mark. Petitioner argues that because Pennsylvania's rule was not a "firmly established and regularly followed" procedural rule, it is thus an inadequate ground to bar federal review. However, this argument assumes that the Superior Court *declined* to review Petitioner's

claims because of a procedural rule, but that is not the case.[15] The Superior Court did not invoke a procedural rule to decline review of the claims because the claims were never before it to review in the first place.

Because Petitioner has not demonstrated cause to meet the cause and prejudice exception, the Court finds that he has not overcome the procedural default of claims 1-3, 5-14, 16, and 18-20 under this exception.

Claims 4, 17, and 21-23 were never raised in the state courts. Additionally, to the extent claim 10 specifically concerns Estelle Pierce, it too was never raised in the state courts, and neither was claim 14 to the extent it specifically concerns an expert on shoeprint evidence. The Court will first address Petitioner's procedurally defaulted claims of prosecutorial misconduct (claims 17 and 21-23).

While Petitioner made several allegations of prosecutorial misconduct in his post-verdict motions, he did not raise the specific allegations of prosecutorial misconduct alleged in claims 17, 21, 22, and 23, nor did he pursue these allegations of misconduct on direct appeal or in a post-conviction collateral proceeding. Petitioner argues that the cause for the default of these claims was the ineffective assistance of PCRA counsel. However, as this Court has already

[15] The independent and adequate rule has no application here. It applies when the procedural default in question is due to the state court's refusal to review a claim due to a state procedural rule. In that case, "[t]he procedural default doctrine prohibits federal courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment." *Nara v. Frank*, 488 F.3d 199, 201 (3d Cir. 2007). State procedural rules are not independent, and will not bar federal habeas relief, if the state law ground rested primarily on federal law or is so "interwoven with federal law" that it cannot be said to be independent of the merits of petitioner's federal claims. *Coleman*, 501 U.S. at 739-40. A state rule is "adequate" if it is "firmly established and regularly followed." *Johnson v. Lee*, 578 U.S. 605, 606 (2016) (citation omitted).

explained, the ineffective assistance of PCRA counsel cannot serve as cause unless it falls under the *Martinez* exception, and *Martinez* applies only to underlying claims of ineffective assistance of trial counsel. As such, Petitioner fails to demonstrate cause under the cause and prejudice exception to excuse the default of his prosecutorial misconduct claims.

The Court will now turn to Petitioner's procedurally defaulted claims of ineffective assistance of trial counsel that were never raised in the state courts (claims 4, 10 and 14). Petitioner argues that the cause for the default of these claims was the ineffective assistance of PCRA counsel who he blames for failing to raise the claims in the counseled PCRA petition.

While the exception in *Martinez* arguably applies to these claims, the Court finds that the defaulted claims of trial counsel's ineffectiveness in claims 4, 10, and 14 are not "substantial." The Third Circuit has explained that a claim is "substantial" if it has "some merit." *Workman v. Supt. Albion SCI*, 915 F.3d 928, 937-38 (3d Cir. 2019). This requires Petitioner "'to show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should be resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Id*. at 138 (quoting *Miller-El*, 537 U.S. at 336). For the reasons discussed in footnote 16 in connection with Petitioner's actual innocence argument, the Court finds that Petitioner has not met his burden of demonstrating that his allegations involving David Riley's testimony in claim 4, Estelle Pierce in claim 10, and a shoeprint expert in claim 14, have "some merit." Therefore, Petitioner cannot satisfy the cause and prejudice exception to excuse the default of these claims, either.

**3. <u>Petitioner has not demonstrated a miscarriage of justice to overcome the procedural default of his claims.</u>**

Petitioner states that he is actually innocent of the charges of which he was convicted. Therefore, he argues that he has overcome the procedural default of his claims by satisfying the miscarriage of justice exception. The Court disagrees.

For the miscarriage of justice exception to apply, a petitioner must show "he is, in fact, innocent." *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). *Sweger v. Chensey*, 294 F.3d 506, 523 (3d Cir. 2022) ("actual innocence requires a showing of factual innocence, not mere legal insufficiency."). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 537-38 (2006) (quoting *Schlup*, 513 U.S. at 327).

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Schlup*, 513 U.S. at 329.

Removing the double negative, a petitioner's burden at the gateway stage is to demonstrate "that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. As this formulation makes clear, "actual innocence" is something of a misnomer, because "the *Schlup* standard does not require absolute certainty about the petitioner's

guilt or innocence" – that is, a petitioner need not make "a conclusive exoneration." *Id*. at 538, 553; *see also Schlup*, 513 U.S. at 327 ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard."). Thus, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Id*. at 331; *see House*, 547 U.S. at 553-54 (granting a gateway innocence claim despite acknowledging that "[s]ome aspects of the State's evidence . . . still support an inference of guilt"); *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (noting that the actual innocence standard "is less strict than the insufficient evidence standard").

Nevertheless, the Supreme Court has stressed that the *Schlup* standard is "demanding," *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013), and "that tenable actual-innocence gateway pleas are rare," *id*. at 386, arising only "in an extraordinary case," *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316). The actual innocence standard is designed to "ensure[ ] that petitioner's case is truly 'extraordinary' while still providing [a] petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

To be credible, a claim of actual innocence requires a petitioner to present "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. In assessing the adequacy of a petitioner's showing, "the habeas court must consider 'all the

evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28). Put another way, the innocence inquiry "requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Id.* at 539 (quoting *Schlup*, 513 U.S. at 328).

The Court has carefully considered the "new" evidence Petitioner has submitted in support of his claim of actual innocence that is set forth in his Reply brief. *See* ECF No. 29 at 164-202. However, notwithstanding questions as to the reliability of some of the evidence (i.e., David Houtz's recantation testimony and Estelle Pierce's "insider information"), the Court finds that the evidence is not so probative of Petitioner's innocence that no reasonable juror would have convicted him of the charged offenses.[16]

[16] The Court declines to address every argument contained in Petitioner's Reply brief with respect to his alleged actual innocence, but it will take this opportunity to make the following observations as to the "new" evidence Petitioner claims that the jury did not hear during the trial:

1. *Shoeprint evidence*: Petitioner has submitted a document titled "Forensic Footwear Examination Report" which is dated August 27, 2023, and authored by Alicia Wilcox, Ph.D., a forensic consultant specializing in pattern evidence who has been certified as a footwear examiner by the International Association for Identification since 2006. ECF No. 5-3 at 154-61. Dr. Wilcox states that she was provided with eight crime scene images and certain excerpts of Petitioner's trial transcript, specifically the direct examination of Detective Sassano and the closing argument of the prosecutor, District Attorney Haberstroh. *Id.* at 155. She was not provided with any physical evidence such as the victim's shoes or the carpet padding containing the partial shoeprint impression.

   Dr. Wilcox makes the following conclusion in her report: "The difference in the outsole design provides support for the proposition that a different item of footwear made the impression B on the carpet padding and weak support for the proposition that the victim's shoe made the questioned impression." *Id.* at 159. In other words, according to Dr. Wilcox, "there is support for source exclusion," meaning there is "support" for finding that the shoeprint was made by a different item of footwear than what the victim was wearing. *Id.*

However, she states that the photographs supplied to her were "not examination quality photographs," and that her "preliminary conclusions" would "need to be verified by another qualified footwear examiner." *Id*. at 156, 159.

Dr. Wilcox's report also contains her opinion of the statement made by Attorney Haberstroh in his closing argument at Petitioner's trial, wherein he stated that the shoeprint "matches Mr. Lascoli's shoe sole." *Id*. at 160. Dr. Wilcox reports that this statement is "not supported by the evidence in the case," because "a comparison of test impressions of the victim's shoes and impression B" was not carried out in this case. *Id*.

At most, Dr. Wilcox's report supports the conclusion that the Commonwealth perhaps misrepresented the footwear evidence in this case. It does not, however, support Petitioner's claim of innocence. It was the defense's theory that as many as eight individuals could have been inside the victim's house the night he was killed, and, even if Dr. Wilcox could have conclusively stated that the shoeprint did not belong to the victim, which she could not, this does not disprove Petitioner's involvement or presence at the scene.

2. *David Houtz's plea deal with the Commonwealth*: Petitioner submits that David Houtz's testimony that he did not have a deal with the Commonwealth in exchange for his testimony was a lie. ECF No. 29 at 165-66. Petitioner states that David Houtz's then-attorney confirmed via a letter to his attorney that "a deal with Assistant District Attorney Richard Consiglio had been reached at the preliminary hearing on February 7, 1990, about three months before [Houtz] testified against Petitioner. *Id*. at 166. Contrary to Petitioner's claim, the letter does not demonstrate that such a deal was, in fact, established at the time of David Houtz's testimony in Petitioner's case. Instead, the letter indicates that a plea was *offered* by Assistant District Attorney Consiglio at David Houtz's preliminary hearing, but "it was not actually entered into and signed by [David Houtz] until October 5, 1990." ECF No. 5-1 at 62. This is not inconsistent with David Houtz's testimony, N.T., 5/3/90, at 143, and appears to be consistent with the discussion held between counsel at side bar before his testimony, *id*. at 138.

Notwithstanding the above, the Court disagrees with Petitioner's statement that "[t]he jury did not hear that [David Houtz] had motivation to lie to stay out of prison." ECF No. 29 at 166. It was the defense's theory at trial that David Houtz, Petitioner's half-brother, was testifying untruthfully in order to cover for Tommy Bowling, who was his close friend and who allegedly had incriminating information on him. While the defense was unsuccessful in their attempts to admit evidence regarding the specific incriminating information Tommy Bowling allegedly had on David Houtz, which involved another homicide, N.T., 5/3/90, at 146-149, the jury did hear evidence of the close friendship between Tommy, David and Kim Hileman, and the jury also heard Kim testify that she knew "why" David Houtz took the bloody clothes out of her car and threw them up at Prospect Park, even though she was ultimately prevented from continuing to answer by a sustained objection. *See* N.T., 5/10/90,

at 179-180. Although David Houtz denied that Tommy Bowling had anything incriminating on him, N.T., 5/3/90, at 149, the jury could infer from his answer, and the other testimony given at trial, that Houtz had motive to lie.

3. *David Riley*: Petitioner attacks the testimony of David Riley and suggests that it was fabricated because of "serious criminal charges" pending against him when he testified at Petitioner's trial. ECF No. 29 at 166-67. He states that David Riley was arrested on four felony and misdemeanor charges two days before he testified in Petitioner's trial, and twelve days after his testimony he entered a plea in the Blair County Court of Common pleas to one count of simple assault. *Id*. Petitioner states that David Riley served no jail time and received a sentence of two years of probation when he could have been sentenced up to twenty years in prison. *Id*. at 167.

The fact that David Riley had pending criminal charges against him at the time he testified does not modify the reality that he was already set to be a witness for the Commonwealth before he was arrested on those criminal charges. Furthermore, David Riley's testimony was limited to a single issue and encompassed a mere six pages of a trial that spanned 21 days. It was far from being considered a focal point of Petitioner's trial. David Riley was simply one of many witnesses who connected the jams found in Prospect Park to Petitioner, and he testified that the reason the tag on the jams was marked with "F.R." was because he put it there in connection with his duties at the Blair County Detention Home on August 17, 1987.

Petitioner states that David Riley was not at the detention home when he arrived on August 17, 1987, and his testimony was therefore false. ECF No. 29 at 166. In support of this statement Petitioner submits a photocopy of an excerpt from the Blair County Detention Home logs. ECF No. 18-1 at 2. The document shows that someone named "Dave" went "out" of the facility at 12:05 a.m. on August 17, 1987, and it also shows that the "sheriff" came "in with Frankie" at 9:30 a.m. later that same day. *Id*. Assuming "Dave" is David Riley, Petitioner claims that this proves that David Riley was not at the detention home when he was admitted at the facility on August 17, 1987, and therefore he could not have written "F.R." on the jams as he testified to doing at trial. But the log does not prove that much. It is a single page and does not show any further activity that occurred beyond 9:30 a.m. when the sheriff came into the facility with Petitioner on August 17, 1987. Notably, that entry is the last entry on the last line of the page, but Petitioner does not provide the Court with the subsequent page of entries. David Riley could have entered the facility shortly after Petitioner, but, even if he did not, the log does not provide support for Petitioner's position that David Riley could not have written "F.R." on the jams in connection to Petitioner's admittance into the facility that day.

It was David Riley's testimony that when a juvenile is brought into the detention home, they are not allowed to wear their clothes for the first 24 hours, and the clothes that are with them are marked with a black magic marker and then washed. *See* N.T., 5/4/90, at 154. David

Riley testified that when he "was called in," he was "told to check Frank's clothes, to initial them and to start the wash. Then I was to go upstairs." *Id*. at 155. The log does not support Petitioner's claim that this could not have happened. At most, the log shows only that David Riley might not have been at the Blair County Detention Home between 12:05 a.m. and 9:30 a.m. on August 17, 1987, but that is not inconsistent with David Riley's testimony. His testimony was that he marked the jams and washed them, which, logically, would have been after Petitioner had already arrived at the facility and changed clothes. David Riley could have arrived after 9:30 a.m. and done this. Simply put, the log does not establish that David Riley was not at the detention home to have written the initials on the jams at any point in time after Petitioner was brought in at 9:30 a.m. on August 17, 1987.

4. *Estelle Pierce's insider information*: Petitioner states that Estelle Pierce was a "member of this circle" and had she testified she would have told the jury that, "[i]n the early hours of June 8, 1988, Tommy [Bowling] and Maria [Pierce, her sister], told Timmy [Bowling] and I to get rid of a bag of clothes. We were scared so we took the clothes to an empty apartment downstairs." ECF No. 5-3 at 149. She also states that "[w]hen the police started asking questions about the Lascoli murder, Tommy and Maria told us a story to tell them about us all being home watching a basketball game with Isabel Bowling. That wasn't true. Ms. Bowling never came over and she never watched basketball. We were not watching basketball that night." *Id.*

   In claim 10, Petitioner alleges that his trial counsel was ineffective for failing to "find" Estelle Pierce and have her testify because she was a "crucial witness" and she would not have invoked her Fifth Amendment right not to incriminate herself. The Court would again like to remind Petitioner that Estelle Pierce did actually testify as a witness at his trial, for the defense, a fact that Petitioner's counsel appears to have overlooked, as did Estelle Pierce herself. Estelle Pierce testified that she was sleeping that night because she was sick. N.T., 5/14/90, at 92-93. She did not testify that she was watching a basketball game with Isabel Bowling. Regardless, the information she states that she would have testified to would have only served to impeach the credibility of Tommy Bowling and Maria Pierce, two people whose credibility had already been attacked by other defense witnesses, including Kim Hileman. Her proposed testimony does not support a claim of actual innocence.

5. *Missing vial of Petitioner's blood*: Petitioner maintains that an inventory of evidence conducted on November 25, 1992, shows that a purple-topped tube of his blood "had disappeared" despite the tube of blood having been returned by Lifecodes to the Altoona Police Department in 1988. ECF No. 29 at 167. It is unclear what, if any, relevance Petitioner claims this had in light of the fact that the inventory of evidence was conducted well over two years after the evidence, including the tube of Petitioner's blood, had already been admitted at his trial, *see* N.T., 4/30/90, at 22 (Commonwealth's Exhibit 14). The inventory log merely shows that the tube of Petitioner's blood, along with over 35 other items of physical evidence, including a tube of the victim's blood, was not in the custody of

For example, the evidence does not call into question the central forensic proof connecting him to the crime, nor does it point to a different suspect. Nothing submitted by Petitioner establishes or even insinuates that he was not involved in the victim's killing, and, at most, it attacks the credibility of already incredible witnesses who testified at trial and suggests that other individuals could have been involved in the crimes along with Petitioner. This was the theory that was argued by the defense and supported by witness testimony and evidence that was admitted at Petitioner's trial. Indeed, despite the Commonwealth's theory, which was that Petitioner acted alone in killing the victim, the defense's theory was that it was not the work of one person, and this theory was apparently credited by at least one or more persons of the jury who found, as a mitigating factor at Petitioner's sentencing phase hearing, that due to circumstantial evidence, there was a possibility of someone else being involved.

Simply put, this is far from the type of rare and extraordinary case that supports a finding of the miscarriage of justice exception. The Court therefore finds that Petitioner has not sufficiently demonstrated an exception which would allow this Court to review his procedurally defaulted claims.

**B. Petitioner has not met his burden under the AEDPA with respect to claims 15 and 24.**

It is undisputed that claims 15 and 24 were properly exhausted because they were raised before the Superior Court and adjudicated on their merits. Because the claims were denied on the merits, this Court's review of them is very limited. It is not for this Court to decide whether

---

the Prothonotary of Blair County on November 25, 1992. ECF No. 5-1 at 42-46. It does not prove that this evidence had, in fact, gone "missing" as he claims, or that his blood was used in any nefarious way prior to its admission at trial. In short, it does not support a claim of innocence.

the state court decision was right or wrong. Rather, under AEDPA's standard of review, as codified in relevant part at 28 U.S.C. § 2254(d)(1), it is Petitioner's burden to show that the state court's adjudication was "contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States," or, as codified in relevant part at 28 U.S.C. § 2254(d)(2), was an "unreasonable determination of the facts in light of the evidence presented."

**1. Claim 15**

In claim 15, Petitioner argues that his trial counsel was ineffective for failing to object to Commonwealth Exhibit 205 going back with the jury during their deliberations in Petitioner's guilt phase proceedings. ECF No. 5 at 83-85. Exhibit 205 was Petitioner's admission form to the Blair County Detention Home dated August 17, 1987, which was approximately ten months before Mr. Lascoli was killed. N.T., 5/4/90, at 147-148; *see also* ECF No. 5-3 at 58-59. The form contains identifying information for the Petitioner, an inventory of his personal property, and indicates that, on that day, Petitioner was being admitted to the juvenile facility for the offense of "Robbery."[17] *Id*. at 58. The Commonwealth moved to admit the exhibit on May 10, 1990, and trial counsel objected stating, "I would like the record to reflect that I have an objection to the admission of a whole of that exhibit and submission to the jury. I think it has been understood at side bar that that question can be dealt with later." N.T., 5/10/90, at 19. The court responded by saying that it would "take up the question of what exhibits will be sent out to

[17] Prior to 1995, juvenile adjudications were inadmissible in subsequent criminal proceedings, so information pertaining to a prior robbery committed while Petitioner was a juvenile would have been inadmissible in the trial. *See Commonwealth v. Presley*, 686 A.2d 1321 (Pa. Super. 1996).

the jury and whether it will be necessary to do any didacting [sic] when it will be sent out later." *Id*. The court ultimately received the exhibits, including Exhibit 205, into evidence subject to the objections as noted. *Id*. at 21. When the time came to discuss which exhibits would not go back with the jury, on May 18, 1990, no further discussion was held on Exhibit 205, and counsel did not reassert his previous objection or request for redaction. N.T., 5/18/90, at 120-28.

In his counseled amended PCRA petition, Petitioner alleged that trial counsel was ineffective for failing to properly pursue the objection to Exhibit 205 being sent out with the jury and that counsel could not have had a strategic basis for failing to pursue the objection to the jury's having possession of the exhibit during deliberations. ECF No. 20-8 at 29.

At an evidentiary hearing held on March 21, 2003, which was approximately thirteen years after the trial, eight of the twelve jurors testified as to whether they had seen Exhibit 205 during their deliberations in the guilt phase of Petitioner's trial. Upon assessing their testimony and making credibility determinations, the PCRA court noted that it was "satisfied [that] none of the jurors could state with any degree of certainty that they had been exposed to this Exhibit during the guilt phase let alone that they were prejudiced by it if, in fact, they did see it." ECF No. 20-9 at 65. It stated that in the absence of "any credible evidence of the jurors having been exposed to the Exhibit, any suggestion of prejudice, or any actual prejudice," Petitioner was not entitled to relief on his claim that trial counsel was ineffective. *Id*.

On appeal, counsel for Petitioner argued that the PCRA court's findings regarding the jurors' exposure to the exhibit were "not supported by the record" because five of the eight jurors who testified at the PCRA hearing testified that they "had at least some recollection of it or information it contained." ECF No. 20-10 at 23. However, the Superior Court stated that it

would "not disturb the credibility assessments and conclusions . . . made by the PCRA court" because the record supported those determinations, and, as such, it thus affirmed the denial of PCRA relief. ECF No. 20-10 at 45.

Here, Petitioner first argues that the PCRA court's factual findings were not supported by the record, and because they were not supported by the record, he argues that the Superior Court's adjudication of the claim was based on an unreasonable determination of the facts in light of the evidence presented, thus meeting his burden under 28 U.S.C. § 2254(d)(2).

Because the Superior Court denied this claim, in large part, based upon the factual determinations made by the PCRA court, the two provisions of AEDPA that pertain to such findings by the state courts – § 2254(e)(1) and § 2254(d)(2) – will be discussed first.

As set forth above, the standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Titlow*, 571 U.S. at 18. "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El*, 537 U.S. at 340). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice*, 546 U.S. at 342 (reversing court of appeals' decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas

corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Wood*, 558 U.S at 301 (quoting *Collins*, 546 U.S. at 341-42).

Under section 2254(e)(1), this Court is bound by the credibility determinations and findings of fact that the PCRA court made unless Petitioner produces "clear and convincing evidence" that the PCRA court was wrong.[18]

Petitioner claims that the PCRA court's factual finding that no jurors could say with certainty that they had seen Exhibit 205 during guilt-phase deliberations "is not an accurate accounting of what happened at the hearing." ECF No. 29 at 205. This Court disagrees and finds that Petitioner has not met his burden under § 2254(e)(2) and (d)(2).

Petitioner cites to portions of the PCRA hearing transcript and documents he introduced at that hearing which he contends support his allegations, but that evidence does not amount to "clear and convincing evidence" required under § 2254(e)(1) to rebut the presumption of correctness that this Court must afford the PCRA court's findings of fact and credibility determinations.

Petitioner likewise has not demonstrated that the state court's adjudication of his claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Although there can be the rare case where

[18] Section 2254(d)(2) and (e)(1) "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." *Lambert*, 387 F.3d at 235. The Court of Appeals has instructed that § 2254(d)(2), when it applies, provides the "overarching standard" that a petitioner must overcome to receive habeas relief, while 2254(e)(1) applies to "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." *Id.*

"[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable [under § 2254(d)(2)] or that the factual premise was incorrect by clear and convincing evidence [under § 2254(e)(1)]" *Miller-El*, 537 U.S. at 340, this case is not one of them. This Court has reviewed the testimony given by the eight jurors at the PCRA hearing held on March 21, 2003, and it disagrees with Petitioner's characterization of the PCRA court's factual findings as being inaccurate. The PCRA court's factual findings are indeed an accurate account of what happened at that hearing. Specifically, while some of the jurors testified that they remembered seeing the exhibit, that it looked familiar, or that they recalled certain information that was included in the exhibit (like Petitioner's personal property), none of those jurors could state with any degree of certainty when it was that they saw the particular exhibit – during the guilt or sentencing phase. Most of the jurors, however, testified that they didn't really remember the exhibit at all. This Court thus finds that the state court's determination of the facts was reasonable.

This Court must now decide whether the state court's decision comported with clearly established federal law. Petitioner argues that the Superior Court's decision was contrary to clearly established federal law because it applied the incorrect prejudice standard when adjudicating his claim. He therefore maintains that he has met his burden under 28 U.S.C. § 2254(d)(1).

Here, the clearly established federal law implicated for Petitioner's claim of ineffective assistance of counsel is that which is set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right

to be represented by an attorney who meets at least a minimal standard of competence. *Id*. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Titlow*, 571 U.S. at 24.

Under *Strickland*, it is a petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *See, e.g.*, *Preston v. Sup't Graterford SCI*, 902 F.3d 365, 379 (3d Cir. 2018).

*Strickland* also requires that a petitioner demonstrate that he was prejudiced by counsel's alleged deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Here, the Superior Court stated that Petitioner had "failed to establish that, but for trial counsel's failure to properly pursue an objection to the presence of Commonwealth's Exhibit 205 in the jury room during deliberations on his guilt, the outcome of his trial would have been

different." ECF No. 20-10 at 45. Petitioner argues that this adjudication of his claim was "contrary to" *Strickland* because it required him to prove, in establishing prejudice, that the outcome of his trial "would have been different" but for trial counsel's alleged deficient performance, not whether, as stated in *Strickland*, there was a "reasonable probability" that the outcome of his trial "would have been different." 466 U.S. at 694.

If the Superior Court did in fact apply a more demanding prejudice standard than that required by *Strickland*, then its adjudication was "contrary to" *Strickland* under § 2254(d)(1) and this Court would have to review that prong of this claim *de novo*. *Williams*, 529 U.S. at 405-06. The Supreme Court has cautioned, however, that federal courts reviewing a state prisoner's habeas claim should not be too quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim. *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (per curiam) (finding the court of appeals' "readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state court decisions be given the benefit of the doubt."). This is particularly so when a commonly-applied and well-known inquiry such as the *Strickland* prejudice prong is at issue. *Id*. *Cf*. *Titlow*, 571 U.S. at 19 (observing how common ineffective assistance of counsel claims under *Strickland* are and that it is "a claim state courts have now adjudicated in countless criminal cases for nearly 30 years[.]").

In *Visciotti*, the Supreme Court pointed out that it too has stated imprecisely *Strickland*'s prejudice standard at points in some of its decisions, and it noted that the state court's shorthand reference to the *Strickland* standard that was not entirely accurate "can no more be considered a

repudiation of the standard than can this Court's own occasional indulgence in the same imprecision." 537 U.S. at 24 (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) and *Williams*, 529 U.S. at 393).

Petitioner has not convinced this Court that the Superior Court applied a more difficult prejudice inquiry than *Strickland* requires when it denied this claim. In the section of its opinion immediately before its discussion of the claim, it set forth the well-known and appropriate inquiry. ECF No. 20-10 at 44 ("Appellant must demonstrate: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, *there is a reasonable probability that the outcome of the proceedings would have been different*.") (citing *Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999) (emphasis added)). And, at the end of its analysis of the claim, it specifically stated that Petitioner had failed to meet the requirements of the *Kimball* test, which is consistent with the two-prong performance and prejudice test in *Strickland*.[19] *Id*. at 45. Reviewing the Superior Court's "opinion as a whole . . . [this Court] cannot find an 'affirmative indication' to rebut the presumption that the [state] court knew and followed the law." *Sawyer v. Sup't Muncy SCI*, 619 F. App'x 163, 170-71 (3d Cir. 2015). Because Petitioner did not

---

[19] Thus, this case is distinguishable from *Rogers v. Sup't Greene SCI*, 80 F.4th 458 (3d Cir. 2023), a case cited to by Petitioner in his Reply brief. In *Rogers*, the Third Circuit held that the Superior Court's adjudication of the petitioner's claim was "contrary to" *Strickland* because it applied the wrong prejudice standard. A review of the Superior Court's decision in *Rogers* shows that it never set forth the *Strickland* prejudice standard correctly in its decision and clearly applied the wrong standard. *Id*. at 464-65; *Commonwealth v. Rogers*, 2019 WL 3103863, at *4-5 (Pa. Super. Ct. July 15, 2019); *see also Williams v. Sup't Greene SCI*, 112 F. 4th 155, 169 (3d Cir. 2024) (the state court's adjudication was "contrary to" *Strickland* because it required the petitioner, in establishing prejudice to show a "'substantially greater' prospect for success,' [and, therefore,] demanded a higher standard than what *Strickland* requires[.]'").

demonstrate that the Superior Court's decision was "contrary to" *Strickland*, the next question for this Court in evaluating this claim is whether its decision withstands review under § 2254(d)(1)'s "unreasonable application of" clause. Petitioner, however, does not make any specific argument in his Petition or in his Reply brief that the state court's decision was an unreasonable application of *Strickland*. Nevertheless, the Court finds that there is no basis to conclude that the state court's adjudication of Petitioner's claim was an unreasonable application of the governing standards announced in *Strickland*. As such, Petitioner is not entitled to habeas relief on this claim.

**2. Claim 24**

Petitioner claims that his Fifth Amendment right against self-incrimination was violated "when the trial court erroneously refused to suppress statements that he made while in custody, uncounseled, and the focus of police investigation into Mr. Lascoli's homicide." ECF No. 5 at 108. The following background is relevant to this claim.

On June 10, 1988, two days after Mr. Lascoli's body was found, Petitioner was taken into custody pursuant to a bench warrant issued on the grounds that he was allegedly in violation of his juvenile probation. According to Detective Mitchell Cooper of the Altoona Police Department, who testified at Petitioner's preliminary hearing held on August 3, 1988, while he was at City Hall on June 10, 1988, he "observed that [Petitioner] had cuts on the left pinky finger and the left ring finger of his hand, those cuts being in the middle joint of those 2 fingers." N.T., 8/3/88, at 49. He testified that "[t]hey were slicing type cuts, the one on the pinky finger appeared to be more severe than the one on the ring finger." *Id.* Detective Cooper testified that he inquired as to how Petitioner had received the cuts because he "knew he was going to be

enroute to the detention home and they would be interested in those cuts since they were seeping and appeared to be fresh cuts." *Id*. at 51. He stated that Petitioner told him that "he had been fooling around with a knife with another friend of his identified as Thomas Bowling." *Id*. at 52. Detective Cooper testified that on June 10, 1988, Petitioner was not in custody for purposes of the Lascoli homicide, *id*. at 50, although when asked Detective Cooper was unable to state with any specificity when Petitioner became a suspect in the case, *id*. at 54.

The defense filed a motion to suppress Petitioner's oral statement made to Detective Cooper on June 10, 1988, and, at a hearing held on October 4, 1988, the court decided that it would wait and decide the motion after submission of memorandum of law by the defense and the Commonwealth.[20] N.T., 10/4/88, at 23-28. In an order dated November 10, 1988, the judge denied the motion to suppress.[21] A statement of facts and conclusions of law was not provided by the court until January 4, 1991. ECF No. 20-4 at 83-87.

At trial, Detective Cooper testified that due to the amount of blood at the scene of the Lascoli home, when he arrived on June 8, 1988, "there was a discussion as to the possibility of whoever was responsible for the act may have been injured also." N.T., 5/2/90, at 3. He was therefore asked to "check the two hospitals in the city of Altoona to attempt to determine if anyone had been treated at the hospitals for any type of injuries that may have been a result of cutting or some type of lacerations." *Id*. at 3-4. He went to both the Altoona Hospital and

[20] The Court was unable to locate in the physical state court record briefs that were submitted on this issue by the defense and the Commonwealth.

[21] The Court was able to locate this order in the physical state court record, but it does not appear that it was filed as an exhibit in this case by either Petitioner or the Respondents.

Altoona Mercy Hospital, but there were no reports "of anyone who had been cut or anything of that nature." *Id.* at 4.

Detective Cooper's testimony regarding Petitioner's statement made to him at City Hall on June 10, 1988, was then admitted over defense counsel's continuing objection. N.T., 5/2/90, at 4-5. Detective Cooper testified that on June 10, 1988, he took Petitioner into custody pursuant to a bench warrant issued on that day and brought him to City Hall. *Id.* at 5-6. He said that while at City Hall, he spoke to Petitioner about Mr. Lascoli because he had "received prior information that [Petitioner's] mother, Christine Houtz, had been an acquaintance of Mr. Lascoli." *Id.* at 6. Petitioner informed Detective Cooper that he knew Mr. Lascoli and had been at his house on several occasions with his mother. *Id.* He reported that he had last seen Mr. Lascoli sometime between 4 p.m. and 6 p.m. on June 7, 1988, at Petitioner's grandfather's house. *Id.* at 6-7.

When Detective Cooper was asked whether he had made any physical observations of Petitioner at City Hall on June 10th, he testified that as he was talking to him, he "noticed that [Petitioner] had two cuts on his left hand. There would have been a cut on this joint (indicating) of his left pinkie finger, as well as a cut on the left ring finger just slightly below the joint." *Id.* at 9. He stated that the cuts "appeared . . . to be of recent occurrence. The cut on his pinkie finger seemed to be somewhat more severe than the one on his ring finger. They were straight, slicing-type cuts on the finger." *Id.* at 11. He elaborated that they "were still open," and even though "they weren't bleeding, . . . they appeared to be seeping somewhat." *Id.* Detective Cooper testified that he told "individuals at the facility that [Petitioner] was going to about the cuts and that they should be looked at." *Id.* at 11-12. He also testified that Petitioner told him

that he received the cuts "a week earlier on Friday, June the 3rd" when he was "at the Pierce apartment and he was cutting a piece of cardboard, and Tommy Bowling started fooling around with him as he was using the knife, and the knife slipped causing the cuts on his hand." *Id*. at 12.

The following are the findings of fact and conclusions of law the trial court made with respect to the motion to suppress Petitioner's statements that he made to Detective Cooper on June 10, 1988:

**Findings of Fact**

1.

On June 8, 1988, the lifeless body of one Patsy Lascoli was discovered in his residence in the City of Altoona, Pennsylvania, the apparent victim of a homicide perpetrated by person, or persons, unknown.

2.

On June 10, 1988, the Defendant who was then subject to supervision by the Juvenile Probation Office of Blair County was taken into custody by Detective Mitch Cooper of the Altoona Police Department pursuant to the directive set forth in a bench warrant issued by the undersigned as a Judge of the Juvenile Court.

3.

The aforementioned bench warrant was issued by the Court based upon allegation by the Juvenile Probation Office that the Defendant was in violation of his probation.

4.

Upon apprehending the Defendant, Detective Cooper first took him to the Altoona Police headquarters where he noticed open cut wounds on two of the fingers of the Defendant's left hand.

5.

In the course of general conversation with the Defendant, Detective Cooper inquired as to how the Defendant had sustained the aforementioned finger wounds.

6.

In response to Detective Cooper's inquiries, the Defendant indicated that he had been "fooling around with a knife with another friend."

7.

The inquiry regarding the finger wounds was prompted by Detective Cooper's concern that information regarding those wounds would be needed by the staff at the Blair County Detention Home where the Defendant was to be lodged pursuant to the aforementioned bench warrant.

8.

At no time on June 10, 1988, was any "Miranda warning" provided to the Defendant and no responsible adult was present during the aforementioned conversation between Defendant and Detective Cooper.

9.

On June 10, 1988, the Defendant was not a suspect in the police investigation of the death of Patsy Lascoli and that investigation was in no way focused upon the Defendant. On June 10, 1988, the conversation between the Defendant and Detective Cooper was not designed nor intended by Detective Cooper to elicit information from the Defendant regarding the death of Patsy Lascoli.

10.

The custodial status of the Defendant on June 10, 1988, was in no way related to the investigation regarding the death of Patsy Lascoli.

**Conclusions of Law**

1.

The question propounded to the Defendant regarding the wounds on his hand was not related to the investigation regarding the death of Patsy Lascoli.

2.

The aforementioned question was not one intended to elicit from the Defendant any evidence or admission regarding criminal conduct of any kind.

3.

The Defendant was not entitled to be informed of "Miranda rights" under the circumstances existing on June 10, 1988, while he was in the custody of Detective Cooper.

4.

The oral statement provided by the Defendant on June 10, 1988, which is the subject of the instant suppression motion was provided by the Defendant freely and voluntarily and without duress of any kind.

> 5.
>
> The subject oral statement was not obtained in violation of any constitutional right of the Defendant nor in violation of any rule of criminal procedure nor any statute.
>
> 6.
>
> The Commonwealth has satisfactorily borne its burden of proof in this matter and no justification exists for the grant of the Defendant's suppression motion.

ECF No. 20-4 at 83-87.

Petitioner challenged the ruling by the suppression court on direct appeal, and the Superior Court found as follows:

> On the basis of the foregoing factual findings, the suppression court concluded, as a matter of law, that appellant was not entitled to notice of his *Miranda* rights and that the oral statement in question was not obtained in violation of any constitutional right. We agree with this ruling. *Miranda* warnings are necessary only when a suspect is undergoing actual custodial interrogation. *Commonwealth v. Fento*, 526 A.2d 784, 786 (1987), *allocator denied*, 538 A.3d 875 (1988). Our supreme court has defined "interrogation" as police conduct "calculated to, expected to, or likely to, evoke admissions." *Commonwealth v. Whitley*, 457 A.2d 507, 508 (1983). "[A]bsent any notion of interrogation, the statement is classified as a volunteered statement, gratuitous and not subject to suppression for lack of warnings." *Id*. In light of the suppression court's properly supported factual finding that the conversation between Detective Cooper and appellant was not designed nor intended to elicit an admission, we discern no error of law in the lower court's decision to refuse suppression of the challenged statement. [FN14]
>
> > FN14 We note that appellant has correctly argued that a determination of whether a juvenile has knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances. *Commonwealth v. Williams*, 475 A.2d 1283 (1984). The relevant circumstances include a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult. *Commonwealth v. Morningwake*, 595 A.2d 158, 160 (1991), citing *Williams*, *supra*. Although the preliminary hearing transcript documents the fact that appellant was not

> accompanied by an interested adult at the time he conversed with Detective Cooper, appellate counsel has not fully expanded this argument by stating appellant's age on the relevant date, and by discussing his experience and comprehension level at that time. We conclude, however, that appellant has not been prejudiced by these lacunae since the inquiry is simply not germane. Appellant was never subject to a custodial interrogation within the meaning of the relevant case law on June 10, 1988, and his *Miranda* rights therefore never attached. *See Commonwealth v. Witley*, *supra*; *Commonwealth v. Fento*, *supra*.

ECF No. 20-7 at 72-74.

Because this claim was adjudicated on the merits, the state court's decision is entitled to deference under AEDPA. In order to overcome AEDPA deference, Petitioner must establish that the state court's determination was "contrary to" clearly established federal law or reflected "an unreasonable application of" that law, or he must establish that the state court's determination was an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). "In doing so, the appropriate focus of habeas corpus review is the suppression hearing conducted in the state trial court and the findings of fact made by the court in denying the motion to suppress." *Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008) (citing *Schmidt v. Hewitt*, 573 F.2d 794, 798 (3d Cir. 1978)).

The clearly established federal law at issue here stems from *Miranda v. Arizona*, wherein the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). In *Miranda*, the Supreme Court stated that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into

custody or otherwise deprived of his freedom of action in any significant way." *Id.* To trigger *Miranda* safeguards, there must be both "custody" and "interrogation." Because the state court determined that Petitioner was not subject to a custodial interrogation, the question here centers on the latter.

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). The "functional equivalent" of interrogation includes "any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The Supreme Court has stated that "not . . . all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Id.* at 299-300. The functional equivalent of interrogation does not include any words or actions on the part of the police that are "normally attendant to arrest and custody[.]" *Id.* at 300-01. Additionally, the "police may not . . . be held accountable for the unforeseeable results of their words or actions." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (quoting *Innis*, 446 U.S. at 302) (cleaned up). To constitute an interrogation, officer conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300 (footnote omitted). Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.

In determining whether Petitioner was subjected to a custodial interrogation, the state court looked to the standards set forth in *Miranda* and its progeny, and it concluded that *Miranda* protections were not required because Detective Cooper's question to Petitioner regarding how he cut his hand was not related to the investigation into the death of Mr. Lascoli and was not

intended to elicit any evidence or admission regarding criminal conduct of any kind. ECF No. 20-4 at 86. The court additionally found that Petitioner provided his statement to Detective Cooper "freely and voluntarily and without duress of any kind." *Id*. The Superior Court ruled that the suppression court's factual findings were properly supported and therefore found no legal error.

According to Petitioner, the state court's finding that he "was not a suspect at the time of Detective Cooper's interrogation and that the interrogation was not custodial is an unreasonable determination of the facts in the state court record." ECF No. 5 at 113. He argues that because (1) "Detective Cooper was actively looking for someone with injuries consistent with a knife attack[,]" (2) the scene of the crime at Mr. Lascoli's home indicated that Mr. Lascoli was likely familiar with the perpetrator, and (3) Detective Cooper knew that Petitioner knew Mr. Lascoli personally and had been to his home, then it "was unreasonable for the state courts to find that [he] wasn't a suspect, especially after [Detective Cooper] noticed the 'seeping' cuts on [his] hands." *Id*. Petitioner claims that, at the very least, Detective Cooper "could and should have given [him] a *Miranda* warning once he saw those cuts." *Id*. He also claims that it was "unreasonable for the state courts to accept Detective Cooper's pretense for querying [him] about the cuts on his hands[,]" because the "issue does not turn on how police choose to characterize an interrogation or detention." *Id*. Finally, for all of these same reasons, Petitioner also argues that the state court's denial of this claim was contrary to clearly established federal law on custodial interrogations and *Miranda* rights. *Id*. at 113-14.

Here, the state court applied the correct standard derived from the clearly established law governing custodial interrogations, and its decision was neither contrary to nor an objectively

unreasonable application of that law. Therefore, Petitioner has not met his burden under 28 U.S.C. § 2254(d)(1). Additionally, despite Petitioner's arguments to the contrary, the state court's finding that he was not subject to an interrogation was not an unreasonable determination of the facts, and he has therefore not met his burden under 28 U.S.C. § 2254(d)(2), either. Simply put, Petitioner has not demonstrated an entitlement to relief on this claim.

**C. Certificate of appealability.**

AEDPA codified standards governing issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by the State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. Applying this standard here,

Petitioner has not made the requisite showing. Accordingly, a certificate of appealability will be denied. A separate order will be issued.

September 29, 2026

s/Cathy Bissoon
Cathy Bissoon
Chief United States District Judge

cc (via ECF email notification):
All Counsel of Record